**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.



FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE APR 1 2 2018
Fairhurst, CJ
CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on April 12, 2018

Susan L. Carl

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>CONNER MICHAEL SCHIERMAN,<br><br>Appellant. | NO. 84614-6<br><br>EN BANC<br><br>Filed   APR 1 2 2018 |

GORDON McCLOUD, J.—Conner Schierman was convicted of four counts of aggravated first degree murder and sentenced to death. He appeals his convictions and sentences on multiple grounds. For the reasons given below, we affirm all of his convictions. As further discussed below, a majority of this court also rejects Schierman's challenges to his death sentence.

However, I would hold that two critical, erroneous evidentiary rulings during Schierman's penalty phase proceedings require reversal of that death sentence. That would ordinarily require a remand for a resentencing hearing. I therefore go on to conduct our court's statutorily required proportionality review. I conclude that imposition of the death penalty on Schierman violates our state statutory guaranty

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

against disproportionate capital sentencing. For the reasons given in this opinion, I would reverse Schierman's death sentences and remand for imposition of the only statutorily permissible penalty: four consecutive sentences of life in prison without the possibility of parole.

## FACTS

On the morning of July 17, 2006, officials responded to a fire at the home of Leonid and Olga Milkin, a married couple. When firefighters eventually extinguished the flames, they found the bodies of Olga, Olga's sister Lyuba, and Leonid and Olga's two young sons, Andrew and Justin. The women's bodies appeared to have been undressed or partially undressed at the time of the fire. At the time of the fire, Leonid[1] was stationed overseas. An investigation revealed that someone had used accelerants to set the fire, and autopsies revealed that each victim had been stabbed to death before the fire began.

On the morning of the fire, witnesses observed someone who looked like the defendant, Conner Schierman, carrying a gas can in front of the Milkin home. Police contacted Schierman and observed that he had scratches and cuts on his face, head, and neck. Schierman told them that he had intervened in a domestic dispute in the early morning hours of July 17 and had been hurt in the process. Police subsequently

---

[1] First names are used when needed for clarity.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

discovered a videotape of Schierman filling a gas can at a nearby AMPM on the morning of the fire. Eventually, Schierman agreed to come to the police station, where he made three taped statements.

In his third statement, Schierman admitted to being in the Milkin home. He said that he woke up on the morning of July 17 covered in blood, lying in an upstairs bedroom in the Milkins' home and unable to remember how he had gotten there. He stated that he walked around the house, discovered the four bodies, showered and changed his clothes, and decided to burn down the house.

That statement to police was largely consistent with a later statement that Schierman made to defense expert Dr. Andrew Saxon. Schierman told Dr. Saxon that he started drinking in the early evening of July 16, continued drinking all evening, and went into an alcoholic blackout some time during that night. He said that he woke up bloody on a strange bed some time during the morning of July 17, and discovered a woman's body in a pool of blood. But Schierman also told Dr. Saxon that he moved the woman's body and continued to drink while he stayed in the house.

Eventually, forensic investigators discovered Schierman's DNA (deoxyribonucleic acid) in the Milkin home. Investigators also found a pair of gloves in the home, which a witness identified as belonging to Schierman. When Leonid was permitted to return to his house, he found a fire-damaged knife, which

3

he did not recognize, in the remaining debris. Police discovered that Schierman had purchased an identical knife several months earlier. Leonid also discovered a pair of men's shoes, recovered from an undamaged section of the basement. Schierman had purchased an identical pair the previous November. Finally, police also found three empty vodka bottles in a backpack in Schierman's bedroom.

The State charged Schierman with four counts of aggravated murder in the first degree and one count of arson in the first degree. Jury selection began on November 13, 2009, and the jury panel was seated two months later, on January 12, 2010.

The guilt phase of the trial lasted another three months. The defense conceded that Schierman committed arson, but argued that he panicked and set fire to the house to avoid being accused of murders that he did not commit. Schierman was convicted as charged. The penalty phase lasted almost one month; the jury voted to impose the death penalty.

The facts relevant to each of Schierman's assignments of error are summarized in the appropriate section below.

GUILT PHASE ISSUES

I.     Some of the Trial Court's Juror Eligibility Determinations Violated Schierman's Right To Presence (under the Sixth and Fourteenth Amendments and Article I, Sections 3 and 22); Any Error, However, Was Harmless

Schierman argues that two separate phases of juror selection violated his right to presence. The first phase to which he assigns error lasted from late September 2009 to mid-November 2009. During that time, counsel met with King County's jury services manager to review, and sometimes agree to, potential jurors' preliminary hardship excusal requests. Schierman was not present during these meetings.

The second phase of juror selection to which Schierman assigns error took place on January 12, 2010, the last day of voir dire. During this phase, counsel met with the trial judge in chambers, where counsel argued, and the judge ruled on, several for-cause juror challenges. Schierman was not present.

Schierman argues that excluding him from both phases violated his right to presence under the Sixth and Fourteenth Amendments to the United States Constitution, and article I, sections 3 and 22 of the Washington State Constitution. We conclude that he had no right to presence when his attorneys reviewed juror declarations in the nonadversarial setting of the jury administrator's office. We

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

conclude that he did have a right to presence during the hearing on for-cause challenges, but that the error does not require reversal. Because the facts concerning these proceedings are relevant to both the presence claim (discussed here) and the courtroom closure claim (discussed below), we describe those facts here.

### A. Facts

#### 1. Preliminary Excusals for Hardship (Late September to Mid-November 2009)

The documents in the record on this appeal show that in late September 2009, jury summonses were issued to 3,000 people, directing them to report for service on November 13, 2009. A summons recipient could respond by confirming that he or she would appear or by submitting a declaration that he or she was unqualified or unable to serve. The recipients were told that their responses were made under penalty of perjury. Judge Gregory Canova directed the jury services manager for King County, Gregory Wheeler, to review declarations of hardship with the prosecutor and defense counsel.

Per King County Superior Court's general policy, potential jurors could get hardship excusals for disability, age, a severe financial burden, or prior jury service, or because the potential juror was a single parent with young children not attending day care. Due to the anticipated length of Schierman's trial, it was also contemplated that jurors might be excused for reasons that normally warrant only a deferral, e.g.,

6

travel plans, employment, or school. Wheeler conducted a preliminary review of the potential juror responses and created two stacks of excusal requests: one for "those that were clearly meant to be excused per court policy" and one for "requests noting a hardship of a less-than-obvious nature." Clerk's Papers (CP) at 21347-48. He then met separately with the prosecution and defense regarding both categories of hardship request.

If everyone agreed that a declaration stated a "hardship" as defined by official court policy, Wheeler excused the potential juror without further review by the court. If the parties disagreed, Wheeler saved the disputed hardship request so that Judge Canova could review it at a hearing. This process went on between October 19 and November 6, 2009.

The particular proceedings from which Schierman claims he was excluded were the times when his lawyers, without the State's lawyers,[2] went to an administrative office in the courthouse to look at either hard copies of or a computer screen displaying summoned jurors' e-mailed hardship requests (for reasons not clear on this record, the screen could not be downloaded).[3] Schierman says that he

---

[2] It appears that the two sets of lawyers met with Wheeler at different times.

[3] The record does not contain any transcripts concerning the development or execution of this procedure. The documents are silent about these topics. Nor do we have anything to supplement our understanding of how this off-the-record review of paper and electronic documents was developed or carried out, since this is a direct appeal.

was never present at any of these early hardship excusal reviews or conferences. The State does not dispute that assertion. Schierman was present, however, at all the hearings over disputed hardship requests. Thus, there is no claim that Schierman was deprived of the right to presence at any court proceeding or at any noncourt adversarial proceeding. Instead, Schierman claims only that he was excluded from office visits where attorneys looked at a screen or papers for information. Appellant's Opening Br. at 17-18 ("The judge made it clear that he would not review the individual hardship requests if the parties were in agreement. . . . Schierman was never present when the attorneys *dealt with* these hardship requests." (emphasis added)).

Following this preliminary procedure, the venire was sworn, on the record, on November 13, 2009. On that day, prospective jurors completed the questionnaire "designed to let [them] tell the court and the lawyers about [themselves] and about [their] views on a variety of issues." Verbatim Report of Proceedings (VRP) (Nov. 13, 2009) at 9.

### 2. For-Cause Challenges in Chambers (January 12, 2010)

The record tells us quite a bit more about the challenges for cause conducted in chambers—with both sets of attorneys, the judge, and the court reporter, but without Schierman—than it tells us about what occurred during the preliminary hardship excusal reviews. The facts of the in-chambers challenges are as follows.

8

On January 11, 2010, the last day scheduled for voir dire, 70 potential jurors remained in the pool. At the end of that day, Schierman challenged six jurors for cause: Jurors 25, 44, 58, 76, 104, and 171. The court heard argument from both parties on those challenges, but deferred ruling so that the parties could further question the six jurors on the following day.

On the following day, the State questioned Jurors 25 and 58. When that questioning was over, Judge Canova stated, in open court, that he would rule "back in[] chambers" on a number of hardship and for-cause challenges to potential jurors:

> The next thing is that counsel and I are going to go with the court reporter briefly back into chambers, I'm going to rule on a number of requests for hardship that have been received by the court, I'm also going to rule on a number of challenges for cause that are before the court, that is, requests to excuse jurors for different reasons from counsel. That will take less than ten minutes, and at the conclusion of that I will advise all of you who have been excused, if anyone, and we will then proceed to have counsel exercise their peremptory challenges, that is the selection of the jury will follow.

VRP (Jan. 12, 2010) at 15-16.

The minute entry for that same day confirms:

Defendant and respective counsel present

Voir dire continues

Court and counsel meet in chambers re hardship and challenges

Court excuses # 424, 356, 265, 218, 172, 168, 130, 104, 79, 25 (and 208 separately)

9

> As counsel exercise written peremptory challenges, the Court preliminarily instructs and admonishes the potential jurors.

CP at 10402.

Following the judge's statement and the docket notation about meeting with "counsel" in chambers regarding challenges for cause, counsel from both sides went into chambers with the judge and the court reporter.[4] In chambers, the judge asked the State's position on jurors 25 and 58. The State opposed a for-cause challenge to both jurors. The judge nevertheless dismissed jurors 25 and 58 for cause because they indicated that they would hold it against Schierman if he did not testify. The defense also challenged jurors 76, 171, 104, and 44 for cause based on statements that they would not "consider alcohol as contributing to mental state or lesser mental state." VRP (Jan. 12, 2010) at 20. Judge Canova denied all four challenges because he did not think the jurors' statements indicated an inability to be "fair and impartial" jurors. *Id.* at 20-22. He also granted hardship requests to Jurors 49, 79, 130, 172, 265, 356, and 424. He denied hardship requests to Jurors 104, 168, 218, 267, and

---

[4] A written record was also made. The minute entry says that Schierman was present in the courtroom, but that "[c]ourt and counsel me[t] in chambers." CP at 10402. The last comment by the judge before the chambers conference was "With that, Counsel, if you'll please retire with me to chambers." VRP (Jan. 12, 2010) at 16. The State does not argue that Schierman was present at this proceeding.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

285. The judge, lawyers, and court reporter then went back out to the open courtroom, and the judge explained what had just occurred in chambers:

> The following jurors have been excused: Juror number 424, juror number 356, juror number 265, juror number 218, juror number 172, juror number 168, juror number 130, juror number 104, juror number 79, juror number 58, juror number 49, juror number 25. These jurors are not excused because of peremptory challenges. That will come later on this morning.

VRP (Jan. 12, 2010) at 42.

Ultimately, one of the six jurors to whom the defense raised (and lost) a challenge for cause in chambers, in Schierman's absence, did sit on Schierman's jury: Juror 76.

### B. Analysis

A criminal defendant has a right, under the due process clause of the Fourteenth Amendment, to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987); *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835 (1994) (*Lord* II). Article I, section 22 of Washington's Constitution also guarantees the right to "appear and defend in person."[5]

---

[5] This court has held that article I, section 22 "arguably" provides broader protection than the federal due process clause does. *State v. Irby*, 170 Wn.2d 874, 885 n.6, 246 P.3d

11

*State v. Schierman (Conner)*, No. 84614-6

We first address Schierman's right-to-presence challenge to the preliminary hardship determinations, and then his right-to-presence challenge to the for-cause juror challenges in chambers.

### 1. *Preliminary Excusals for Hardship (Late September to Mid-November 2009)*

The State argues that if excluding Schierman from the preliminary hardship conferences was error, it was not of constitutional magnitude and therefore may not be raised for the first time on appeal under Rules of Appellate Procedure (RAP) 2.5(a)(3).

RAP 2.5(a)(3) does not apply in its usual fashion on appeal of a death penalty case. This court has held that we apply this procedural rule more liberally in such cases, including to asserted guilt phase errors raised for the first time on appeal. *State v. Lord*, 117 Wn.2d 829, 849, 822 P.2d 177 (1991) (*Lord* I) (citing *State v. Jeffries*, 105 Wn.2d 398, 418, 717 P.2d 722 (1986)).

It is clear, however, that there is no constitutional right to presence at the noncourt, nonadversarial office visits to view juror declarations that are at issue here. Thus, regardless of whether we consider this claim on its merits or under RAP 2.5(a)(3)'s gatekeeping inquiry—which requires that an asserted error "clearly

---

796 (2011). It has also held that a claim under article I, section 22 must be examined separately from a claim under the due process clause of the Fourteenth Amendment to the United States Constitution. *Id.* at 885.

12

implicate[] a constitutional interest," *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015)—the claim fails.

In support of his argument that the constitutional right to presence attaches to preliminary hardship determinations, Schierman relies primarily on this court's decision in *State v. Irby*, which recognized a defendant's right to presence at *for-cause* eligibility determinations made *after* jurors submitted written answers to juror questionnaires. 170 Wn.2d 874, 884, 246 P.3d 796 (2011). Significantly, *Irby* explicitly distinguished those postquestionnaire determinations from preliminary hardship determinations, referring to the latter as "proceedings that courts have held a defendant does *not* have the right to attend." *Id.* at 882 (emphasis added).[6] In this respect, *Irby* is consistent with case law from other jurisdictions, which generally distinguishes between dismissals that are unrelated to the facts and issues in the

---

[6] The facts in *Irby* obscure this distinction somewhat: substantively, the specific dismissals at issue in *Irby* addressed both hardship (e.g., "77 has a business hardship") and cause ("36, 48, 49 and 53 had a parent murdered"), yet this court held that they were all part of "'the work of empanelling the jury.'" 170 Wn.2d at 878, 883-84 (quoting *Gomez v. United States*, 490 U.S. 858, 873, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989)). But crucially, the *Irby* majority based that holding on the fact that the e-mail exchange at issue occurred *after* the venire was sworn and the members completed their questionnaires, and on the fact that the e-mail exchange addressed some for-cause dismissals. *Id.* at 884 ("In Irby's case, 'the work of empaneling the jury' began on January 2 . . . [and] was ongoing when the trial judge e-mailed Irby's attorneys and the prosecutor about potentially dismissing 10 jurors, not only for hardship, but because 4 jurors had parents who had been murdered.").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

defendant's case (e.g., for schedule conflicts, illness, etc.), and dismissals that implicate facts and issues particular to the case (e.g., for bias, taint, etc.).[7] In this case, the process of defense lawyers reviewing juror declarations—in hard copy or electronic form—did not even rise to the level of a hardship excusal hearing. It was a preliminary review of documents, after which the lawyers advised the court about whether they even wanted a hearing. Thus, with respect to the review of declarations regarding preliminary hardship determinations, Schierman's right-to-presence claim does not implicate any constitutional interest.[8]

Finally, Schierman argues that even if a defendant's right to presence does not normally attach to preliminary hardship evaluations, it attached to the hardship evaluations here because they were conducted according to a special procedure.

---

[7] *See, e.g., City of Mandan v. Baer*, 1998 ND 101, 578 N.W.2d 559, 563-64 (before the prospective juror reports for service, court may excuse prospective juror for illness or hardship outside the defendant's presence); *Porter v. State*, 289 Md. 349, 358, 424 A.2d 371 (1981) (defendant has no right to presence at court's consideration of hardship excuses, since these are "unrelated to juror impartiality or disqualification"); *People v. Marks*, 152 Cal. App. 4th 1325, 1334, 62 Cal. Rptr. 3d 322 (2007) (defendant has a right to presence at proceeding to determine the *suitability*, though not the *availability*, of potential juror).

[8] Schierman does not argue that our state constitution is more protective of this right. This court has held that article I, § 22 is more protective than the Sixth Amendment in the context of a confrontation clause challenge, *State v. Martin*, 171 Wn.2d 521, 532, 252 P.3d 872 (2011), and the right to self-representation, *State v. Rafay*, 167 Wn.2d 644, 222 P.3d 86 (2009). But our case law on the right to presence during jury selection does not address any distinction between the state and federal constitutional right. *See In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 483-84, 965 P.2d 593 (1998); *Lord* II, 123 Wn.2d at 306.

Appellant's Opening Br. at 24-25. He seems to refer to the fact that Judge Canova separately reviewed any disputed hardship requests with the parties. *Id.* But Schierman was present any time the judge conducted such a review. He was absent only from his own lawyers' meetings with an administrator to review documents.

*2. For-Cause Challenges in Chambers (January 12, 2010)*

Schierman next argues that his right to presence was violated when, in his absence, counsel argued and the court ruled on several for-cause juror challenges.

a. Preservation of error

Under *Irby*, the constitutional right to presence clearly attaches to for-cause challenges during voir dire. 170 Wn.2d at 883-84. The State does not dispute this.

Instead, the State argues that even if an "error affecting a constitutional right" occurred here, this error was not "manifest" within the meaning of that rule. RAP 2.5(a)(3). We disagree. As noted above, RAP 2.5(a)(3) does not apply in is usual fashion in a death penalty case. *Lord* I, 117 Wn.2d at 849 (citing *Jeffries*, 105 Wn.2d at 418). But even if it did, its prerequisites are satisfied in this instance.[9] In order to show that an error is "manifest" under RAP 2.5(a)(3), Schierman must make "a 'plausible showing . . . that the asserted error had practical and identifiable consequences in the trial of the case,'" meaning that "'given what the trial court

_____

[9] We note that the State did not raise RAP 2.5(a)(3) in our prior case addressing the right to presence at juror eligibility determinations. Consequently, that case does not discuss the rule's application in that context. *See Irby*, 170 Wn.2d at 885-86.

15

knew at the time, the court could have corrected the error.'" *Kalebaugh*, 183 Wn.2d at 584 (quoting *State v. O'Hara*, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009)). The error in this case meets that standard: the trial judge should have known not to hold for-cause challenge arguments in the defendant's absence, and he could easily have heard those arguments from the bench instead. Thus, the record is sufficient to allow us to determine the merits of Schierman's claim. *O'Hara*, 167 Wn.2d at 99 ("'If the facts necessary to adjudicate the claimed error are not in the record on appeal, . . . the error is not manifest.'" (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007))).

b. Merits

We conclude that the trial court committed constitutional error in excluding Schierman from the discussion and rulings on six for-cause challenges. *Irby*, 170 Wn.2d at 884-85 (defendant's absence from a "portion of jury selection" violated constitutional right to presence); *State v. Slert*, 181 Wn.2d 598, 609, 334 P.3d 1088 (2014) (plurality opinion) (remanding for Court of Appeals to determine whether violation of right to presence under *Irby* was harmless beyond a reasonable doubt), *rev'd*, 186 Wn.2d 869, 383 P.3d 466 (2016).

The State argues that Schierman had no right to presence at the in-chambers proceeding because that proceeding "[did] not require a resolution of disputed facts." Br. of Resp't at 36. It contends that for-cause challenges are strictly "'legal matters'"

16

to which the right to presence does not attach. *Id.* (quoting *Lord* II, 123 Wn.2d at 306).

We disagree. For-cause challenges are not strictly legal arguments (to which a defendant arguably cannot contribute), but involve a factual component. They require the court to scrutinize jurors' answers and behavior for indications of bias that may be subtle. Federal precedent in other contexts supports this view. *E.g.*, *Uttecht v. Brown*, 551 U.S. 1, 9-10, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007) (in determining whether juror can be impartial, the trial court must evaluate juror's demeanor; this judgment is entitled to deference). We hold that the trial court erred when it heard for-cause challenges outside Schierman's presence.

c. Harmless error

In *Irby*, this court *presumed* prejudice stemming from the right-to-presence violation at issue; accordingly, it placed the burden on the State to show that "the jurors who were excused in [the defendant's] absence . . . had no chance to sit on [the] jury." 170 Wn.2d at 886. In adopting this test, *Irby* departed substantially from both federal constitutional law and our state precedent on the right to presence. Prior to *Irby*, this court did not place exactly the same burden on the State. *E.g.*, *State v. Caliguri*, 99 Wn.2d 501, 509, 664 P.2d 466 (1983). Instead, before we applied constitutional harmless error analysis to a violation of a defendant's right to

17

presence, we required the defendant to "first raise *at least the possibility of prejudice*." *Id.* (emphasis added).

Schierman contends that we should apply *Irby*'s presumption of prejudice (even absent "at least the possibility of prejudice") in this case, but the relevant facts in *Irby* are considerably different from the facts at issue here. *Irby*, 170 Wn.2d at 886. In *Irby*, counsel considered prospective jurors' answers to written questionnaires and then, without consulting the defendant, agreed to dismiss several jurors without further questioning—some for hardship and some for cause. *Id.* at 877-78. Thus, in *Irby*, the defendant had absolutely no opportunity to "'give advice or suggestion'" on this portion of the jury selection process. *Id.* at 883 (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 106, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled in part on other grounds by Malloy v. Hogan,* 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)). Nor did he have any way of determining, after the fact, how the excused jurors' "alleged inability to serve [might have been] . . . tested by questioning in [his] presence." *Id.* at 886. In that circumstance, it makes sense to burden the State with proving that even absent the constitutional violation, no excluded juror could have been seated. To put this another way, it does not make sense to burden the defendant with proving the unknowable.

This case is different. Here, Schierman was present for all of the juror questioning—thus, he was present when counsel "tested" these jurors' eligibility to

18

serve. *Id.* He also knew about the in-chambers argument in advance and raised no objection to its occurrence. In this respect, Schierman's absence from the in-chambers hearing is distinguishable from the facts in *Irby* and all of the authority on which that decision relied.[10] Instead, it is more similar to the situation in *Slert*, where such facts militated in favor of finding any error harmless. 186 Wn.2d at 875-76 (factual differences from *Irby* compelled a conclusion different from the conclusion in *Irby*).

Further, Schierman does not specifically allege any prejudice resulting from the error here. Nor is any prejudice evident from the record. As noted above, the two jurors who were excused after the for-cause challenges (jurors 25 and 58) were both excused at the defendant's behest. And of the four jurors whom the defense challenged *unsuccessfully*, only Juror 76 ultimately sat on Schierman's jury. Schierman does not explain how defense decisions on peremptory challenges were handled. Thus, although we conclude that the trial court erred in hearing for-cause challenges outside Schierman's presence, on this record we find the error harmless.

---

[10] *Id.* at 883 (citing *Commonwealth v. Owens*, 414 Mass. 595, 600-02, 609 N.E.2d 1208 (1993) (error to exclude defendant from sidebar voir dire in which judge asked whether the defendant's race would affect the potential juror's deliberation, whether the potential juror would give relatively more weight to the testimony of a police officer, whether the potential juror would have difficulty rendering an impartial verdict in a case involving drugs and guns, and whether the potential juror would prefer not to sit on the jury) and *United States v. Gordon*, 264 U.S. App. D.C. 334, 829 F.2d 119, 124 (1987) (error to exclude defendant from entire voir dire)).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner)*, No. 84614-6

II.    Conducting Certain Juror Eligibility Determinations in a Closed Proceeding Implicates the Right to a Public Trial (under the Sixth Amendment and Article I, Section 22); the Closure in This Case, However, Was De Minimis and Thus Does Not Warrant Reversal

Schierman argues that his right to a public trial, under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, was violated when counsel met privately with the jury services manager to make preliminary hardship excusal determinations (from late September 2009 to mid-November 2009). He also argues that his public trial right was violated when counsel challenged several jurors for cause in chambers on the final day of voir dire (January 12, 2010). He asserts that the remedy for each error is reversal of his convictions.

A. Preliminary hardship determinations

*1. Facts*

The preliminary hardship excusal determinations are described in Section I.A.1 above.

*2. Analysis*

We recently held in *State v. Russell* that the public trial right does not attach to "work sessions" in which attorneys, parties, and the court "review juror questionnaires for hardship." 183 Wn.2d 720, 730-32, 357 P.3d 38 (2015). We explained that hardship determinations—which decide "whether a juror is able to

20

serve at a particular *time* or for a particular *duration*"—differ fundamentally from peremptory or for-cause challenges—which determine a particular juror's ability to serve as a neutral factor in a particular *case*. *Id.* at 730. And we concluded that hardship determinations do not implicate the concerns underlying the public trial right, at least where no juror was excused for hardship without further (on-the-record) proceedings unless all parties agreed. *Id.* at 731.

The preliminary hardship determinations in Schierman's case were identical in all relevant respects to the work sessions in *Russell*. Thus, *Russell* controls and Schierman's public trial right challenge to these determinations fails—regardless of whether we hold that the error was not preserved for review or the closure does not constitute error.

### B. For-cause challenges

#### 1. Facts

The in-chambers juror challenges for cause are described in Section I.A.2 above.

#### 2. Analysis

##### a. Preservation of error

As discussed in Section II.A.2.a above, a claim of courtroom closure can be raised for the first time on appeal.

b. Merits

The State argues that the public trial right does not attach to the proceeding at issue here—a proceeding that entailed both arguments and rulings on for-cause juror challenges. It contends that the public trial right attaches to juror questioning, but not to counsel's for-cause challenges or the trial court's rulings thereon. In support of that argument, the State asserts that the proceeding at issue here was "functionally a sidebar." Br. of Resp't at 54-55.

We reject this argument and reaffirm that the public trial right attaches to juror challenges and the rulings thereon. We recently reiterated that it is "'well settled that the right to a public trial . . . extends to jury selection,' and . . . reaffirm[ed] that the right attaches to . . . for cause and peremptory challenges." *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015) (first alteration in original) (citation omitted) (quoting *State v. Brightman*, 155 Wn.2d 506, 515, 122 P.3d 150 (2005)). It necessarily follows that the right to a public trial extended to the hearing on for-cause challenges in this case.

As we have explained in numerous recent cases, the public trial right attaches to proceedings that have historically occurred in open court and that implicate "the core values" underlying that right. *State v. Sublett*, 176 Wn.2d 58, 72, 292 P.3d 715 (2012) (plurality opinion). These values include "'ensur[ing] a fair trial, . . . remind[ing] the prosecutor and judge of their responsibility to the accused and the

22

*State v. Schierman (Conner)*, No. 84614-6

importance of their functions, . . . encourag[ing] witnesses to come forward, . . . discourag[ing] perjury,' . . . promot[ing] confidence in the judiciary,"[11] and providing an outlet for the public's "concern, outrage, and hostility."[12] Juror challenges plainly implicate several of these values. These challenges and rulings can reflect racial, ethnic, and other forms of bias in jury selection. *See Davis v. Ayala*, __ U.S. __, 135 S. Ct. 2187, 2194-95, 192 L. Ed. 2d 323 (2015); *Batson v. Kentucky*, 476 U.S. 79, 83, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Conducting them in open court, where the public can monitor the parties' use of challenges, thus contributes to the fairness of the proceedings and promotes confidence in the judiciary. This is perhaps never more important than in a contentious, notorious criminal case like this one, where community "concern, outrage, and hostility" are at their highest.[13] When a proceeding has historically occurred in public and implicates these values, it is not a "sidebar."[14]

---

[11] *In re Det. of Morgan*, 180 Wn.2d 312, 325, 330 P.3d 774 (2014) (quoting *Sublett*, 176 Wn.2d at 72 and citing *State v. Momah*, 167 Wn.2d 140, 148, 217 P.3d 321 (2009)).

[12] *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 13, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986).

[13] *Id.*

[14] *State v. Smith*, 181 Wn.2d 508, 516 n.10, 334 P.3d 1049 (2014) (holding that "merely characterizing something as a 'sidebar' does not make it so," and explaining that a proceeding is not a sidebar if it triggers the public trial right under the experience and logic test).

23

Consistent with these principles and with our opinion in *Love*, we hold that the public trial right attached to the proceeding at issue here. The trial court therefore erred when it heard and ruled on six for-cause juror challenges in a closed proceeding.

In addition to arguing that the public trial right did not attach to the proceeding in question, the State argues in the alternative that any error in closing the for-cause challenges was de minimis, "so insignificant that it does not rise to the level of a constitutional violation." Br. of Resp't at 57. This kind of error occurs when a closure *implicates* the values underlying the public trial right—when it involves proceedings to which that right attaches—but does not *undermine* those values to an extent that warrants the remedy of automatic reversal. *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996).

This argument presents us with a question of first impression. To be sure, we have rejected de minimis arguments in past cases. And one such case, *State v. Shearer*, contained broad dicta purporting to completely reject "the possibility of de minimis violations" of the public trial right under any circumstances. 181 Wn.2d 564, 573, 334 P.3d 1078 (2014) (plurality opinion). But we have in fact never considered a de minimis error argument as applied to a proceeding like the one at issue here: a proceeding that involved no witness testimony, no questioning of potential jurors, and no presentation of evidence. Instead, all of our cases rejecting

24

that argument involved the determination of facts behind closed doors. *State v. Frawley*, 181 Wn.2d 452, 455-58, 334 P.3d 1022 (2014) (plurality opinion) (individual jurors questioned in chambers); *Shearer*, 181 Wn.2d at 567-68 (individual jurors questioned in chambers); *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 161, 288 P.3d 1140 (2012) (plurality opinion) (individual jurors questioned in chambers); *State v. Paumier*, 176 Wn.2d 29, 33, 288 P.3d 1126 (2012) (individual jurors questioned in chambers); *State v. Wise*, 176 Wn.2d 1, 7, 288 P.3d 1113 (2012) (individual jurors questioned in chambers); *State v. Strode*, 167 Wn.2d 222, 224, 217 P.3d 310 (2008) (plurality opinion) (individual jurors questioned in chambers); *State v. Easterling*, 157 Wn.2d 167, 172, 137 P.3d 825 (2006) (pretrial motions to sever and dismiss closed so counsel could discuss "specifics" that he was reluctant to discuss in open court); *Brightman*, 155 Wn.2d at 510-11 ("'first two or three days'" of jury selection, including juror questioning, closed to the public); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 801-02, 100 P.3d 291 (2004) (entire voir dire process closed to the public); *State v. Bone-Club*, 128 Wn.2d 254, 256-57, 906 P.2d 325 (1995) (pretrial suppression hearing closed).

This distinction matters to the public trial right analysis. As explained above, the proceeding at issue here implicated several of the concerns underlying the right to a public trial: public jury selection (including for-cause challenges) contributes to oversight of the lawyers and the judge, reminding them of the significance of their

25

*State v. Schierman (Conner)*, No. 84614-6

duties and serving as a check on their biases; promotes confidence in the judiciary; and serves as an outlet for community concern. *See In re Det. of Morgan*, 180 Wn.2d 312, 325, 330 P.3d 774 (2014); *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 570, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980)). But because that proceeding involved no juror statements, witness testimony, or presentation of evidence, another purpose underlying the public trial right is not implicated: "'discourag[ing] perjury." *Morgan*, 180 Wn.2d at 325 (quoting *Sublett*, 176 Wn.2d at 72). Nor is it clear how arguing the for-cause challenges in public could have encouraged any witnesses to come forward. *See id*. Thus, unlike the closures we have held to be reversible error in the past, the closure at issue here—although error—did not fundamentally taint the process by which the court established the facts necessary to assemble the jury or decide the case. *Cf. Wise*, 176 Wn.2d at 18 (granting the remedy of a new trial for the erroneous closure of a portion of voir dire because "[h]ere, we cannot know what the jurors might have said differently if questioned in the courtroom").

To properly address this kind of error, we must strike a careful balance.

On one hand, we must craft a rule that avoids the outcome warned against in Justice Stephens's concurrence/dissent: the conflation of specific procedural rights with a vague right to fundamentally "'fair'" proceedings. Concurrence/dissent at 17

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 145, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006)). The temptation created by that approach, to excuse procedural violations as harmless after the fact, leads predictably to the result that procedural rights become entirely unenforceable. We agree with the concurrence/dissent that this outcome poses unacceptable risks to our system of justice, and that certain de minimis analyses from other jurisdictions exemplify this problem. *E.g.*, *Gibbons v. Savage*, 555 F.3d 112, 114, 121 (2d Cir. 2009) (holding closed proceeding in which potential jurors were questioned about their impartiality was de minimis violation); *United States v. Al-Smadi*, 15 F.3d 153, 154-55 (10th Cir. 1994) (holding that 20-minute closure of trial was de minimis solely because it was inadvertent). We stress that our current precedent, which today's decision does not disturb, forecloses the possibility of de minimis violations involving juror questioning or witness testimony.

On the other hand, we must also avoid enforcing the public trial right in a manner so rigid and mechanistic that we do more harm than good to the values underlying that right. The rule contemplated by *Shearer*'s dicta, which purports to preclude the possibility of de minimis error under any circumstances, would result in that harm, for two reasons. First, a rule requiring automatic reversal for every erroneous closure, no matter how inconsequential to the ultimate fairness of the trial, is more likely to diminish than promote public confidence in the judiciary. This is

27

no doubt why the United States Supreme Court has held that where the public trial right is concerned, "the remedy should be appropriate to the violation." *Waller v. Georgia*, 467 U.S. 39, 50, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984).[15] Second, a rule that completely forecloses the possibility of de minimis violations will often force appellate courts to choose between two undesirable outcomes: on one hand, a reversal that is a clear windfall for the defendant and waste of resources for everyone else; on the other, a holding that the public trial right does not attach at all to the proceeding in question. The policy implications of such a rule are troubling: it creates an incentive for appellate courts to find more and more proceedings exempt from Sixth Amendment and article I, section 10 protections altogether. This is no doubt why there is no jurisdiction we are aware of that has adopted a rule completely rejecting the doctrine of de minimis closures.

In light of these competing concerns, we hold that the doctrine of de minimis error can apply to the proceeding at issue in this case, which involved no juror

---

[15] *Waller* shows that sometimes even structural errors do not warrant the remedy of a new trial. 467 U.S. 39. There, the United States Supreme Court held that the closure of a seven-day preliminary suppression hearing was a constitutional error and that the defendant "should not be required to prove specific prejudice in order to obtain relief." *Id.* at 49. But it also denied the remedy of a new trial. Instead, the Court remanded for a new suppression hearing and ordered a new trial only if the second, *public* suppression hearing resulted in the exclusion of evidence admitted in the first trial. *Id.* at 50. Thus, *Waller* illustrates the fact that a new trial is not always the remedy for the structural error of courtroom closure. *See also Weaver v. Massachusetts*, ___ U.S. ___, 137 S. Ct. 1899, 1909, 198 L. Ed. 2d 420 (2017) (noting that *Waller* did not grant the remedy of a new trial "despite the structural aspect of the violation").

questioning, witness testimony, or presentation of evidence. We also hold, for the reasons given below, that the closure at issue here was a de minimis error and therefore does not warrant the remedy of automatic reversal.

As noted above and elaborated in Justice Yu's concurrence/dissent, the de minimis error inquiry asks to what extent the particular closure in question undermined the values furthered by the public trial right. *Peterson*, 85 F.3d at 43. While this inquiry is necessarily case specific, courts applying it have considered the length of and reason for the closure (e.g., whether it was inadvertent), *Brightman*, 155 Wn.2d at 517 (collecting cases); the substance of the closed proceedings, *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003); and whether that substance was contemporaneously transcribed or timely memorialized in open court, *Peterson*, 85 F.3d at 43.

In this case, the closure was brief and, although it was not inadvertent, it was also not objected to. While a defendant need not object to a courtroom closure in order to preserve the issue for direct appeal, the lack of objection is some indication that the trial remained fundamentally fair. *Accord Weaver v. Massachusetts*, ___ U.S. ___, 137 S. Ct. 1899, 1910, 198 L. Ed. 2d 420 (2017) (erroneous courtroom closure does not necessarily compromise the fundamental fairness of a trial). As discussed at length above, the proceeding at issue here involved no factual determinations and thus did not implicate the purposes of the public trial right relating to the

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

establishment of critical facts. And finally, the proceeding was simultaneously transcribed and then immediately memorialized again in open court. VRP (Jan. 12, 2010) at 41 ("Now that everyone is back, I'm going to read off the numbers of jurors who have been excused at this point."). These measures, while not a substitute for real-time public observation, certainly served to remind the court and counsel of their responsibilities and provide a check on possible bias, thereby ensuring the fairness of the proceedings.

The remaining purposes of the public trial right are to promote public confidence in the judiciary and ensure an outlet for community emotions. Public confidence in—or, for that matter, basic understanding of—the judiciary would not be well served if counsel routinely examined jurors in public but then retired to chambers to characterize and argue about these jurors' expressions, answers, and demeanor. And real-time observation is certainly a better outlet for community "concern, outrage, and hostility," *Press Enter.*, 478 U.S. at 13, than review of a cold record is. But in this case, the 10-minute meeting in chambers, which was contemporaneously memorialized and publicly announced immediately afterward, and occurred without testimony and without objection, cannot be said to have meaningfully undermined public confidence or participation in the judicial system. Indeed, it is more realistic to say that reversing four convictions for aggravated murder resulting from a months-long trial on the basis of a 10-minute in-chambers

discussion—which the parties apparently agreed to and which resulted in no testimony, no evidence, and no secrets—would be more likely to diminish public confidence in the judiciary.

For these reasons, we adopt a limited de minimis exception to our rule of automatic reversal for all violations of the public trial right. We reject *Shearer*'s dicta foreclosing the possibility of de minimis violations altogether, and we hold that the 10-minute closure at issue here—to which there was no objection and which involved no juror questioning, witness testimony, or presentation of evidence, and was simultaneously transcribed and immediately afterward memorialized in open court—was a de minimis violation of the right to a public trial.

III. The Trial Court Did Not Violate Schierman's Right to Counsel under the Sixth Amendment or Article I, Section 22 When It Excused Approximately 100 Jurors for Hardship and Two Jurors for Age-Related Reasons

Schierman argues that his right to counsel under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution was violated when a defense paralegal agreed to the excusal of approximately 100 prospective jurors for hardship. He also argues that his right to counsel was violated when the jury coordinator excused two jurors for age-related reasons. We reject both of these challenges.

A. Facts

*1. Hardship excusal of approximately 100 jurors after consultation with paralegal*

On October 19, 2009—the first day on which Wheeler (the jury services coordinator) reviewed hardship requests with counsel—a defense paralegal from Connick's office came to the courthouse and met with Wheeler. Wheeler believed that the paralegal was an attorney from defense counsel's office, although the paralegal did not actually state that she was an attorney. Wheeler told the paralegal that the State did not object to granting hardship requests for approximately 100 individuals. The paralegal agreed that those individuals could be excused on behalf of the defense. Wheeler excused the 100.

Approximately 30 minutes later, Connick found out what his paralegal had done and e-mailed the court that there had been a mistake. The e-mail stated that the defense did not agree to the dismissals. By that time, however, the court had already dismissed the 100 jurors.

On October 20, 2009, the trial court held an in-chambers conference to address the issue. At the conference, Connick was, according to the court, "quite candid in acknowledging that it had been his mistake in communicating with his paralegal." VRP (Oct. 28, 2009) at 7. Defense counsel gave "no indication that the defense was

32

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

planning to pursue any remedy, to the extent there might be one, for the mistake."

*Id.*

### 2. *Jury coordinator's excusal of two jurors for age-related reasons*

On Friday, October 16, 2009, jury coordinator Patricia Rials sent an e-mail to Wheeler informing him that two potential jurors "were excused for Age Related Reasons." CP at 24703. The e-mail stated that one excused juror was 84 years old and the other was 88, and also explained that the excusal "was done via telephone . . . no back-up information." *Id.* (alteration in original).

### B. Analysis

A criminal defendant has the constitutional right to counsel at all "critical stages" of the proceedings. *State v. Robinson*, 153 Wn.2d 689, 694, 107 P.3d 90 (2005).

### 1. *Hardship excusal of approximately 100 jurors after consultation with defense paralegal*

Schierman argues that preliminary hardship excusal determinations are a critical stage of the criminal proceedings. He does not cite any authority; he makes only the broad argument that "[j]ury selection is a critical stage." Appellant's Opening Br. at 36.

The State argues that the right to counsel cannot attach to a determination that may be delegated to court staff. More specifically, it argues that a hardship excusal

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner)*, No. 84614-6

cannot be a "critical stage" of the criminal proceedings because it involves no "judicial decisionmaking." Br. of Resp't at 65.

Schierman is correct that the "critical stage" determination does not turn on the presence or absence of judicial decision-making. *E.g.*, *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) (right to counsel attaches to postindictment lineup). However, if the right to counsel is claimed for a nonjudicial proceeding, that proceeding constitutes a "'critical stage'" only if "the accused [is] confronted . . . by the procedural system, or by his expert adversary, or by both." *United States v. Ash*, 413 U.S. 300, 311, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973).

The necessary corollary of this rule is that if the accused is not in front of a judge, not confronted by the procedural system, not confronted by the adversary, and not really confronted at all, then the right to counsel does not attach. In this case, the trial court established a hardship determination procedure that afforded both parties an opportunity to object. One of the steps in that procedure was that the lawyers could view juror hardship determinations—some of which came in online and some of which came in on paper—in the jury administrators' office. The State and the defense did go to that office, but they went separately. They looked at declarations there, just as they might look at declarations in the privacy of their own offices. Then, based on their record review, they informed the administrator and the judge about whether a hearing was necessary. Every time a party requested a

34

hearing, the request was granted. Thus, this is not a situation where the State was represented at an adversarial proceeding and the defendant was not.

Even if it were, the invited error doctrine prohibits a party from appealing on the basis of an error that he or she "set up" at trial. *City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002) (citing *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 764 (1984), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995)). In this case, defense counsel both caused the error and failed to request any remedy when given the opportunity. Thus, the error was invited and Schierman cannot raise it now, on appeal.

### 2. *Jury coordinator's excusal of two jurors for age-related reasons*

Schierman's assignment of error to these dismissals is contradicted by the record. The e-mail from Rials to Wheeler identified the two excused jurors by name. CP at 24703. On October 22, 2009, defense counsel sent an e-mail to Wheeler identifying these same two jurors by name and agreeing to their excusal for "adv.age." CP at 25068.

IV. The Trial Court Did Not Err, under This Court's Decisions in *Dearbone*[16] and *Luvene*,[17] by Permitting the State To File a New Notice of Special Sentencing Proceeding in November 2009

RCW 10.95.040(1) provides, "If a person is charged with aggravated first degree murder as defined by RCW 10.95.020, the prosecuting attorney shall file written notice of a special sentencing proceeding to determine whether or not the death penalty should be imposed when there is reason to believe that there are not sufficient mitigating circumstances to merit leniency." RCW 10.95.040(2) provides that the notice must be filed "within thirty days after the . . . arraignment." In *Dearbone* and *Luvene*, this court held that RCW 10.95.040(2) requires strict compliance.

Schierman argues that before the State filed the notice of special sentencing proceeding in his case, it failed to charge him with aggravated first degree murder "*as defined by RCW 10.95.020*" because it omitted some of the language describing the aggravating factor alleged. RCW 10.94.040(1) (emphasis added). He argues that the notice of special sentencing proceeding was therefore invalid under *Dearbone* and *Luvene*. We reject this argument.

---

[16] *State v. Dearbone*, 125 Wn.2d 173, 177, 883 P.2d 303 (1994).

[17] *State v. Luvene*, 127 Wn.2d 690, 719, 903 P.2d 960 (1995).

36

A. Facts

The State charged Schierman on July 24, 2006, with four counts of aggravated first degree murder and one count of first degree arson. Count I alleges that Schierman premeditatedly caused the death of Olga and "that further aggravating circumstances exist, to-wit: there was more than one victim; Contrary to RCW 9A.32.030(1)(a) and 10.95.020(10)." CP at 1. Counts II, III, and IV allege similarly that Schierman murdered Lyuba, Justin, and Andrew. They also included the following language:

> [The State accuses Schierman] of the crime of Aggravated Murder in the First Degree, a crime of the same or similar character and based on a series of acts connected together with another crime charged herein, which crimes were part of a common scheme or plan, and which crimes were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the other, committed as follows: . . . .

*Id.* (boldface omitted). The remainder of each count alleged the existence of aggravating circumstances: "to-wit: there was more than one victim; Contrary to RCW 9A.32.030(1)(a) and 10.95.020(10), and against the peace and dignity of the State of Washington." CP at 2.

On October 20, 2006, at defense counsel's request, the court extended the deadline for filing the notice of intent to seek the death penalty to January 31, 2007. The State filed the notice on January 30, 2007.

37

At an omnibus hearing on October 23, 2009, the State notified the court and the defense that the charging information contained a "scrivener's error . . . with respect to the aggravating factor." VRP (Oct. 23, 2009) at 126. The State explained that although the information cited to the correct statute where it alleged the existence of aggravating circumstances, it omitted part of the statutory language. The information alleged that there was "more than one victim; Contrary to . . . [RCW] 10.95.020(10)," CP at 1-2, but the full language of RCW 10.95.020(10) reads: "There was more than one victim *and the murders were part of a common scheme or plan or the result of a single act of the person.*" (Emphasis added.) The State moved to amend the information to add the missing language.

The court heard argument on that motion on November 3, 2009. The State admitted its error but argued that the amendment would not prejudice the defense, since "there ha[d] never been . . . any question in this case as to which aggravating factor was alleged." VRP (Nov. 3, 2009) at 100. The defense objected that it would be prejudiced if the State were permitted to amend the information. It argued that it would have conducted discovery differently had it known that the State would allege that the murders were part of a common scheme or plan, the result of a single act of the person, or both.

The court granted the State's motion to amend the information, concluding that the defense would not be prejudiced since if the amendment changed the

38

charging instrument at all, it would only add to the State's burden. The court's order states that the "Amended information corrects [a] scrivener's error." CP at 6764. The amended information is identical to the original information except that it alleges the full aggravating circumstance listed in RCW 10.95.020(10): "There was more than one victim *and the murders were part of a common scheme or plan or the result of a single act of the person*." CP at 6766-68 (emphasis added).

The State filed a new death penalty notice on the same day (November 3, 2009). CP at 6769. The defense filed a motion to strike that notice, arguing that the original notice of special proceedings had been based on a faulty charging information and that it was now too late to file another notice. The court denied that motion, ruling that the original charging information had properly pleaded the aggravating circumstance listed at RCW 10.95.020(10).

### B. Analysis

Schierman argues that the original information did not properly charge him with aggravated first degree murder, that the original notice of special sentencing proceeding was therefore invalid, and that the subsequent notice of special sentencing proceeding was therefore untimely. Accordingly, he argues that the State never filed a valid notice of special sentencing proceeding and that it therefore may not seek the death penalty. He relies on *Dearbone* and *Luvene*.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

We disagree. Schierman does not point to any defect in the content or timing of the original notice of special sentencing proceeding. He identifies instead a defect in the information, i.e., that it failed to specifically allege that the murders were "part of a common scheme or plan or the result of a single act of the person." CP at 6764-68. That is not a defect in the death notice. And, in fact, the information did contain the "common scheme or plan" language—just not in the usual place. Its failure to include the "single act of the person" language is not a defect in the content, filing, or service of the death notice. RCW 10.95.020(10). We therefore reject Schierman's argument that the notice of special sentencing proceeding was invalid.

V.   The Trial Court Misunderstood the Standard Applicable to the Defense's For-Cause Juror Challenges, But It Did Not Violate Schierman's Rights to Due Process and an Impartial Jury (under the Sixth and Fourteenth Amendments)

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to trial by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). In a capital case, the trial court must ensure that the jury is composed of members who can apply the State's death penalty law impartially. *State v. Brown*, 132 Wn.2d 529, 598, 940 P.2d 546 (1997).

Schierman argues that the trial court violated his right to an impartial jury by applying unequal standards in its death qualification rulings. He contends that the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

court applied a harsher standard—more likely to result in a juror's dismissal—when a juror expressed opposition to, as opposed to approval of, the death penalty.

A. Facts

On December 1, 2009, defense counsel challenged Juror 25 for cause, arguing that the juror's questionnaire responses indicated he would not consider mitigating factors during the penalty phase if Schierman were found guilty of aggravated, premeditated first degree murder. The trial court and defense counsel then debated the standard applicable to "disqualification of a juror for cause because of their favoring the death penalty." VRP (Dec. 1, 2009) at 56.

The trial court opined that under *Morgan*, a juror could not be disqualified on the basis of his or her *support* for the death penalty unless "the person really has an automatic reaction . . . [and] will impose the death penalty if [the defendant] is convicted of a particular crime regardless of any . . . mitigating circumstances." *Id.* The court also opined that a different standard applied to jurors who opposed the death penalty. It rejected defense counsel's for-cause challenge because it concluded that Juror 25's questionnaire responses indicated that he would consider mitigating circumstances "if we reach a sentencing phase." *Id.* at 60.

Defense counsel objected, arguing that Juror 25's responses indicated that he would consider mitigating circumstances only "insofar as [they] relate[] to the offense itself." *Id.* at 61. Defense counsel also objected to the court's interpretation

41

of *Morgan*. The following day, defense counsel filed a written motion arguing that the correct standard for disqualifying a juror because of his or her views on the death penalty was "'whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.''" CP at 6972 (boldface omitted) (quoting *Morgan*, 504 U.S. at 728 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985))). Counsel argued that this standard, articulated by the United States Supreme Court in *Witt*, applied to both pro- and anti-death-penalty jurors. In this motion, the defense asked the court to disqualify for cause Jurors 14, 20, and 25.

In response, the State filed a motion arguing that different standards apply to jurors who oppose and jurors who favor the death penalty. According to the State, jurors who *oppose* the death penalty may be excluded on that basis whenever their opposition would "substantially impair them from performing their duties," but jurors who *favor* the death penalty may be excluded on that basis only when they "would automatically impose the death penalty." CP at 6977.

On December 8, 2009, the trial court issued a lengthy oral ruling on the parties' motions and the meaning of the *Morgan* decision. It concluded that its prior rulings were correct, and that United States Supreme Court precedent applicable in this state under *Brown*, 132 Wn.2d at 598, established different standards for disqualifying pro-death-penalty and anti-death-penalty jurors. The court specifically

42

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

agreed with the view expressed in footnote 5 to Justice Scalia's dissent in *Morgan*: that the majority's holding resulted in a "double standard" for capital jury qualification. VRP (Dec. 8, 2009) at 226; *see also Morgan*, 504 U.S. at 750 n.5 (Scalia, J., dissenting).

On December 22, 2009, the trial court excluded Juror 302 on the ground that her anti-death-penalty sentiments rendered her ineligible under the *Witt* standard. Defense counsel again objected that the application of different disqualification standards to pro- and anti-death-penalty jurors violated "fundamental fairness." VRP (Dec. 22, 2009) at 82-83. The court declined to address the issue further.

Schierman argues that the trial court's application of this "'asymmetrical standard'" resulted in the seating of two jurors who were "substantially impaired" in their ability to be impartial (Jurors 59 and 140), and the erroneous exclusion of Juror 280. Appellant's Opening Br. at 47, 55.

### 1. Juror 59

On December 8, 2009, the defense challenged Juror 59 for cause, arguing that that juror believed the defense had the burden to prove mitigation and that he would consider only limited mitigating evidence, such as "a psychiatrically diagnosed condition." VRP (Dec. 8, 2009) at 103-04. The trial court rejected the challenge

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

under both the *Morgan* standard[18]—which it believed applied to jurors who favored the death penalty—and the *Witt* standard—which it assumed applied "for the sake of discussion." *Id.* at 106-09. The court specifically noted that Juror 59 admitted he knew little about the law and said that he would follow the court's instructions. *Id.* at 108. It also concluded that Juror 59 "was fine with the presumption of life being the presumed sentence in the penalty phase . . . and . . . would follow that presumption." *Id.* at 108-09. Ultimately, Juror 59 was dismissed before the jury began its deliberations.

### 2. Juror 140

The challenge to Juror 140 proceeded similarly to the challenge to Juror 59. The defense moved to disqualify Juror 140 because her questionnaire responses indicated that she thought the defendant should get the death penalty "if he is convicted." VRP (Dec. 9, 2009) at 40. The trial court rejected the challenge because it concluded that Juror 140 had, on further questioning by counsel for both parties, shown herself to be capable of applying the law as instructed by the court.

Juror 140's responses to counsel's in-person questions were somewhat ambiguous. In response to questions by defense counsel, Juror 140 stated that she

---

[18] As indicated by my analysis below, there is no such thing as a "Morgan standard" for excluding jurors in a capital case. VRP (Dec. 8, 2009) at 106. We use that term, although it is incorrect, because it is useful shorthand for the trial court's rulings on this issue.

didn't think "where [a defendant] came from in their own life and circumstances" should make any difference at sentencing, provided the defendant was "convicted of intentional, premeditated[] murder." *Id.* at 32. She also agreed that if a defendant were convicted of premeditated murder, "then . . . the death penalty is the only appropriate penalty for a guilty murderer like that." *Id.* at 32-33. In response to questions by the State, however, Juror 140 stated that even if a defendant were convicted of premeditated murder, "he might not need death, you know, there might be hope . . . for this person." *Id.* at 37. She also agreed that she was "okay with the . . . idea . . . [t]hat [a defendant convicted of aggravated premeditated murder] could spend the rest of [his] days in prison," instead of facing execution, because she didn't "know the whole story yet" and stated that she "can't go with what my heart tells me, I've got to listen to the facts of the whole thing and be open." *Id.* at 38-40. She repeatedly emphasized the possibility that a person who committed premeditated murder might be truly sorry and "better himself." *Id.* at 38. She stated that she was "open to the idea" that "fairness or mercy" could play a role in sentencing "because we don't know the whole story yet." *Id.* at 39. She also stated her willingness to apply a presumption in favor of life in prison without parole.

As with Juror 59, the trial court concluded that Juror 140 should not be disqualified under either the "*Morgan*" (automatic death penalty) standard or the *Witt* (substantial impairment) standard. *Id.* at 44-45, 48.

45

### 3. *Juror 280*

In response to questioning by the court, Juror 280 stated that she would probably have difficulty imposing the death penalty because "the death penalty is definitely finite, and there's no going back. I also think that it's kind of arbitrary, from kind of state to state, and perhaps maybe if you have more money you might get a better judgment." VRP (Dec. 21, 2009) at 22. She clarified that she could impose the death penalty under "really clearcut . . . circumstances where . . . if the person was let out they would kill again." *Id.* In response to questioning by defense counsel, Juror 280 indicated that she might have trouble following the court's instructions during the penalty phase because her personal "bar [to imposing the death penalty] may be different than what the court instructs." *Id.* at 29. She then repeated that her "bar" was that the death penalty should be imposed only on a "person . . . likely to kill again." *Id.* at 30.

The trial court granted the State's for-cause challenge to Juror 280, finding that her approach to the death penalty would add to the State's burden of proof: "She has [her ability to impose the death penalty] narrowed down to one very, very limited set of facts and that set of facts clearly, in the court's view, would substantially impair her ability to follow the court's instructions as to the law to be applied in this case." *Id.* at 39.

46

*State v. Schierman (Conner)*, No. 84614-6

B. Analysis

In the death-qualification context, the State, as well as the defendant, is entitled to an "impartial jury." *State v. Hughes*, 106 Wn.2d 176, 185-86, 721 P.2d 902 (1986) ("'The guarantee of impartiality cannot mean that the state has a right to present its case to the jury *most* likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury *most* likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury *least* likely to convict or impose the death penalty, nor that the defense must present its case to the jury *least* likely to find him innocent or vote for life imprisonment.'" (quoting *Smith v. Balkcom*, 660 F.2d 573, 579 (5th Cir. 1981))). The United States Constitution and Washington's constitution provide the same degree of protection for the impartial jury trial right in the death-qualification context. *Brown*, 132 Wn.2d at 598.

For the reasons that follow, we conclude that the trial court erred when it ruled that different disqualification standards apply to jurors who oppose, and jurors who favor, the death penalty. But we also conclude that this error did not deprive Schierman of his state and federal constitutional right to an impartial jury.

### 1. *The trial court erred when it ruled that different disqualification standards apply to pro- and anti-death-penalty jurors*

In *Witt*, the United States Supreme Court held that a prospective juror may be dismissed for cause "because of his or her views on capital punishment" if those

47

views would "'prevent or substantially impair the performance of his [or her] duties as a juror.'" 469 U.S. at 424. In embracing that standard, the Court rejected statements in an earlier case, *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), to the effect that a potential juror could not be dismissed for his opposition to the death penalty unless he "'states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal.'" *Witt*, 469 U.S. at 418 n.2 (emphasis omitted) (quoting *Maxwell v. Bishop*, 398 U.S. 262, 265, 90 S. Ct. 1578, 26 L. Ed. 2d 221 (1970) and citing *Boulden v. Holman*, 394 U.S. 478, 482, 89 S. Ct. 1138, 22 L. Ed. 2d 433 (1969)).

Contrary to the trial court's ruling in Schierman's case, *Witt*'s "substantial impairment" standard governs for-cause dismissals based on *either* opposition to *or* support for the death penalty. *See Morgan*, 504 U.S. at 728-29; *Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988). There is no separate, stricter requirement that protects "death-prone jurors" from dismissal unless they admit that they would "automatically" vote for the death penalty. *Witt*, 469 U.S. at 418 n.2.

*Morgan* did not change that. Rather, it reaffirmed and elaborated the Court's earlier holding, in *Ross*, that a juror is per se ineligible under the *Witt* standard if he

48

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

or she will automatically vote to impose the death penalty upon a defendant's conviction in a capital case:

> A juror who will *automatically* vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Morgan*, 504 U.S. at 729 (emphasis added).

Indeed, the standard for juror exclusion was not even at issue in *Morgan*—the case concerned only the defendant's entitlement to ask certain questions during voir dire. The *Morgan* Court rejected the argument that "general fairness and 'follow the law' questions . . . are enough to detect those in the venire who automatically would vote for the death penalty," reasoning that a juror might sincerely believe that his or her "dogmatic views" are fair, impartial, and consistent with the law. *Id.* at 734-35. It therefore held that such questions do not suffice, under the Fourteenth Amendment, to protect the defendant's right to an impartial jury. U.S. CONST. amend. XIV.

Thus, *Morgan* holds only that a juror who will refuse to consider mitigation *at all* is "substantially impaired" (and therefore ineligible to serve) *as a matter of*

49

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*law*, and that "general fairness" questions are insufficient to identify such jurors.[19]

Contrary to the State's assertions, *Morgan* never held that a potential juror who

harbors doubts about the death penalty is easier to exclude than a potential juror who

is inclined to impose that sentence. Justice Scalia's footnote to the contrary appears

---

[19] The State cites dicta from *United States v. Mitchell*, 502 F.3d 931, 954 (9th Cir. 2007), to support its contention that the *Witt* (substantial impairment) standard applies only to jurors who oppose the death penalty. Br. of Resp't at 90-91. Our review of the relevant cases reveals many more that treat *Morgan* as an application of—rather than an alternative to—*Witt*. *See United States v. Whitten*, 610 F.3d 168, 185 (2d Cir. 2010) ("In capital cases, a juror is constitutionally unqualified if he has 'views on capital punishment' that would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' [Under *Morgan*, t]hat category *includes* 'those prospective jurors who would *always* impose death following conviction.'" (first emphasis added) (citation omitted) (quoting *Morgan*, 504 U.S. at 728, 733-34); *Williams v. Bagley*, 380 F.3d 932, 953 (6th Cir. 2004) ("As a general rule, a defendant may excuse a juror for cause if 'the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' *Applying this rule in the capital context*, '[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances'" and may be excluded on that basis. (emphasis added) (alteration in original) (citation omitted) (quoting *Morgan*, 504 U.S. at 728-29)); *Nicklasson v. Roper*, 491 F.3d 830, 838 n.7 (8th Cir. 2007) (under *Morgan*, juror who would automatically impose the death penalty following conviction does not qualify as impartial under the *Witt* (substantially impaired) standard); *United States v. Brown*, 441 F.3d 1330, 1353 n.10 (11th Cir. 2006) ("Death-qualification is the process by which jurors in a capital case are screened . . . to ensure that none has an opposition to the death penalty so strong that it would prevent or substantially impair their performance as jurors in the sentencing phase. A juror who could never vote for the death penalty, regardless of the court's instructions, or a juror who would automatically vote for death in every case, is removed for cause. *See Morgan* . . . , 504 U.S. [at] 728-29.").

in dissent and is incorrect, and the trial court erred in adopting its interpretation of the majority's decision.[20]

---

[20] The full text of that footnote is as follows:

> If, as the Court claims, this case truly involved "the reverse" of the principles established in *Witherspoon* v. *Illinois*, 391 U. S. 510[, 88 S. Ct. 1770, 20 L. Ed. 2d 776] (1968), . . . then it is difficult to understand why petitioner would not be entitled to challenge, not just those jurors who will "automatically" impose the death penalty, but also those whose sentiments on the subject are sufficiently strong that their faithful service as jurors will be "substantially impaired"—the reformulated standard we adopted in . . . *Witt*, 469 U. S. 412. . . . The Court's failure to carry its premise to its logical conclusion suggests its awareness that the premise is wrong.

*Morgan*, 504 U.S. at 750 n.5 (Scalia, J., dissenting) (emphasis omitted).

When the trial court endorsed this portion of the dissent, it noted that the *Morgan* majority "[did] not respond at all to this simply stated analysis." VRP (Dec. 8, 2009) at 226. We disagree. The *Morgan* majority opinion makes very clear that the same (substantial impairment) standard applies to jurors opposed to and in favor of the death penalty. *See, e.g.*, *Morgan*, 504 U.S. at 734-35 ("*Witherspoon* . . . would be in large measure superfluous were this Court convinced that . . . general ['follow the law'] inquiries could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath. But such jurors—whether they be unalterably in favor of, or opposed to, the death penalty in every case—by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding."). *Morgan* presented only one issue: whether a trial court may *prevent* defense counsel from asking potential jurors if they would "automatically" impose the death penalty upon conviction. *Id.* at 721. The Court had no occasion to consider what other inquiries—also designed to identify "substantial impairment"—a defendant might be constitutionally entitled to make.

It should also be noted that the State's brief contains a misstatement relating to this issue. The State asserts that the *Witt* Court explicitly limited its holding to for-cause challenges by the *prosecution*: "In fact, in the footnote appended to its 'prevent or substantially impair' sentence in <u>Witt</u>, the Court wrote: '[W]e simply modify the test stated in <u>Witherspoon</u>'s footnote 21 to hold that <u>the State</u> may exclude from capital sentencing juries that "class" of veniremen whose views would prevent or substantially impair the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner)*, No. 84614-6

> 2. *The trial court's error did not deprive Schierman of his state and federal constitutional right to an impartial jury; thus, he is not entitled to relief*
>
>     a. <u>Juror 59</u>: even if the trial court erred by refusing to dismiss Juror 59, this error does not entitle Schierman to relief because Juror 59 was excluded before deliberations began

Schierman acknowledges that Juror 59 was excused before closing arguments, but argues that the mere fact of his seating "demonstrates how prejudicial the court's misreading of the law was to [the defense]." Appellant's Opening Br. at 55.

Where a trial court erroneously denies a defendant's for-cause challenge and the defendant is forced to use a peremptory challenge to cure the trial court's error, his rights are not violated so long as he is subsequently convicted by a jury on which no biased juror sat. *United States v. Martinez-Salazar*, 528 U.S. 304, 307, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000); *State v. Fire*, 145 Wn.2d 152, 154, 34 P.3d 1218 (2001). Juror 59 was not excluded through peremptory challenge, but he was excluded before Schierman's jury began deliberations. Under the reasoning of *Martinez-Salazar* and *Fire*, a trial court's erroneous denial of a for-cause challenge

---

performance of their duties in accordance with the instructions or their oaths.'" Br. of Resp't at 88 (alteration in original) (quoting *Witt*, 469 U.S. at 424 n.5). Read in context, however, the reference to "the State" in the *Witt* footnote clearly indicates trial courts and state legislatures—it is not a reference to the prosecution. *Witherspoon*, the subject of the footnote in *Witt*, addressed a state *statute* that made any person with "'conscientious scruples against capital punishment'" subject to for-cause removal from a capital jury pool. 391 U.S. at 512 (quoting former ILL. REV. STAT. ch. 38, § 743 (1959)).

52

*State v. Schierman (Conner)*, No. 84614-6

is not independent grounds for relief. *Fire*, 145 Wn.2d at 165 (citing *Martinez-Salazar*, 528 U.S. 324). Rather, the defendant is entitled to relief only when the trial court's error actually resulted in the seating of a biased juror. *Id.*

The trial court's refusal to dismiss Juror 59 for cause did not result in Juror 59 actually deliberating in Schierman's case. Nor does Schierman allege that the refusal indirectly resulted in the seating of any biased juror. Rather, he asserts that it illustrates the prejudicial nature of the trial court's views on for-cause dismissals. This argument asks us to assume that prejudice resulted from the court's application of an asymmetric juror-exclusion standard. Under *Fire*, we cannot make that presumption. *Id.* Thus, even if the trial court erred in seating Juror 59, this error does not entitle Schierman to relief.

> b. <u>Juror 140</u>: the trial court did not abuse its discretion by refusing to dismiss Juror 140 for bias

Unlike Juror 59, Juror 140 did deliberate in Schierman's case. But the record does not indicate that Juror 140's seating resulted from the trial court's legal error. Although the trial court erred in ruling that different standards apply to defense and prosecution for-cause challenges in a capital case, it explicitly stated that Juror 140 could be seated under *either* standard. Thus, it concluded that Juror 140's views on capital punishment would not "'prevent or substantially impair the performance of [her] duties as a juror.'" *Witt*, 469 U.S. at 424.

53

That conclusion is reviewed for abuse of discretion. *State v. Cross*, 156 Wn.2d 580, 595, 132 P.3d 80 (2006). Juror 140 stated that she would not be able to decide whether death was the appropriate penalty until she heard all the facts. She stated that she would be able to consider mitigating circumstances and apply the presumption in favor of life without parole. The trial court did not abuse its discretion in concluding that Juror 140 was not substantially impaired in her ability to follow the court's instructions and apply the law.

c. <u>Juror 280</u>: the trial court did not abuse its discretion when it dismissed Juror 280 for bias

Juror 280 explicitly stated that her views on the death penalty would probably prevent her from following the court's instructions. In context, this meant that she would not consider imposing the death penalty unless the State proved that Schierman would kill again if released.

In *Cross*, this court affirmed the trial court's exclusion of a juror who said that he "'would have a hard time'" voting to impose the death penalty because the defendant had paraplegia and used a wheelchair. This court reasoned that the "challenge raise[d] a difficult question because . . . Cross was entitled to ask the jury to grant him mercy on the grounds of his physical state." *Id.* at 596-97. But it concluded that the trial court did not abuse its discretion by excluding the juror: "The trial judge clearly concluded that Juror 8 was not meaningfully willing or able to

54

consider the death penalty given the specific evidence in the case. It was not an abuse of discretion to exclude this juror." *Id.* at 597.

In light of this holding in *Cross*, we conclude that the trial court did not abuse its discretion by excluding Juror 280. In this case, Juror 280 told the trial court that she would probably not consider voting to execute Schierman unless the State proved that he would likely kill again. In *Cross*, Juror 8 told that court that he would probably not vote to impose the death penalty because the defendant had a disability. Given the deferential standard of review applicable and the concept of "impartiality" this court adopted in *Hughes*, 106 Wn.2d at 185-86, we cannot conclude that the trial court committed reversible error by excluding Juror 280.

VI.    Cumulative Error in Jury Summoning and Selection Did Not Violate Schierman's Right to a Fair and Impartial Jury

The errors that occurred during jury selection do not individually warrant reversal. In this case, they do not rise to the level of cumulative error in the overall jury selection process.

VII.    The Trial Court Did Not Violate Due Process Protections by Permitting the State To Argue That There Was Circumstantial Evidence of Sexual Motivation

Schierman argues that the trial court violated due process protections by permitting the State to argue that there was circumstantial evidence of a sexual motivation for the murders. We disagree.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner)*, No. 84614-6

A. Facts

On December 30, 2009, the State served the defense with a "Supplemental Memorandum And Materials In Support Of Admission Of Crime Scene And Autopsy Photographs That Include Images Of The Victims." CP at 7200 (italics omitted). The memorandum contained a list of photographs and corresponding expert witness "Declaration[s]" interpreting the images therein. CP at 7231. According to the defense, some of the interpretations suggested the State's intent to "assert[] some type of sexual motivation." CP at 7201-02. Of particular concern was medical examiner Dr. Richard Harruff's description of photograph 2548, which read as follows: "Shows the victims' legs are spread apart, in all likelihood not a result of the fire but probably reflects positioning prior to the fire; this photo also shows a flashlight in the debris." CP at 7232. The defense believed this description contradicted statements Dr. Harruff made in a 2007 defense interview to the effect that he found nothing unusual about the posing of the victims' bodies and attributed their positioning to the "thermal effect" of the house fire. CP at 7203-04 (boldface omitted). It also argued that any attempt by the prosecution to present a sexual motivation theory directly conflicted with the State's earlier stipulation that "there is no physical evidence of sexual assault of any of [the] victims." CP at 7202 (underline omitted).

The defense moved the court to sanction the prosecution, strike the jury pool, and continue the trial, arguing that it needed time to respond to what it deemed a completely new theory by the prosecution.[21] The trial court set arguments on the issue for January 19, 2010, one week after jury selection was scheduled to begin. When defense counsel argued that the motions should be decided before jury selection began, the trial court ordered that "there will be no evidence presented of sexual motivation or sexual assault, consistent with this Court's prior rulings and the prior representations of counsel for the State that that was not an issue in the case." VRP (Jan. 11, 2010) at 7. The court then stated that it would await the State's briefing and the defense reply before addressing the matter further.

When the State filed its motion in response, it asserted that it had never agreed not to pursue a sexual motivation theory. Instead, it said it had agreed only that "there is no physical evidence of sexual assault." CP at 7347 (boldface omitted). It also argued that the defense had known "for literally years" about the circumstantial evidence of a sexual motive, and that there was no legitimate reason for defense

---

[21] CP at 7201 ("As a result of the [State's] non-disclosure . . . the defense is forced to proceed to trial unprepared."), 7209 ("the jury pool has not been death qualified with respect to [a sexual motivation] aggravator"); VRP (Jan. 11, 2010) at 3-4 ("the [jury] selection process is . . . constitutionally defective . . . particularly given the late disclosure of discovery that we received from the prosecutor on December the 30th . . . [that] changes the whole picture . . . . No one has been asked about anything related to the subject matter contained within this new discovery. The entire process is flawed."). The State opposed the motion.

counsel to suddenly express concern over the State's intent to pursue this line of argumentation. The State cited

> the defendant's sexual comments, on the night of the murder, about one of the women across the street; the defendant's sexual banter in his email communications late into the night of July 16, 2006; the condition of Olga's body, which was found naked, on her back and with her legs spread; the condition of [Lyuba]'s body, which was found virtually naked, with the one article of remaining clothing, her tank top, pushed above her breasts; and the presence of a probable fire trailer consisting of women's underwear in Alla Botvina's[22] bedroom in the basement.

CP at 7348 (footnotes omitted).

The trial court denied the defense motion for sanctions, for a continuance, and to strike the jury pool. It rejected defense counsel's argument that voir dire would have been conducted differently if the defense had known about the sexual motivation theory. The trial court instead agreed with the State that the defense had received ample notice that there was "circumstantial evidence of a sexual motive." VRP (Jan. 19, 2010) at 147. This evidence was, according to the trial court, crime scene photos showing that Olga's and Botvina's bodies had been found nude or mostly nude, the presence at the crime scene of a "probable fire trailer consisting of women's underwear," and allegations that the defendant made sexual comments about one of the victims. *Id.* at 148-49. The trial court also ruled that the State had

---

[22] Alla Botvina is Lyuba's sister who lived in the Milkin's basement; she was not at home at the time the murders took place.

58

not offered, and would not be allowed to present, any expert testimony regarding such a motive. Finally, the trial court ruled that the defense could re-interview Dr. Harruff on the contradiction between his initial statements and subsequent declaration regarding the positioning of the victims' bodies.

B. Analysis

The State argues that it never misled the defense regarding its intent to argue sexual motivation, and that it stipulated that there was no evidence of sexual assault only to prevent the defense from independently testing vaginal swabs taken from the adult victims. The record supports that contention. CP at 4448-56 ("State's Memorandum in Opposition to Defendant's Motion to Independently Test Extracts from Vaginal Swabs (Y-STR Testing)").

Further, with the exception of Dr. Harruff's statement regarding the positioning of the victims' legs, Schierman does not allege that the State withheld any sexual-motivation-related evidence. The trial court permitted the defense to re-interview Dr. Harruff about his statement prior to trial, and Dr. Harruff ultimately offered no testimony that the victims' legs were positioned apart.

As for the trial court's statement that the prosecution would not be allowed to argue a sexual motivation theory, we agree with the State that this was a "passing comment . . . based on a misunderstanding—later corrected." Br. of Resp't at 125. As the trial court explained when it ruled on this issue, the State never requested any

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"special finding" of a "sexual motivation." VRP (Jan. 19, 2010) at 149-50. In that respect, the *fact* of sexual motivation was not at issue in the case, but this did not mean that the State agreed not to argue any sexual motivation *theory*. Schierman argues now that he "reasonably understood *the prosecutor's stipulation* [regarding sexual assault] to mean that sexual motivation would not be an issue at trial." Appellant's Reply Br. at 36 (emphasis added). But that is not a reasonable response to the State's stipulation regarding sexual assault.

## VIII. The Evidence Was Sufficient To Support the State's Sexual Motivation Argument

Schierman argues that by presenting its sexual motivation theory, the State made prejudicial statements unsupported by the evidence. We disagree; the State's sexual motivation theory was supported by sufficient circumstantial evidence.

### A. Facts

Sean Winter, a man who shared a duplex with Schierman and another tenant, Isaac Way, at the time of the murders, testified that Schierman engaged in sexual conversation on various occasions. He stated that when Schierman moved into the house, he asked if there were "any good-looking women" in the neighborhood and then specifically asked about "the blonde across the street." VRP (Feb. 9, 2010) at 85. Winter also said that Schierman engaged in "locker room talk . . . about girls" on the night before the murders, and made a sexual comment in a Russian accent,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

referring to Olga. *Id.* at 90, 105. Winter testified that on the night before the murders, Schierman had a pornographic video and made a joke about giving a friend a "blowup doll." VRP (Feb. 10, 2010) at 52-54, 66.

Todd Taylor, a computer forensic technician, testified that Schierman had a Myspace chat with someone on the night before the murders, in which he sent and received messages of a sexual nature.

Several witnesses also testified that women's undergarments were found strewn around a basement bedroom in the Milkin home. There was evidence of forced entry through the back basement door of the home. Dr. Harruff, the medical examiner, testified that Olga's and Lyuba's bodies had been found nude or mostly nude, and Kim Duddy, a forensic scientist, testified that Lyuba's clothing had been removed after she was killed. That clothing was found stuffed into a microwave oven vent. Finally, there was evidence that Schierman had an injury on his neck that resembled a ligature mark, and testimony that a necklace identified as Schierman's had Olga's DNA on it. The forensic expert who testified about the DNA explained that he expected to find Schierman's DNA on the whole necklace, but any "foreign biology . . . only on a portion of the necklace," and that his test results bore these expectations out. VRP (Feb. 17, 2010) at 29-30, 41-42. He also explained that foreign DNA could occur on a portion of the necklace "if the necklace was grabbed in some way." *Id.* at 29.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner)*, No. 84614-6

In the guilt phase closing argument, the prosecutor suggested that Schierman had destroyed evidence of a sexual nature: "Why pour gasoline on the victims' bodies? What does he know about those bodies that he doesn't want discovered?" VRP (Apr. 8, 2010) at 75. The prosecutor also referenced most of the evidence noted above:

> Well, we know what was going on Sunday evening. I talked about the comment he knew about the women across the street, he knew about the locker room talk, the joke about the blow-up doll, the defendant bringing out the pornographic movie, Jenna Jamison movie, the e-mail at 9:37 at night, 10:00, a sex party, there's nothing wrong with that, people talk, that's not a condemnation, but taken together, what does it tell us?
>
> We know what's on the floor of Alla's bedroom, we know where the bodies were found and how they were found inside that room at the top of the stairs. Olga completely naked, leaving Lyuba only with her tank-top on.
>
> We know what the evidence tells us. We know there was trace evidence found on the pajamas that were taken from the microwave, Lyuba's DNA and the defendant's DNA, and there was trace evidence recovered from underneath Lyuba's body.

*Id.* at 77-78. In addition, the prosecutor also suggested that the location of the ligature mark—high on Schierman's neck—indicated that Schierman "may have been prone on top of somebody else, and who might that person have been? Whose DNA is on this necklace? Conner Schierman and Olga Milkin." *Id.* at 78-79.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Finally, in the penalty phase, the prosecutor elicited testimony from Schierman's friend Christopher O'Brien that Schierman had referred to the "hot chick" across the street. VRP (Apr. 21, 2010) at 84.

B. Analysis

Schierman is correct that counsel, in closing argument to the jury, may not make prejudicial statements that are unsupported by the evidence. *State v. Rose*, 62 Wn.2d 309, 312, 382 P.2d 513 (1963). But counsel *may* argue "'the facts in evidence and reasonable inferences'" therefrom. *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003) (quoting *State v. Smith*, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985)). Here, almost every statement that Schierman challenges is a direct reference to testimony elicited in the trial.

The authority on which Schierman relies holds only that counsel may not argue a theory for which there is *no* evidence. *Rose*, 62 Wn.2d at 310, 312 (prosecutor committed misconduct when he referred to the defendant as a "'drunken homosexual'" even though the State's own witnesses testified that the defendant had not appeared drunk); *State v. Boehning*, 127 Wn. App. 511, 518-23, 111 P.3d 899 (2005) (prosecutor committed misconduct by arguing that the jury could infer that child witness's out-of-court statements were even more damaging to defendant than her in-court statements were).

*State v. Schierman (Conner)*, No. 84614-6

Schierman appears to suggest that the State needed expert testimony to support its "sexual conclusions" because these conclusions were so prejudicial. There is no support for this argument in the case law.[23]

IX. The Presence of Soldiers in Uniform at the Trial, Coupled with Testimony That Leonid Was Deployed in a Combat Zone When the Murders Occurred, Did Not Violate Fourteenth Amendment Due Process Protections or Sixth Amendment Rights to Confrontation and an Impartial Jury

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the fundamental right to a fair trial. *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 417, 114 P.3d 607 (2005), *overruled in part on other grounds by Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006). That right may be violated where the "courtroom arrangement" created a risk that "'impermissible factors'" would influence the jury. *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986) (quoting *Estelle v. Williams*, 425 U.S. 501, 505, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976)). Schierman alleges that two factors, in combination, rendered his trial inherently unfair: (1) Leonid's

_____

[23] Schierman cites *House v. Bell*, 547 U.S. 518, 521, 540-41, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006), an "actual innocence" case in which the Supreme Court noted that "[w]hen identity is in question, motive is key." *House* held that new DNA evidence, proving that semen on the victim's clothing did not come from the petitioner, was material even though "neither sexual contact nor motive were elements of the offense." *Id.* at 540. It does not address the relationship between closing argument and the record.

testimony that he was deployed in Iraq at the time of the murders and (2) the presence of uniformed military personnel in the courtroom audience.

A. Facts

Leonid, Olga's husband and Andrew and Justin's father, was a United States soldier stationed in Iraq at the time of the murders. On October 28, 2009, the defense filed "Defendant's Motion to Preclude Soldiers in Fatigues from Attending Proceedings." CP at 6443. It stated that defense counsel expected that uniformed soldiers would attend the trial, and that this expectation was "based on prior experience on this case, where the usual practice has been for soldiers in fatigues to sit in the courtroom, behind the prosecutor's table, close to and in full view [of] jurors who will not only decide whether Schierman committed the offense, but also whether he will live or die." CP at 6444. Defense counsel requested in the alternative that the court permit videotaping of the courtroom audience.

The trial court heard oral arguments on the motion on November 5, 2009. At that hearing, defense counsel noted that Leonid had been appearing in uniform, acknowledged that "he ha[d] every right to do so," and requested that the court instruct the prosecution not to tell the jury that Leonid had been deployed in Iraq when the murder took place. VRP (Nov. 5, 2009) at 9. The defense requested that the jury be told only that Leonid was out of the country at the time. The State opposed all of the defense motions related to military service.

65

The trial court denied the motion to exclude soldiers in uniform from the courtroom. It reasoned that "the limited presence of military personnel" did not infringe on Schierman's constitutional rights because it was not a comment on guilt or innocence. *Id.* at 20. It also denied defense counsel's alternative motion to permit videotaping.

The trial court did, however, limit "references to [Leonid]'s status as follows: That he was in the military, on active duty at that time, and stationed outside of the United States at the time of these crimes." VRP (Jan. 20, 2010) at 14. The trial court thus excluded evidence that he was stationed in Iraq.

That order was violated almost immediately. At trial, Leonid was the State's first witness. At first, he testified that he was a soldier stationed at Fort Lewis, but then later stated that when the murders occurred he "came back on emergency leave from Iraq, from overseas." *Id.* at 100, 108. This violated the in limine ruling in Schierman's favor; defense counsel did not call further attention to it, though—he did not object when the violation occurred. Later, the State asked Leonid about his communications with his wife while he was stationed overseas. Leonid responded that "[s]ometimes my base would be mortared, and that [would] knock out communications." *Id.* at 167. The defense objected that the testimony was irrelevant. The trial court overruled the objection, and Leonid continued, "[A]lso,

66

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

whenever soldiers would get killed, a complete communication blackout would be imposed on our base." *Id.*

After the jury was excused, defense counsel renewed its objection and referred to the in limine ruling, asserting that the State was "back-dooring in the fact that [Leonid] was fighting overseas." *Id.* at 170. The trial court asked the prosecutor to explain the relevance of questions about Leonid's communications with his wife. The prosecutor claimed these questions were relevant "to establish what type of communication was available from inside the Milkin residence, were there land lines, were there cell phones?" *Id.* at 171. But the prosecutor also apologized to defense counsel and the court.

The court directed the prosecutor to have another discussion with Leonid regarding the limits on his testimony. It also told Leonid that if he made further references to his service in Iraq, the court would instruct the jury that he was in violation of a court order. The defense moved for a mistrial and, in the alternative, for a limiting instruction. The court denied the motion for a mistrial, finding that "the nature of the restrictions is not such that a violation of them . . . rises to the level of creating unfair prejudice to the defendant for violating his rights to a fair trial." *Id.* at 175.

The court did give a limiting instruction, though. The following day, Judge Canova admonished the jury to disregard all testimony "regarding [Leonid] being

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

stationed in a combat zone in July of 2006."[24]  VRP (Jan. 21, 2010) at 12.  Defense counsel stated for the record that "there are three friends of [Leonid] in uniform in court, and he appeared yesterday in court in uniform." *Id.* at 8.

About one month later, defense counsel renewed its objection to the presence of soldiers in uniform: "Throughout this trial we've had two ordinarily uniformed military people not only sitting in court, but sitting outside . . . as jurors come in. . . . It happens every day, and . . . they sit directly on a bench in front of the doors, as the jurors come in."  VRP (Feb. 18, 2010) at 10.  The court disagreed with that characterization: "For the record, I have not noticed individuals sitting in front of the doors of the courtroom in military fatigues or otherwise in military uniform except

---

[24] The defense offered an alternative instruction stating:

> The court has previously ruled that the nature and location of Leonid Milkin's military service in July 2006 is irrelevant.  The prosecutor pursued a line of questioning yesterday regarding phone contact between Leonid Milkin and Olga Milkin while in the military.  The answers elicited by the prosecutor regarding the location and nature of Mr. Milkin's military service w[ere] irrelevant to these proceedings and violated the court's prior order.  The questions and answers regarding the nature and location of Mr. Milkin's military service is stricken and the jury is instructed to disregard such testimony.

CP at 7395-96. Judge Canova rejected the proffered language, stating that he did "not want those kinds of personal references as to opposing counsel. They are completely unprofessional and inappropriate, and if I hear those kinds of comments again from either side, that are personal attacks on opposing counsel, you will be subject to sanctions for contempt of court." VRP (Jan. 21, 2010) at 7.

on one or two occasions, including one day earlier this week." *Id.* at 10-11. It declined to change its prior ruling on the issue, concluding that there was no indication that any courtroom spectators had improperly influenced the jury.

Schierman argues that these events deprived him of his Fourteenth Amendment right to due process and Sixth Amendment rights to confrontation and an impartial jury.

### B. Analysis

A defendant alleging that the "courtroom arrangement" rendered his trial unfair bears the burden of showing that the courtroom arrangement was inherently prejudicial. *Holbrook*, 475 U.S. at 570.[25] A trial court's determination that spectator conduct is not inherently prejudicial is reviewed for abuse of discretion. *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007) (*Lord* III).

Schierman cites three lines of cases in support of his argument that the presence of uniformed soldiers was inherently prejudicial, in violation of his fair trial right. First, he cites cases holding that the appearance of abnormal security measures can deprive a defendant of due process. Appellant's Opening Br. at 80-81 (citing *Holbrook*, 475 U.S. at 572; *State v. Jaime*, 168 Wn.2d 857, 233 P.3d 554 (2010)).

---

[25] A defendant can also prevail by showing that the courtroom arrangement resulted in actual prejudice. *Norris v. Risely*, 918 F.2d 828, 830 (9th Cir. 1990), *overruled in part on other grounds by Carey*, 549 U.S. 70. Schierman does not cite any evidence of actual prejudice.

69

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner)*, No. 84614-6

Second, he cites cases holding that conduct by courtroom spectators can constitute an implicit statement, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, that the defendant is guilty. *Id.* at 81 (citing *Norris v. Risely*, 918 F.2d 828, 833 (9th Cir. 1990), *overruled in part on other grounds by Carey*, 549 U.S. 70). Finally, he cites cases holding that a defendant charged with an offense against a law enforcement officer was denied a fair trial when large numbers of the victim's colleagues attended the trial in uniform. *Id.* at 83 (citing *Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991); *Shootes v. Florida*, 20 So. 3d 434 (Fla. Dist. Ct. App. 2009); *United States v. Johnson*, 713 F. Supp. 2d 595, 616-17, 643-44 (E.D. La. 2010)).

The first line of cases is not on point. The record in Schierman's case does not indicate that the military officers who attended his trial appeared to be courtroom security.

The second line of cases is on point, but distinguishable under Washington precedent. In *Norris*, the defendant's rape trial was attended daily by at least three women wearing buttons that read, "'Women Against Rape.'" 918 F.2d at 830-31. The Ninth Circuit held that this deprived the defendant of a fair trial because it conveyed a message that he was guilty: "Just as the compelled wearing of prison garb during trial can create an impermissible influence on the jury throughout trial, the buttons' message, which implied that Norris raped the complaining witness,

70

constituted a continuing reminder that various spectators believed Norris's guilt before it was proven, eroding the presumption of innocence." *Id.* at 831.

This court distinguished *Norris* in *Woods*, where this court denied relief from the petitioner's death sentence, holding that he was not deprived of a fair trial when the victim's family members wore "remembrance ribbons" in the courtroom. 154 Wn.2d at 416-18. The *Woods* court concluded that the ribbons were a tribute to the victim and an expression of mourning, rather than a comment on the defendant's guilt. *Id.* This court reaffirmed that holding in *Lord* III, distinguishing trial spectators' "silent displays of affiliation" with the victim—in that case, the wearing of buttons displaying an in-life photograph of the deceased—from spectator conduct that "explicitly advocate[s] guilt or innocence." 161 Wn.2d at 287-90.

The wearing of military uniforms by some spectators at Schierman's trial is, like the wearing of buttons or ribbons in *Lord* III and *Woods*, a display of affiliation. Applying that precedent, we hold that the wearing of a military uniform is distinguishable from the wearing of "Women Against Rape" buttons in *Norris*, and that it did not violate Schierman's right to a fair trial.

Finally, the third line of cases Schierman cites is distinguishable by the number of uniformed spectators involved. The defendant in *Dugger* was convicted of killing a prison guard and sentenced to death. 923 F.2d at 1455. His trial took place in a small town whose economy centered on the prison where the crime

71

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

occurred. *Id.* at 1455-57. The trial received a great deal of publicity and was attended daily by a full courtroom of spectators, about half of whom were prison guards in uniform. *Id.* at 1458-59. The Eleventh Circuit held that these elements combined to create an atmosphere that deprived the defendant of his Sixth Amendment right to a fair trial. *Id.* at 1460.

In *Shootes*, the defendant was charged with assaulting a narcotics officer. 20 So. 3d at 436. During the final stages of the trial, between 35 and 70 uniformed narcotics officers were present in the courtroom, constituting at least half of the spectators. *Id.* Further complicating matters, the nature of the narcotics officers' uniforms was an issue in the trial because the defendant argued that he had not known his victim was an officer. *Id.* at 439. Distinguishing cases in which the officers were fewer in number and less visible to the jury, the Florida Court of Appeals held that the law enforcement presence violated the defendant's Sixth and Fourteenth Amendment rights to a fair trial. *Id.*

Finally, in *Johnson*, the defendant was charged with shooting a security officer during a bank robbery; he was convicted and sentenced to death. 713 F. Supp. 2d at 603. During the testimony of an officer present at the robbery, more than 40 uniformed members of the "Sherriff's Office" attended the trial. *Id.* at 616. Defense counsel objected and asked the court to instruct the officers not to appear in uniform. *Id.* The court denied the request. *Id.* Upon the defendant's motion for a

new trial, the court recognized that in light of relevant precedent, it should have granted the defense motion to prohibit law enforcement officers from attending the trial in uniform. *Id.* at 617. It concluded that the error did not deprive the defendant of a fair trial since it resulted in only one day of significant police presence, but that it was "a small part[] of the overall totality of circumstances justifying a new penalty hearing." *Id.*

To the extent that we have a record regarding the presence of uniformed soldiers in the courtroom, that record indicates that there were at most two or three uniformed soldiers attending the trial on any given day. It does not indicate that the jury was exposed to the kind of show of force at issue in *Dugger*, *Shootes*, and *Johnson*. Given the small number of spectators who attended Schierman's trial in military uniform, the jury is likely to have assumed, at most, that a few of Leonid's colleagues were in the courtroom to support Leonid. This situation, even in combination with the erroneous admission of testimony that Leonid served in Iraq, is readily distinguishable from the facts in *Dugger*, *Shootes*, and *Johnson*. In those cases, the overwhelming presence of law enforcement in the courtroom, combined with the nature of the charges, signaled to the jury that the many spectators "wanted a conviction." *Shootes*, 20 So. 3d at 439 (citing *Dugger*, 923 F.3d at 1460).

For these reasons, the trial court did not abuse its discretion in denying the motion to prohibit military uniforms in the courtroom. Even in combination with

73

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Leonid's improper testimony about his service in Iraq, the limited military presence at Schierman's trial did not result in inherent prejudice in the guilt phase.

X.     The Guilt Phase Jury Instructions Did Not Violate Fourteenth Amendment Due Process Protections

Schierman argues that the trial court violated Fourteenth Amendment due process clause protections when it denied three separate defense requests for jury instructions. U.S. CONST. amend. XIV. He assigns error to (1) the denial of the defense's proposed instructions differentiating between "premeditation" and "intent," (2) the denial of the defense's proposed instructions on voluntary intoxication, and (3) the denial of the defense's request for a manslaughter instruction.

A. Schierman's proposed instruction differentiating between "premeditation" and "intent"

*1. Facts*

The trial court gave the standard pattern jury instruction on "[p]remeditation": WPIC 26.01.01.   11 WASHINGTON PRACTICE:   WASHINGTON PATTERN JURY INSTRUCTIONS:  CRIMINAL 26.01.01 (3d ed. 2008) (WPIC).   CP at 7834.   That instruction reads as follows:

> Premeditated means thought over beforehand.  When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated.  Premeditated must involve more than a moment

74

in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

*Id.* The defense objected to that instruction on the ground that it could not be distinguished from the WPIC on "intent":[26]

> Any intent must involve more than "a moment in time" and WPICs 26.01.01 and 10.01 have no discernible difference. Murder 1° requiring premeditation and Murder 2° requiring intent (i.e., acting with "objective or purpose") have no difference – both Murder 1° and Murder 2° require a "thinking it over beforehand" to accomplish "a result that constitutes a crime." Accordingly, the defense requests the United States Supreme Court's definition in [*Fisher v. United States*, 328 U.S. 463, 467 n.3, 66 S. Ct. 1318, 90 L. Ed. 1382 (1946)] with the emphasis on prior deliberation.

CP at 7653.

The defense proposed three alternative instructions on "premeditation." The first read as follows:

> Deliberation is consideration and reflection upon the preconceived design to kill; turning it over in the mind; giving it second thought.

> Although formation of a design to kill may be instantaneous, as quick as thought itself, the mental process of deliberating upon such a design does require that an appreciable time elapse between formation of the design and the fatal act within which there is, in fact deliberation.

> The law prescribes no particular period of time. It necessarily varies according to the peculiar circumstances of each case. Consideration of a matter may continue over a prolonged period—hours, days or even longer. Then again, it may cover but a brief span of minutes. If one forming an intent to kill does not act instantly, but pauses and actually

---

[26] WPIC 10.01 defines "intent" as "acting with the objective or purpose to accomplish a result that constitutes a crime." 11 WPIC 10.01, at 217.

gives second thought and consideration to the intended act, [he] [she] has, in fact, deliberated. It is the fact of deliberation that is important, rather than the length of time it may have continued.

CP at 7652 (alterations in original).

The defense alternatively proposed the following addition to the WPIC "premeditation" instruction:

It is not enough that a person intended to kill or had the opportunity to deliberate; premeditation requires that the person actually engage in the process of reflection and meditation.

Premeditation may be proved by circumstantial evidence only where the circumstantial evidence is substantial.

CP at 7814 (boldface omitted).

Finally, the defense proposed a third alternative:

Premeditation must involve more than a moment in point of time; but, mere opportunity to deliberate is not sufficient to support a finding of premeditation.

Rather, premeditation is the deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.

CP at 7815. The court refused all of these alternatives and, over defense objection, gave the standard WPIC "premeditation" instruction. VRP (Feb. 7, 2010) at 13-17.

### 2. Analysis

A jury instruction is proper if it permits each party to argue its theory of the case, is not misleading, and properly informs the jury of the applicable law. *State v.*

*Clark*, 143 Wn.2d 731, 771, 24 P.3d 1006 (2001) (quoting *State v. Rice*, 110 Wn.2d 577, 603, 757 P.2d 889 (1988), *vacated in part on other grounds by Rice v. Wood*, 77 F.3d 1138 (9th Cir. 1996)). A trial court's refusal to give a jury instruction is reviewed for abuse of discretion if it is based on a factual determination. *State v. Walker*, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998). It is reviewed de novo if it is based on a legal conclusion. *Id.*

This court has upheld the WPIC on premeditation in numerous cases, rejecting the precise argument that Schierman makes here. *Clark*, 143 Wn.2d at 771 (citing *Lord* II, 123 Wn.2d at 317); *State v. Benn*, 120 Wn.2d 631, 657-58, 845 P.2d 289 (1993) (*Benn* I), *aff'd in part and rev'd in part*, 161 Wn.2d 256, 165 P.3d 1232 (2007) (*Benn* II); *Rice*, 110 Wn.2d at 770-71. This court has held that Washington's pattern instructions on "'premeditation'" and "'intent,'" at least when used in combination, make the distinction between these concepts "abundantly clear." *Rice*, 110 Wn.2d at 603-04. It has also held that WPIC 26.01.01 properly defines "premeditation," accurately states the law, and is not misleading. *Clark*, 143 Wn.2d at 771.

Schierman acknowledges this line of cases, but asks this court to "reconsider the pattern instructions because they do not differentiate between intent and premeditation in any meaningful way." Appellant's Opening Br. at 89.

*State v. Schierman (Conner)*, No. 84614-6

Schierman timely objected and offered his own instructions on this point. Schierman's proposed instructions are good alternatives to the pattern instruction; certainly, the trial court would not have erred by giving any of those alternative instructions. But Schierman does not offer any argument that this court has not previously addressed, and he does not show that our prior precedent on this issue is incorrect and harmful. We therefore decline his invitation to overrule that precedent.

Alternatively, Schierman argues that his Fourteenth Amendment right to due process was violated when the State used a baseball analogy in closing argument to explain the difference between "intent" and "premeditation." *Id.* at 90-93; U.S. CONST. amend. XIV. Schierman does not allege that this analogy constituted prosecutorial misconduct, and he does not cite any authority for the assertion that it resulted in a due process violation. We therefore reject it.

### B. Schierman's proposed instruction on voluntary intoxication

#### *1. Facts*

The defense proposed the following instruction on voluntary intoxication:

> The prosecution must prove that the defendant committed Aggravated First Degree Murder with premeditation and/or Murder in the Second Degree with intent. The defendant contends that he did not have the required intent and mental state due in whole or part to his intoxication. However, the defendant does not need to prove that he did not have the required intent and mental state.

78

If you have a reasonable doubt about whether the defendant committed the crime with premeditation, intent, criminal recklessness or criminal negligence, you must find the defendant not guilty.

CP at 7654. The court denied that request and gave the standard WPIC on voluntary intoxication instead:

No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant acted with intent or premeditation.

CP at 7849. The defense objected to the first sentence of that instruction, arguing that it "seems to contradict and vitiate the next line." VRP (Apr. 7, 2010) at 17-18. The court rejected that argument because the WPIC mirrored the language in RCW 9A.16.090, the Washington criminal code statute addressing voluntary intoxication. *Id.* at 18.

### 2. Analysis

Schierman contends that the trial court should have omitted the first sentence of the WPIC on voluntary intoxication because that sentence renders the instruction "[c]ontradictory and [a]mbiguous." Appellant's Opening Br. at 93. He is correct that there is some tension between the first sentence, implying that intoxication is not relevant to the question of guilt, and the second sentence, stating that intoxication "may be" relevant to guilt. CP at 7849. But he does not show that the trial court erred. He contends that the trial court should instead have borrowed language from

*State v. Schierman (Conner)*, No. 84614-6

this court's decision in *State v. Coates*, 107 Wn.2d 882, 735 P.2d 64 (1987), which interpreted the voluntary intoxication statute. *Coates*, however, neither held nor implied that there is anything wrong with the WPICs on voluntary intoxication. It held only that neither party bears the burden of proof on voluntary intoxication. *Id.* at 891. In reaching that conclusion, the *Coates* court actually approved of a jury instruction that exactly tracked the language of Washington's voluntary intoxication defense statute, RCW 9A.16.090, which provides:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular mental state is a necessary element to constitute a particular species or degree of crime, the fact of his intoxication may be taken into consideration in determining such mental state.

*Id.* at 889.

Schierman also argues that the voluntary intoxication instruction should have "appl[ied] to the aggravating factor of common scheme or plan." Appellant's Opening Br. at 94. The State correctly points out that Schierman did not request any instruction to this effect.

C. Denial of defense's request for lesser included offense instruction on manslaughter

*1. Facts*

The defense requested lesser included offense instructions on first and second degree manslaughter. CP at 7641-51. The requested first degree manslaughter instruction read as follows:

> To convict the defendant of the crime of Manslaughter in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1)   That on the 17th day of July, 2006, Conner Michael Schierman inflicted sharp force injury to [the victim];
>
> (2)   That Conner Michael Schierman's acts were reckless;
>
> (3)   That [the victim] died as a result of Conner Michael Schierman's acts; and
>
> (4)   That the acts occurred in the State of Washington.

CP at 7643. The requested second degree manslaughter instruction was similar.

The trial court denied the requests, finding that they were not supported by the evidence: "[T]he court's view[] is that there is no evidence to support the giving of the lesser degree for manslaughter in the first degree and manslaughter in the second degree, certainly not to the exclusion of the charged offense, which is murder in the first degree." VRP (Apr. 7, 2010) at 11-12.

Schierman argues that evidence of his intoxication raised an inference that he committed manslaughter: "[T]he defense presented evidence that Schierman was severely intoxicated at the time of the offense. The jury could have found that this reckless intoxication diminished Schierman's ability to act intentionally, or even to knowingly disregard a risk of harm." Appellant's Opening Br. at 97.

Schierman presented his intoxication evidence primarily through the testimony of Dr. Andrew Saxon, an addiction psychiatrist at the Veteran's Affairs Medical Center in Seattle. Dr. Saxon interviewed Schierman in November 2006 and February 2007 regarding the events of July 16 and 17, 2006 (the time of the murders). He also reviewed Schierman's medical and addiction treatment records.

In the interviews, Schierman told Dr. Saxon that he had consumed one 375-milliliter bottle of vodka at work on July 16, 2006, and taken three or four more bottles home with him. Based on Schierman's self-reporting, and on the fact that detectives had recovered three empty vodka bottles from Schierman's bedroom three days after the murders, Dr. Saxon formed the "opinion" that Schierman drank heavily on the evening of July 16, 2006. VRP (Apr. 1, 2010) at 106-07.

Two witnesses who saw Schierman on July 16, 2006, testified that if Schierman was drinking that night, he hid it from them. Schierman's roommate at the time, Way, testified that although he had not seen Schierman drinking that night, he later remembered Schierman acting "more outgoing than usual, more jovial,"

when he arrived home on the evening of July 16, 2006, and thought that this might have been a sign of intoxication. VRP (Feb. 10, 2010) at 169. Way also testified that when detectives arrived on Tuesday, July 18, to question Schierman and examine his injuries, Way began to suspect that Schierman had relapsed into drinking. *Id.* at 177. While Schierman was at the hospital having his injuries examined, Way entered Schierman's room and found a champagne bottle cork and an alcoholic energy drink, which Way regarded as evidence that Schierman had, in fact, started drinking again. *Id.* Finally, Way testified that he confronted Schierman after his return from the hospital, and that Schierman then admitted to a relapse. *Id.* at 181.

Schierman's housemate, Winter, testified that Schierman was "lively" and "seemed happy" on the night of July 16, 2006, and that he saw Schierman drinking a glass of orange juice with ice in it that night. VRP (Feb. 9, 2010) at 159-61.

From the transcript of the hearing on Schierman's guilt phase jury instructions, it is clear that the trial court was deeply skeptical of Schierman's intoxication evidence. Indeed, the court stated that it did not think Schierman was legally entitled to the voluntary intoxication instruction, but that it would nevertheless give that instruction "out of an abundance of caution":

> The court did conclude . . . that while technically the court does not believe the evidence at this point meets the standard set by the case law requiring, among other things, substantial evidence of drinking and a

83

connection between the amount of alcohol consumed . . . [and] the ability of the defendant to form the requisite intent . . . [or] premeditation . . . .

. . . .

. . . [O]ut of an abundance of caution, . . . I'm going to give it . . . [because of] the nature of the consequences of the court's interpretation being erroneous.

VRP (Apr. 7, 2010) at 7-9.

### 2. *Analysis*

Schierman argues that the trial court committed reversible error by denying his request for the manslaughter instruction. The State disagrees, contending that no error occurred and that if any did, it was harmless beyond a reasonable doubt. We agree with Schierman that the trial court erred when it refused to give the manslaughter instruction, but we conclude that the error was harmless beyond a reasonable doubt.

A party is entitled to have the jury instructed on a lesser included offense if that offense satisfies the two-pronged test this court established in *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). Under the first prong (*Workman*'s legal prong), the offense must consist solely of elements necessary to conviction of a greater offense charged. *Id.* at 448. Under the second prong (*Workman*'s factual prong), the evidence must support an inference that only the lesser offense was committed, to the exclusion of the greater offense charged. *Id.*

84

*State v. Schierman (Conner)*, No. 84614-6

In this case, the State concedes that *Workman*'s legal prong is met, since first and second degree manslaughter consist solely of elements necessary to conviction of first degree (premeditated) murder. Br. of Resp't at 157 (citing *State v. Warden*, 133 Wn.2d 559, 562-63, 947 P.2d 708 (1997); *State v. Berlin*, 133 Wn.2d 541, 550-51, 947 P.2d 700 (1997); *see also State v. Jones*, 95 Wn.2d 616, 621, 628 P.2d 472 (1981) (if prosecution proves intent, it necessarily proves recklessness and negligence); *State v. Bowerman*, 115 Wn.2d 794, 806, 802 P.2d 116 (1990) ("mental elements of recklessness and criminal negligence are lesser included mental states of intent").

The State argues, however, that the requested manslaughter instructions failed *Workman*'s factual prong because "the evidence overwhelmingly established that Schierman acted . . . with premeditated intent." Br. of Resp't at 162. Alternatively, it argues that any error in denying the manslaughter instruction was harmless because by rejecting a conviction for second degree murder, the jury necessarily rejected any lesser conviction as well. *Id.*

A trial court's refusal to give instructions to a jury is reviewed for abuse of discretion if it is based on a factual determination. *Walker*, 136 Wn.2d at 772. Here, the trial court made a factual determination that the evidence did not support an inference that Schierman committed manslaughter (a reckless or negligent

85

*State v. Schierman (Conner)*, No. 84614-6

homicide) to the exclusion of either intentional (second degree) or premeditated (first degree) murder.

Although the trial court denied Schierman's request for instructions on first and second degree manslaughter, it did instruct the jury on second degree murder and voluntary intoxication. Taken together, these three rulings indicate that the trial court believed the evidence supported an inference that Schierman was too intoxicated to *premeditate* the murders, but not an inference that he was too intoxicated to *intend* the murders. Schierman argues that this was error: since the evidence supported giving the voluntary intoxication instruction, which told the jury that intoxication might diminish intent, the trial court should have instructed the jury on manslaughter—a homicide offense with a lesser mental state (recklessness or negligence) than intent to kill.

The case law supports Schierman's position on this point. In *State v. Colwash*, 15 Wn. App. 530, 531-33, 550 P.2d 57 (1976), *aff'd*, 88 Wn.2d 468, 564 P.2d 781 (1977), the defendant was convicted of second degree murder, which the evidence showed he committed "by stabbing [the victim] with a knife." The court instructed the jury that the homicide was neither excusable nor justifiable, but that "intoxication could be considered in determining the presence of intent." *Id*. at 531. It also denied the defendant's request for a manslaughter instruction. *Id*. at 532.

The Court of Appeals reversed the conviction in *Colwash*, holding that the defendant was entitled to the manslaughter instruction because "[t]he giving of an intoxication instruction created for the jury a question as to whether defendant possessed the requisite premeditation and/or intent to kill required for murder." *Id.* This court affirmed the Court of Appeals. *Colwash*, 88 Wn.2d at 470-71. We reached the same conclusion in *Berlin*, where the defendant was found holding a shotgun and standing over his dead friend after an evening of heavy drinking. 133 Wn.2d at 549. We upheld the defendant's right to a manslaughter instruction, reasoning that "ample evidence was offered of Berlin's drinking to the point of potentially impairing his ability to form the requisite intent to kill." *Id.* at 552. And although *Warden*, 133 Wn.2d 559, involved a diminished capacity defense instead of a voluntary intoxication instruction, its reasoning supports Schierman's argument in this case.[27] In that case, the defendant "disguised herself as a delivery person and

---

[27] The State argues that *Warden* is inapposite because in that case, the defense presented expert testimony that posttraumatic stress disorder diminished the defendant's capacity for intent. But we do not require a defendant to present expert testimony in order to establish that alcohol affected his or ability to acquire a requisite mental state. *State v. Thomas*, 109 Wn.2d 222, 231-32, 743 P.2d 816 (1987) (expert testimony "not absolutely necessary in order for a court to give an intoxication instruction"); *Jones*, 95 Wn.2d at 622-23 (defendant's testimony that he drank "'nine or eleven' beers," combined with eyewitness testimony describing defendant's slurred speech, glassy eyes, and stint in the "'drunk tank'" on the night of the offense, entitled the defendant to a voluntary intoxication instruction in murder case).

*State v. Schierman (Conner)*, No. 84614-6

gained entry into [the victim's] residence," demanded money, broke a mason jar over the victim's head, and then stabbed the victim to death with a butcher knife she found in a kitchen drawer.[28] A defense expert testified that Warden suffered from PTSD (posttraumatic stress disorder) resulting in dissociative episodes, and that he believed "[she] lacked that the mental capacity to form the intent to kill." *Id.* at 564. We held that Warden was therefore entitled to an instruction on manslaughter in addition to second degree murder. *Id.*

In this case, testimony that Schierman was in an alcoholic blackout when the murders occurred created the same factual question that existed in *Colwash, Berlin,* and *Warden*: whether, if the defendant did commit the acts charged, he or she did so with the conscious intent necessary to constitute intentional, as opposed to reckless or negligent, murder. This is why the trial court—albeit, in an "abundance of caution"—gave the voluntary intoxication instruction. VRP (Apr. 7, 2010) at 8-9.

Consistent with our precedent on this issue, we hold that the trial court erred when it refused Schierman's request for a manslaughter instruction.

We also hold, however, that this error was harmless.

As the State points out, the jury convicted Schierman of first degree premeditated murder, despite the fact that it also received an instruction on the lesser

---

[28] *State v. Warden*, noted at 106 Wn. App. 1055, 2001 WL 747659, at *1 (appeal after remand).

included offense of second degree intentional murder. The State argues that this verdict implicitly rejects every lesser offense included in first degree premeditated murder, and that we can therefore be sure that a manslaughter instruction would have made no difference.

We recently rejected a similar argument in *State v. Condon*, where the defendant was charged with first degree premeditated murder and first degree felony murder, the trial court erroneously refused an instruction on the lesser included offense of second degree intentional murder, and the jury convicted the defendant of premeditated murder (the greatest crime charged) instead of first degree felony murder. 182 Wn.2d 307, 313, 326, 343 P.3d 357 (2015). In holding that the trial court's instructional error was not harmless, we rejected the argument that simply by instructing the jury on the definitions of premeditation and intent, the trial court effectively emphasized the legal distinction between first degree premeditated and second degree intentional murder. *Compare State v. Condon*, noted at 174 Wn. App. 1041, 2013 WL 1628247, at *7 ("[t]he instructions given with respect to [premeditated murder and felony murder] did not draw the jury's attention to the difference between premeditation and intent"), *with Condon*, 182 Wn.2d at 333-34 (González, J., dissenting) (pointing out that the jury was actually instructed on the definitions of "intent" and "premeditation," and arguing that this sufficed to draw the jury's attention to the difference).

89

With respect to this harmless error analysis, we find Schierman's case distinguishable from *Condon*. In Schierman's case, the relevant legal distinction was between intentional murder (committed by a person whose level of intoxication prevented him from premeditating his offenses) and reckless or negligent murder (committed by a person whose intoxication prevented him even from intending those offenses). Unlike the instructions given in *Condon*, the instructions given in Schierman's case called the jury's attention to this distinction—and to the defense theory that Schierman was in a state of alcoholic blackout when the murders occurred.

This is because even though Schierman's jury was not instructed on manslaughter, it was instructed on voluntary intoxication. That instruction specifically called the jury's attention to Schierman's intoxication evidence, and it specifically told the jury that it could consider this evidence when deciding whether the defendant had premeditated or intended the murders. Having heard this instruction, the jury nevertheless found that Schierman premeditated the murders— that is, it found that he committed the murders with the most conscious and culpable mental state. On this record, and given these instructions, there is only one possible explanation for that verdict: the jury did not credit the theory that an alcoholic blackout diminished Schierman's capacity to premeditate. There is no possibility that a manslaughter instruction would have led the jury to a different conclusion.

For the foregoing reasons, we conclude that the trial court erred when it refused to instruct the jury on manslaughter, but that this error was harmless. Having found only one instructional error and that this error is harmless, we also reject Schierman's argument that cumulative instructional error warrants reversal of his conviction.

PENALTY PHASE ISSUES

Schierman raises several challenges to his death sentence. We hold that in most respects, the experienced trial court judge correctly applied a complicated set of constitutional and evidentiary rules to a contentious and emotionally charged proceeding.

However, I disagree with the trial court's decisions to exclude important mitigating evidence proffered by defense expert witnesses. I conclude that those errors require reversal of the death sentences. And they would ordinarily require a remand to permit the State to proceed to a new sentencing phase. But this court is also required by statute to analyze whether imposing a sentence of death in each particular case is proportionate. I further conclude that the sentences of death violate Washington's prohibition on disproportionate capital sentencing. For that reason, I would reverse the sentences of death and remand with instructions to impose the only lawful sentence available for these crimes: four consecutive sentences of life in prison without possibility of parole.

91

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner)*, No. 84614-6

I.   The Exclusion of Certain Mitigating Evidence Violated Schierman's Right to Due Process and Protection against Cruel Punishment under Article I, Sections 3 and 14 of the Washington State Constitution

A. The trial court erred by excluding Dr. Cunningham's expert testimony on lack of future dangerousness in prison

*1. Facts*

In opening statements during the penalty phase, the defense mentioned for the first time that it planned to call Dr. Mark Cunningham, a clinical and forensic psychologist, to testify regarding Schierman's lack of future dangerousness in prison. The State objected that the defense had never disclosed its intent to call Dr. Cunningham to testify on any topic other than the phenomenon of alcoholic blackout. The defense submitted an offer of proof later that evening. This offer summarized Dr. Cunningham's proposed testimony on future dangerousness and mentioned a Microsoft PowerPoint presentation.

The next day, the trial court found that the defense had no "possible . . . legitimate basis . . . for this incredibly untimely disclosure of an absolutely new and previously unrelated scope of expert testimony." VRP (Apr. 20, 2010) at 15-16. The trial court did not, however, penalize Schierman for his lawyers' lateness: it specifically denied a motion to exclude Dr. Cunningham's testimony due to untimely disclosure. Instead, it postponed ruling on admissibility and directed the defense to provide the State with a copy of the proposed PowerPoint presentation.

92

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

That presentation, "Conner Schierman: Violence Risk Assessment March 2010," consisted of 42 slides summarizing and applying data culled from Dr. Cunningham's research on inmates incarcerated throughout the United States. CP at 8302. Many of the slides depicted rates of violence among various groups of inmates in different state and federal prisons. Overall, they conveyed the message that inmates sentenced to death or life without parole are less likely than other inmates to commit violent acts in prison. The presentation culminated in three slides titled "Individualized Actuarial Likelihood of Conner Schierman Committing a Prison Assault," and several slides listing the "Available Measures to Control Disruptive or Violent Inmates" in Washington Department of Corrections (DOC) facilities. CP at 8307-08.

Slides 36, 37, and 38 were all titled "Individualized Actuarial Likelihood of Conner Schierman Committing a Prison Assault." *Id.* The first slide compared Schierman with inmates in the Florida DOC, the second compared him with capital offenders in Texas, and the third compared him with "capital offenders who obtained relief from death sentences 1989-2008." *Id.* Slide 36 stated that among the Florida inmates studied, "*Inmates matching [Schierman] were in the lowest 15% of risk classification,*" and had only a "4.5% [rate of] potentially violent misconduct." CP at 8307. The second two slides stated that 0 percent of inmates "*matching [Schierman]*" committed serious assaults. CP at 8308.

93

As discussed above, the State moved to exclude Dr. Cunningham's presentation and testimony due to late disclosure and lack of relevance. The trial court did not exclude this evidence for late disclosure.

The trial court instead excluded it for lack of relevance. It accepted the State's argument on this point, which rested on *Morva v. Commonwealth*, 278 Va. 329, 350-351, 683 S.E.2d 553 (2009). In that case, the Supreme Court of Virginia held that the same Dr. Cunningham could not provide capital penalty phase testimony about the Virginia DOC's "security interventions" because they were not relevant to the defendant's "character, history, and background." *Morva*, 278 Va. at 350-51. The trial court acknowledged that testimony on future dangerousness was "clearly . . . allowed" since lack of future dangerousness is a "statutorily listed mitigat[ing] circumstance." VRP (Apr. 29, 2010) at 22. But it concluded that the majority of the slides in Dr. Cunningham's presentation were "generic" and thus irrelevant. *Id.* at 24.

The trial court did not fully explain what it meant by calling the excluded slides "generic." *Id.* at 24. But when it limited Dr. Cunningham's testimony on this basis, the court cited the Virginia case, *Morva*, with approval:

> I quote from the decision in <u>Morva versus The Commonwealth of Virginia</u>, which is, again, found at page 11 of the State's brief . . . .

There the Court, while considering the scope of Dr. Cunningham's proffered testimony on this same issue, noted as follows:

"To be admissible, evidence relating to a prison environment must connect the specific characteristics of the particular defendant to his future adaptability in the prison environment. It must be evidence peculiar to the defendant's character history and background in order to be relevant to the future dangerousness inquir[y].

"Conditions of the prison life and the security measures utilized in the maximum security facility are not relevant to the future dangerousness inquiry, unless such evidence is specific to the defendant on trial and relevant to that specific defendant's ability to adjust in prison life."

That is a quote taken from page 350 of the Morva opinion.

With that in mind, the court is appropriately limiting Dr. Cunningham's testimony on future dangerousness to those factors; that is, factors which are tailored to Mr. Schierman's situation, his background, everything that would relate to, in Dr. Cunninham's opinion, his ability to not present a risk of violence in the future, impose a risk of danger to other[s], without possibility of parole or life in the Washington State [DOC].

The vast majority of Dr. Cunninham's slides are generic. They are not, in the Court's view, at all helpful to the jury's understanding of this issue.

They are not within the scope that I have outlined, by my reference to the quotation from . . . Morva versus the Commonwealth of Virginia.

*Id.* at 23-24.

This passage clearly indicates that when the trial court excluded the "vast majority" of Dr. Cunningham's testimony, it was applying the rule from *Morva*:[29] the rule that a defendant's diminished opportunity to commit acts of violence due to prison security measures is inadmissible in a capital penalty phase proceeding because it is irrelevant to the defendant's character, history, or background.[30] *Morva*, 278 Va. at 350-51.

The court's ruling left the defense with 16 full slides and one partial slide. These slides covered topics such as "Why Conner Schierman is likely to make a positive prison adjustment," CP at 8302 (italics omitted); Schierman's "Employment in Community," CP at 8303; "Constructive Activities in Confinement," "Positive Adjustment to Custody," and "Continuing Relationships with Family and Friends," CP at 8304; and rates of inmate assault and homicide in Washington DOC facilities. They also included a slide listing five personal characteristics that reduced Schierman's risk of violence and a slide explaining that "[p]ast violence in the

---

[29] We do not understand the concurrence/dissent's contrary assertion. Concurrence/dissent at 13-14. It is plainly incompatible with the record.

[30] Interestingly, the trial court also seems to have believed that information about prison conditions *generally* was relevant to Schierman's future dangerousness so long as it pertained to *Washington* DOC facilities. *See* CP at 8306 (slide ruled admissible, depicting rates of inmate homicide and assault in Washington DOC facilities).

96

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

community is not strongly or consistently associated with prison violence." CP at 8306-07.

But the ruling excluded all the slides containing the data, culled from prisons throughout the United States that formed the factual basis for Dr. Cunningham's actuarial analysis and conclusion that Schierman posed a statistically low risk of committing violence in prison. Among the slides excluded were the three "individualized . . . actuarial" likelihood slides comparing Schierman with the inmates from other jurisdictions and concluding that he was unlikely to commit any acts of violence in prison. VRP (Apr. 29, 2010) at 25.

The day after the trial court excluded most of Dr. Cunningham's testimony and evidence on future dangerousness, the defense filed a declaration from Dr. Cunningham explaining actuarial methodology and asking the court to reconsider its ruling. The declaration explained that "there is no *individualized* assessment of a particular person that does not rest on group data of one sort or another." CP at 8266. It explained the importance of the excluded factual data on which Dr. Cunningham's opinion rested by stating, among other things, that "the statistical prevalence of a particular behavior over a set period of time . . . is the fundamental group statistic in risk assessment and is considered to be the single most important piece of data necessary in making an accurate risk estimate." CP at 8267-68. It also explained that "[w]ithout this anchor of a comparative reference point, individual

risk estimates at capital sentencing may be little more than speculation." CP at 8268.

Finally, Dr. Cunningham's declaration also summarized his qualifications, including awards he had won for his scholarship.

The trial court denied the motion to reconsider. It reasoned that "Dr. Cunningham is still allowed to testify to the group rates, which he feels are necessary as a concept. The group rates, however, are limited to the group behavior as reflected from statistics for the [DOC] in the State of Washington, not the [DOCs] in the State of Florida, or Texas, or anywhere else." VRP (Apr. 30, 2010) at 3.

After this ruling and another excluding a second PowerPoint presentation offered in support of Dr. Cunningham's testimony on a different issue (discussed below), the defense decided not to call Dr. Cunningham. During closing argument, the State asserted that Schierman had a problem with authority and would have contact with other inmates in prison.

### 2. *Analysis*

    a. The defense properly preserved the trial court's exclusion of Dr. Cunningham's testimony on future dangerousness for review

The State argues that any error related to Dr. Cunningham's risk assessment testimony is unpreserved because Dr. Cunningham did not testify. Citing *State v. Brown*, 113 Wn.2d 520, 533-40, 782 P.2d 1013 (1989), *State v. Mezquia*, 129 Wn. App. 118, 127-32, 118 P.3d 378 (2005), and *State v. Kimp*, 87 Wn. App. 281, 283-

98

85, 941 P.2d 714 (1997), the State asserts that "Schierman's offer of proof alone does not preserve any error." Br. of Resp't at 174.

The authority on which the State relies is inapposite: it all addresses the erroneous *admission* of evidence, rather than its exclusion. *Brown*, 113 Wn.2d at 539-40 (defendant must testify in order to preserve claim that prior conviction evidence was erroneously admitted for impeachment purposes under ER 609(a)); *Mezquia*, 129 Wn. App. at 127-31 (defendant must make offer of proof to preserve alleged error in admitting rebuttal evidence under ER 404(b)); *Kimp*, 87 Wn. App. at 281 (admission of impeachment evidence under ER 608(b) not reviewable unless witness testifies). The reasoning underlying these holdings is that in the context of impeachment or rebuttal evidence, an appellate court cannot review the trial court's ER 403 determination without reference to the witness's actual or proposed testimony. *Brown*, 113 Wn.2d at 535-36; *Mezquia*, 129 Wn. App. at 128-29; *Kimp*, 87 Wn. App. at 284.

That reasoning does not apply here. Dr. Cunningham made a detailed offer of proof, and the court thoroughly explained its reasons for excluding much of the proposed testimony. The record is sufficient to review Schierman's claim that this exclusion was error.

> b. The trial court erred in excluding Dr. Cunningham's testimony on Schierman's lack of future dangerousness in prison

The exclusion of evidence generally lies within the trial court's discretion, but a trial court abuses its discretion if it excludes evidence under the wrong legal standard. *Reese v. Stroh*, 128 Wn.2d 300, 310, 907 P.2d 282 (1995). In addition, as discussed above, the erroneous exclusion of mitigating evidence in the penalty phase of a capital trial violates state and federal constitutional guaranties. U.S. CONST. amends. VIII, XIV; CONST. art. I, §§ 3, 14. Such constitutional claims are legal issues reviewable de novo. In this case, the trial court applied the wrong standard to exclude Dr. Cunningham's testimony. Hence, it both abused its discretion and committed legal error.

As noted above, the trial court relied on the Virginia Supreme Court's decision in *Morva*, 278 Va. at 350-51, to exclude Dr. Cunningham's evidence. But the *Morva* court applied *Virginia* precedent holding that "a court should exclude evidence concerning the defendant's diminished opportunities to commit criminal acts of violence in the future due to the security conditions in the prison." *Id.* Under Virginia capital sentencing law, evidence of prison conditions that apply equally to all prisoners is deemed irrelevant to "'the defendant's character, prior record, or the circumstances of his offense.'" *Cherrix v. Commonwealth*, 257 Va. 292, 309, 513 S.E.2d 642 (1999) (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 n.12, 98 S. Ct. 2954,

100

57 L. Ed. 2d 973 (1978)); *see also Morva*, 278 Va. at 350 ("Our precedent is clear that a court should exclude evidence concerning the defendant's diminished opportunities to commit criminal acts of violence in the future due to the security conditions in the prison.").

Washington law is different. We do not follow the rule applied in Virginia, according to which testimony about prison security is irrelevant. Indeed, lack of future dangerousness is a statutory mitigating factor in our state, RCW 10.95.070(8), and ability to function well in the structured prison setting is relevant and admissible on that point. *Cf. In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 262, 172 P.3d 335 (2007); *State v. Finch*, 137 Wn.2d 792, 863-66, 975 P.2d 967 (1999) (plurality opinion). Moreover, Virginia's contrary rule arguably conflicts with *Lockett*, 438 U.S. at 605, *Skipper v. South Carolina*, 476 U.S. 1, 4-5, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986), and *Tennard v. Dretke*, 542 U.S. 274, 287, 124 S. Ct. 2562, 159 L. Ed. 2d 304 (2004), which all hold that a defendant must be permitted to present *any* relevant evidence that might support a sentence less than death.[31]

Further, the trial court misunderstood the Virginia court's reasoning in *Morva*. Under the rule applied in that case, courts are generally prohibited from admitting

---

[31] For an example of a law review note making this argument, see Lara D. Gass, Note, *Virginia's Redefinition of the "Future Dangerousness" Aggravating Factor: Unprecedented, Unfounded, and Unconstitutional*, 70 WASH. & LEE L. REV. 1887 (2013).

*State v. Schierman (Conner)*, No. 84614-6

*any* evidence of prison conditions at the penalty phase, because "evidence of the effectiveness of general prison security . . . is not relevant to the issue of [the unique defendant's] future dangerousness." *Morva*, 278 Va. at 351. But in Schierman's case, the trial court didn't limit Dr. Cunningham's testimony because it related to prison conditions, generally, as opposed to Schierman's characteristics, specifically. Instead, it excluded testimony based on data from other *states*. Nothing in *Morva*'s reasoning supports that ruling.

> c. The trial court may not exclude Dr. Cunningham's actuarial evidence unless it finds that the validity of this evidence is "seriously in doubt"

The State argues for the first time on appeal that Dr. Cunningham's testimony was properly excluded under ER 703[32] because it was not based on any validated actuarial instrument. Br. of Resp't at 174. It relies on *In re Detention of McGary*, 175 Wn. App. 328, 340, 306 P.3d 1005 (2013), which upheld the exclusion of expert testimony (in a non-death-penalty case) based on an actuarial instrument that only six experts used. The *McGary* court concluded that because so few experts used it,

---

[32] ER 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Under ER 703, "an expert witness must have a reasonable basis of information about the subject before offering his or her expert opinion." *In re Pers. Restraint of Keefe*, 159 Wn.2d 822, 831, 154 P.3d 213 (2007).

"the test was not reasonably relied upon . . . and thus not sufficiently reliable to support [the witness'] opinion." *Id.* at 341.

The State is correct that expert testimony may be excluded—under the regular ER 703 standard—if it is based on an actuarial method that is not "reasonably relied upon by experts in the [relevant] field." ER 703. *See In re Det. of Thorell*, 149 Wn.2d 724, 756, 72 P.3d 708 (2003) (challenges to the admissibility of actuarial evidence "are to be assessed under ER 702 and 703"). Under *Bartholomew* II, however, ER 703 does not apply in its typical fashion during the penalty phase of a capital case. *State v. Bartholomew*, 101 Wn.2d 631, 646, 683 P.2d 1079 (1984) (*Bartholomew* II).[33]

Because the State did not challenge Dr. Cunningham's testimony on this basis in the trial court, the record contains no discussion of this testimony's reliability and we are therefore unable to address the State's new argument for exclusion for the first time on appeal.[34] If we remanded for resentencing, however, the trial court would certainly retain discretion to evaluate Dr. Cunningham's actuarial testimony

_____

[33] While *Bartholomew* II did not cite ER 703 specifically, the precedent it applied dealt with the admissibility of polygraph evidence, which is generally excludable, absent stipulation, "on the ground that the technique has not attained general scientific acceptability." 101 Wn.2d at 646; *State v. Renfro*, 96 Wn.2d 902, 905, 639 P.2d 737 (1982) (citing *State v. Descoteaux*, 94 Wn.2d 31, 614 P.2d 179 (1980)).

[34] We recognize that we can affirm on any ground that is apparent from the record. The reliability of Dr. Cunningham's methodology, however, is not apparent from this record.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

for reliability. But the applicable reliability standard is the one we adopted in *Bartholomew* II, not the one listed in ER 703. The *Bartholomew* II standard is minimal reliability, discussed above. Thus, the trial court should determine whether the validity of Dr. Cunningham's actuarial analysis is "seriously in doubt." *State v. Rupe*, 101 Wn.2d 664, 691, 683 P.2d 571 (1984) (plurality opinion) (recognizing that "relaxed evidentiary rules" apply to the admission of mitigating evidence in death sentencing proceedings, and that mitigating polygraph evidence can therefore be excluded only where its "trustworthiness is seriously in doubt"). The trial court can apply the *Bartholomew* II "seriously in doubt" test, but not the Virginia *Morva* rule.

> d. The trial court's error in excluding Dr. Cunningham's evidence on lack of future dangerousness requires reversal

The State does not argue that any error in limiting Dr. Cunningham's evidence on lack of future dangerousness was harmless. I can certainly understand why. Dr. Cunningham's presentation was the defense's best evidence that Schierman posed little threat of future dangerousness. It was the only evidence on this issue that came from a neutral source (an expert rather than a friend or family member). *See State v. Barry*, 25 Wn. App. 751, 761, 611 P.2d 1262 (1980) (noting the "special credence often attached to expert testimony"). And the trial court's ruling gutted Dr. Cunningham's presentation by excluding its most persuasive aspect: the data

underlying Dr. Cunningham's conclusion that Schierman posed little threat of future dangerousness in prison. Without that data, Dr. Cunningham's presentation would have appeared to be weak, unsupported opinion testimony. Given the importance of the excluded evidence, combined with the State's (unrebutted) suggestion to the jury in penalty phase closing argument that Schierman's dangerousness supported a death sentence, this exclusion constituted reversible error.

### B. The trial court erred by excluding Dr. Cunningham's testimony regarding diminished control

#### 1. Facts

Along with the future dangerousness presentation included in its April 20, 2010, offer of proof, the defense offered a second PowerPoint presentation by Dr. Cunningham. This presentation was titled "Conner Schierman: Adverse Developmental Factors March 2010," and generally expressed the idea that Schierman had "diminished . . . control" due to his traumatic childhood and the legacy of substance abuse in his family. CP at 8271-84. The first three slides in the presentation juxtapose two columns of questions, one titled "Criminal Responsibility" and the other titled "Moral Culpability." CP at 8288. In the "Criminal Responsibility" column, four questions appear: "Could he control himself? Did he have a choice? Did he know right from wrong? [and] What did he do?" *Id.* In the "Moral Culpability" column, five related questions appear: "What

diminished his control? What shaped the choice? What shaped his morality and value system? How did we get here? [and] How was he damaged?" CP at 8288. These slides were followed by several more depicting the word "Choice" on a line whose downward slope becomes more extreme as the presentation progresses. CP at 8288-99. As the slope becomes more extreme, an upward-pointing vector on the left hand of each slide grows longer; it is labeled "Damaging or Impairing Factors." *Id.* A corresponding downward-pointing vector on the right side also grows longer; it is labeled "Moral Culpability." *Id.*

Later in the presentation, the slides depict a tower of positive words and phrases, such as "Stability," "Consistency," and "Positive Peer Relationships," atop a foundation labeled with various family and developmental circumstances. CP at 8291-92. In some of the slides, the foundation is labeled with neutral circumstances: "No family history of addiction or psychological disorder[,] No childhood maltreatment or violence exposure[,] No developmental abandonment or instability." CP at 8292. In these slides, the foundation is level and the tower standing straight. In other slides, the foundation reads, "Family addiction/psychological disorder[,] Childhood maltreatment and violence[,] Developmental abandonment & instability." *Id.* In those slides, the foundation is slanted and the tower of positive words and phrases is tilting precariously. CP at 8291-92.

106

Still later in the presentation, the slides list adverse developmental influences specific to Schierman—e.g., "Father's alcohol and drug abuse," CP at 8294, "Chronic parental marital conflict," CP at 8295, and "Physical and Emotional Abuse by Father," CP at 8297.

The State objected to this evidence, arguing that it raised "mental defenses, such as diminished capacity," that Schierman "disavowed" during the guilt phase. CP at 8140-41.

The trial court agreed. Once again, it criticized the defense for late disclosure. But, once again, the trial court refrained from punishing Schierman for his lawyers' error. It did not exclude the "Adverse Developmental Factors" presentation on the ground that it was untimely disclosed. Instead, citing *Oregon v. Guzek*, 546 U.S. 517, 126 S. Ct. 1226, 163 L. Ed. 2d 1112 (2006), the court ruled that "diminished capacity goes to the issue[s] of intent and premeditation," which had already been decided in the guilt phase. VRP (Apr. 30, 2010) at 9. It concluded that Dr. Cunningham could not testify that any "adverse developmental factors" had diminished Schierman's self-control because this would be tantamount to a diminished capacity defense and therefore inconsistent with the guilt phase verdict. *Id.* at 8-12.

The court did rule that Dr. Cunningham could testify to "the issues relating to moral culpability." *Id.* at 10. According to the court, these issues were

107

"[Schierman's] development as a child, boy and adolescent[,] . . . [h]is addiction[]
issues, both alcohol and drugs, [and] his alcohol treatment and recovery." *Id.*

As noted above, after the trial court excluded so much of Dr. Cunningham's
presentations that the defense decided not to call him, the defense entered the
"Adverse Developmental Factors" PowerPoint into the record. *Id.* at 11.

> 2. *Analysis*
>
> > a. Schierman properly preserved for review the trial court's
> > exclusion of Dr. Cunningham's testimony on diminished
> > control

The State argues that Schierman failed to preserve any error relating to this
exclusion because he did not call Dr. Cunningham to testify. This argument fails for
the reasons given in my discussion of Dr. Cunningham's testimony on future
dangerousness.

The State also argues that any error is unpreserved because Schierman failed
to make an adequate offer of proof. ER 103(a)(2) provides that a party may not
appeal a ruling excluding evidence unless "the admission affects a substantial right
and 'the substance of the evidence was made known to the court by offer or was
apparent from the context within which questions were asked.'" *Benn* II, 161 Wn.2d
at 268.

This argument fails as well. It is clear from the slides that were proffered that
Dr. Cunningham intended to testify that certain "Adverse Developmental Factors"—

108

specifically, a family history of addiction or psychological disorder, childhood maltreatment or violence exposure, and developmental abandonment or instability—tended to reduce Schierman's capacity for self-control and sound moral decision-making.[35] CP at 8288, 8290-93. To preserve a claim that evidence was erroneously excluded, a party need only make an offer of proof that reveals the general substance of the proposed testimony. *State v. Ray*, 116 Wn.2d 531, 539, 806 P.2d 1220 (1991) (to preserve issue under ER 103(a)(2), record must reveal substance, but not details, of proposed testimony). The "Adverse Developmental Factors" presentation meets this standard. Accordingly, I address this assignment of error on its merits.

> b. The trial court erred in excluding Dr. Cunningham's evidence on diminished control; it was not inconsistent with the guilt phase verdict

The jury in Schierman's case was instructed to consider at the penalty phase:

> [whether, a]t the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law was substantially impaired as a result of mental disease or defect.

---

[35] The State asserts that Cunningham "struck . . . as irrelevant" a "list of issues related to legal responsibility" shown on three of the disputed PowerPoint slides. Br. of Resp't at 180. That assertion is misleading. The slide in question juxtaposes the "Criminal Responsibility" and "Moral Culpability" columns and superimposes a circle with a line through it over the "Criminal Responsibility" column. CP at 8288. This is clearly intended to illustrate the distinction between guilt phase and penalty phase considerations—it does not characterize any testimony as irrelevant.

CP at 8318. This mitigating factor is codified at RCW 10.95.070(6). It is one of eight statutory "[f]actors which the jury may consider in deciding whether leniency [is] merited" in a capital sentencing proceeding. RCW 10.95.070.

The trial court excluded diminished capacity evidence, citing *Guzek*. The issue presented in *Guzek*, however, was "whether the State may limit the *innocence-related* evidence [the defendant] can introduce at [the capital sentencing] proceeding to the evidence he introduced at his original trial." 546 U.S. at 519 (emphasis added). The evidence in question was new alibi testimony, previously available to the defendant but not offered during the guilt phase. *Id.* at 523. The *Guzek* Court held that the Constitution does not bar the State from excluding such evidence in the sentencing proceeding. *Id.* The *Guzek* holding rested on three rationales: (1) sentencing concerns "*how*, not *whether*, a defendant committed the crime," (2) the admission of new innocence-related evidence resembles a (disfavored) collateral attack, and (3) at the sentencing phase, the defendant could still introduce (through transcripts) any innocence-related evidence he introduced in the guilt phase. *Id.* at 526-27.

Unlike the defendant in *Guzek*, Schierman did not seek to collaterally attack his conviction. As Schierman points out, a defendant can commit a murder with intent and premeditation while also being impaired—diminished—in his ability to appreciate the wrongfulness of his conduct or conform his conduct to the

110

requirements of the law. Indeed, the legislature must have contemplated that exact scenario when it enacted RCW 10.95.070(6)—because that subsection allows the jury to consider that mitigating factor only *after* finding that the defendant committed intentional, premeditated murder.[36]

Because diminished self-control or decision-making is a relevant mitigating factor in a capital sentencing proceeding, the trial court erred in excluding Dr. Cunningham's testimony under *Guzek*.

        c. The trial court's error in excluding Dr. Cunningham's
        presentation on diminished control requires reversal

Like Dr. Cunningham's presentation on lack of future dangerousness, Dr. Cunningham's presentation on diminished control was among the most persuasive mitigating evidence offered during the penalty phase. The vast majority of the other mitigation witnesses were friends or family as opposed to neutral experts. And Dr. Cunningham was the only expert who offered admissible evidence on Schierman's limited capacity for self-control, something that our legislature has specifically identified as relevant in a capital sentencing proceeding. Given the significance of

---

[36] The State also argues that the mitigating factor provided in RCW 10.95.070(6) refers to an *insanity* defense, and that the exclusion of testimony regarding *diminished capacity* therefore did not impair Schierman's ability to establish this mitigating factor. This argument is meritless. As explained above, Schierman was not attempting to relitigate the questions of intent or premeditation by presenting a diminished capacity defense. Instead, he was attempting to present expert testimony linking his criminal conduct to developmental influences, in contrast to conscious choice.

this potentially mitigating evidence, the trial court's error in excluding it requires reversal.

The erroneous exclusion of Dr. Cunningham's evidence (on both lack of future dangerousness and diminished self-control) necessitates reversal of Schierman's death sentence. Since I am the only one who would reverse the death sentence, though, I address Schierman's additional penalty phase claims.

### C. The trial court erred by excluding Dr. Mark McClung's testimony regarding past brain injury

#### 1. Facts

On April 27, 2010, the defense offered a letter by Dr. Mark McClung, a forensic psychiatrist, stating that past brain injury might have diminished Schierman's capacities for self-control and anger management. Dr. McClung based this opinion on an MRI (magnetic resonance imaging) scan of Schierman's brain, conducted in July 2009; a review of that MRI by Dr. Wendy Cohen; neuropsychological testing conducted by Dr. Paul Connor in April of 2010; and Dr. McClung's personal interviews with Dr. Cohen and Dr. Connor.

Along with Dr. McClung's letter, the defense filed three documents: (1) the MRI scan report, (2) an affidavit by Dr. Richard Adler stating that the MRI reflected a 1997 concussion and that this was "not the first incidence of brain injury suffered by Conner Schierman," CP at 8249-50, and (3) a letter from Dr. Connor to Dr. Adler

112

explaining that Schierman had probably suffered multiple head injuries during his life. Dr. Connor based this opinion on the fact that "Schierman and his family have reported a number of incidents of domestic violence in which he was struck in the head by his biological father." CP at 8257.

The State objected to Dr. McClung's testimony on the grounds that it was offered too late and did not meet the *Frye*[37] standard for scientific reliability. The transcript of the argument on this issue indicates that just as the penalty phase proceedings were beginning, Dr. Adler "discovered what he considered to be significant information related to a prior brain trauma" in Schierman's medical records, that defense counsel then marshalled several experts to investigate this discovery, and that the defense finally offered Dr. McClung's opinion about one week after the penalty phase proceedings began. VRP (Apr. 28, 2010) at 57-58.

Dr. McClung's letter addressed the issue of brain injury in the following, somewhat noncommittal terms:

> Mr. Schierman's brain injury may have had no impact on his subsequent emotions or behavior. However, it is possible that it had an impact on subsequent mood problems and intensity of substance abuse. When Mr. Schierman was intoxicated, the brain injury may have contributed to worsening any problems with loss of inhibitions, interpreting his surroundings, and controlling anger/aggression. Violent offending is correlated with increased incidence of brain injury in offender; however, specific cause-and-effect has not been established in all but a few specific cases.

---

[37] *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923).

113

CP at 8260.

As with Dr. Cunningham's testimony, the State objected to Dr. McClung's testimony on the ground that it was offered too late to permit any meaningful cross-examination. However, as with Dr. Cunningham's testimony, the court did not exclude Dr. McClung's testimony due to late disclosure. Instead, it excluded that testimony as speculative, "based upon a faulty foundation," and not "expressed to a reasonable degree of medical certainty." VRP (Apr. 29, 2010) at 20, 6.

### 2. *Analysis*

As noted above, the trial court provided two different reasons for excluding Dr. McClung's testimony. First, it concluded that the testimony lacked an adequate factual foundation. Second, it ruled that the testimony did not meet the threshold for admitting expert opinion since it was not expressed to a reasonable degree of medical certainty.

With respect to the first conclusion—that Dr. McClung's testimony lacked an adequate factual foundation—I disagree. At the hearing on Dr. McClung's testimony, the trial court spent close to 13 minutes examining the "chain of other experts and their evaluations" that Dr. McClung relied on in forming his opinion. *Id.* at 7-20. This examination contains medical judgments that the court was not qualified to make. As noted above, Dr. McClung relied on Dr. Connor's

neuropsychological testing report, which included Dr. Connor's opinion that Schierman had probably suffered multiple head injuries, at the hands of his biological father, prior to the 1997 concussion. According to Dr. Connor, the earlier injuries were significant because they likely worsened the effects of the 1997 concussion: "It is well documented that multiple head injuries ha[ve] a cumulative effect such that in each subsequent injury, the negative impacts are often greater than would be expected from one head injury in isolation."[38] CP at 8257. The trial court rejected this theory, ruling that there was no "foundation" for any expert's conclusion that Schierman had suffered multiple head injuries. VRP (Apr. 29, 2010) at 20.

It is not entirely clear why the court reached that conclusion. Certain parts of the transcript indicate that the court believed the MRI conclusively proved that Schierman had suffered only one brain injury.[39] (According to the offer of proof, the MRI revealed that Schierman had suffered *at least* one, but not necessary *only*

---

[38] In his affidavit in support of Dr. McClung's proposed testimony, Dr. Adler stated that "the effect(s) of the 1997 [concussion reflected in the MRI] was/were likely made more serious by precedent head trauma." CP at 8250.

[39] VRP (Apr. 29, 2010) at 8 ("Dr. Cowen's re-evaluation of the MRI[] . . . concludes that . . . there was evidence of a prior insult -- that is singular"), 15 ("[Dr. Adler] does seem to ignore [Dr. Cowen's] conclusion, as Dr. Connor did, that there was evidence of one, a, prior injury or insult . . . shown in the rereading of the MRI.").

115

one, concussion.) But the majority of the court's comments on the issue indicate that it just didn't think that Schierman's father hit Schierman hard enough or often enough in the head to sustain any expert's conclusion that Schierman had suffered multiple head injuries.[40]

This medical conclusion exceeded the trial court's expertise. Both Schierman and his sister told Dr. Cunnningham about an incident in which their biological father picked Schierman up and slammed him face first into a brick hearth. This occurred when Schierman was 9 or 10 years old. Schierman also told Dr. Cunningham that his father often shook him so hard that his head flopped back and forth, and that his father threw him against walls and kicked him down stairs. Schierman's mother reported that Schierman's father slapped him so hard that it left marks.

It is not clear whether Dr. McClung would have testified that these prior injuries likely worsened the effects of Schierman's documented 1997 concussion— his proposed testimony did not explicitly endorse that particular portion of Dr.

---

[40] *E.g.*, *id.* at 13-14 ("[In his interview with Dr. Cunningham, [t]he defendant relates this incident that his sister [also] related . . . where their father grabbed the defendant and threw him face first on to the brick hearth. The defendant relates . . . that he was about . . . 9 or 10 at the time . . . and was dizzy after that and disoriented for a little while. *There is no detail about how long that effect lasted.*" (emphasis added)), 9 ("[Schierman's mother] *only reports one incident* . . . when the defendant was in the third grade, his biological father . . . slapped him in the face, hard enough that it left marks" (emphasis added)).

116

Connor's report. But, as a forensic psychiatrist, he was qualified to offer such testimony. The trial court, by contrast, was not qualified to assess the probable medical consequences of Schierman's childhood abuse. Therefore, it should not have excluded Dr. McClung's testimony for inadequate "foundation." *Id.*

The trial court's second ruling—that Dr. McClung's opinion was inadmissible because it was not expressed to a reasonable degree of medical certainty—presents a more complicated legal question. Under normal (non-capital-sentencing phase) evidentiary standards, expert medical opinion testimony is inadmissible unless it is expressed to a "reasonable[]medical certainty" or "reasonable medical probability." *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 606-07, 260 P.3d 857 (2011). Schierman—understandably—does not argue that Dr. McClung's proposed testimony met this standard. Instead, he argues that the "reasonable medical certainty" standard does not apply to mitigating expert testimony in a capital sentencing proceeding. Appellant's Opening Br. at 124.[41] This is a question of first impression for this court.

---

[41] Schierman cites *State v. Ellis*, 136 Wn.2d 498, 963 P.2d 843 (1998), arguing that it established a low bar for the admission of "expert testimony on diminished capacity," at least in capital cases. Appellant's Opening Br. at 124. *Ellis* does not stand for that principle. In *Ellis*, the trial court excluded a significant amount of expert testimony on diminished capacity on a pretrial motion in limine. 136 Wn.2d at 522-23. The *Ellis* court held that the exclusion was premature, and that the trial court should have evaluated it under ER 702, 401, and 402 instead of applying the nine separate factors articulated in *State v. Edmon*, 28 Wn. App. 98, 621 P.2d 1310 (1981). *Ellis*, 136 Wn.2d at 522-23.

The "reasonable medical certainty" or "reasonable degree of probability" requirement for expert opinion testimony is partly a matter of relevance.[42] Under ER 401, "relevant evidence" is evidence that tends to make the existence of a material fact more or less probable, and, in a normal adjudication of criminal or civil liability, expert opinion does not satisfy this standard unless it is expressed to a reasonable degree of probability.[43] Neither the Eighth nor the Fourteenth Amendment to the United States Constitution prohibits the exclusion of mitigation evidence on the ground that it is irrelevant.[44] But the question remains: What makes an expert opinion relevant to the ultimate determination that a jury must make under

---

Nothing in *Ellis* undermines the "reasonable medical certainty" standard for expert medical testimony.

[42] *Lord* III, 161 Wn.2d at 295 n.16 ("If the expert cannot express an opinion to a reasonable degree of probability, then his or her opinion does not make the material issue more or less likely . . . . Such testimony amounts to speculation." (citing *State v. Phu Huynh*, 49 Wn. App. 192, 198, 742 P.2d 160 (1987))); *Torno v. Hayek*, 133 Wn. App. 244, 250, 135 P.3d 536 (2006) (medical testimony not helpful to the trier of fact unless "based upon a more probable than not basis" (citing *Carlos v. Cain*, 4 Wn. App. 475, 477, 481 P.2d 945 (1971))); ER 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any [material] fact . . . more probable or less probable than it would be without the evidence.").

[43] ER 401.

[44] *State v. Davis*, 175 Wn.2d 287, 318-19, 290 P.3d 43 (2012) (*Davis* II) (upholding trial court's exclusion of several witness's mitigation testimony as irrelevant); *State v. Gregory*, 158 Wn.2d 759, 856-57, 147 P.3d 1201 (2006) (trial court properly excluded as irrelevant evidence regarding sentences imposed for other defendants' crimes), *overruled in part on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014).

*State v. Schierman (Conner)*, No. 84614-6

Washington's death penalty statute—the determination of whether the jury is "convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" RCW 10.95.060(4).

In this case, Dr. McClung offered to testify that Schierman's brain injury might, but might not, have impacted his behavior. CP at 8260. The State is correct that this testimony does not make the *fact* of Schierman's diminished control more probable; it just establishes the *possibility* of that diminished control. Thus, in a normal adjudication of criminal or civil liability, Dr. McClung's testimony would be properly excluded as irrelevant.

But, as the State argued in *State v. McEnroe*, the jury's determination under RCW 10.95.060(4) is not purely factual. 181 Wn.2d 375, 383-84, 333 P.3d 402 (2014). Instead, that determination involves considerations of "mercy, leniency, and other *nonfactual* matters." *Id.* at 386 (emphasis added). In this respect, the jury's decision in a capital sentencing phase proceeding is fundamentally different from its decision in a normal civil or criminal case.

In light of this difference, the "reasonable medical certainty" standard should not be applied to mitigating expert testimony in a capital sentencing proceeding. When the jury is answering the question posed under RCW 10.95.060(4)—whether it is "convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency"—the Eighth and Fourteenth amendments to the

119

United States Constitution require that it be allowed to consider all evidence that "'*might* serve "as a basis for a sentence less than death."'" *Tennard*, 542 U.S. at 288 (emphasis added) (quoting *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604)). Thus, in Washington, a capital defendant must be allowed to present any penalty phase evidence that might create reasonable doubt about the conclusion that "leniency"—a sentence of life in prison without parole instead of death—is not warranted.

Dr. McClung's testimony clearly satisfied that standard. While Dr. McClung did not testify that prior brain injury *probably* impaired Schierman's capacities, he did testify that it *possibly* impaired Schierman's capacities. Some jurors might consider that possibility to be a circumstance meriting leniency. Thus, even if Dr. McClung's testimony did not establish a probability of diminished capacity, it still might serve as a basis to impose a sentence less than death. Dr. McClung's testimony is therefore relevant mitigating evidence in the penalty phase. The cumulative effect of excluding all of this science in the penalty phase was not harmless.

D. Schierman's other assignments of error

*1. Facts*

Just before the penalty phase began, the defense submitted a new list of mitigation witnesses. It listed 79 people and summarized each one's proposed

testimony. The summaries referred generally to Schierman's personal characteristics and/or emotional relationship with the witness.[45] The State moved to exclude most of these witnesses as cumulative.

The trial court ruled that the defense could select up to 12 of the listed family members and 2 teachers or school counselors to testify as to Schierman's character. It ruled that the defense could select up to 15 of the remaining lay witnesses to testify as to Schierman's character, but that these witnesses could testify about Schierman's history of alcohol blackouts only to the extent that the defense experts did not cover this subject. Finally, the court ruled that the defense could call just one treatment professional from the Lakeside-Milam Recovery Center (Lakeside-Milam).

The trial court also limited the scope of the lay witness testimony. It ruled that lay witnesses could testify to the facts that Schierman's parents divorced and Schierman's father was abusive, but could not offer opinions as to how these things affected Schierman. The court clarified that Schierman's mother could testify about "[o]bserved behaviors . . . that she may associate with [Schierman's father's]

---

[45] *E.g.*, CP at 26426 (cousin, Derek Huotari, would testify "about their childhood [and that] [Schierman] cared about them and treated people respectfully [and] loved animals"), 26427 (cousin Seth Justesen would testify "regarding his experience of [Schierman's] family over the years and his feeling of connectedness to [Schierman] as a friend and family member), 26431 (friend of Kinsey Schierman (Schierman's sister) would testify "to [Schierman's] treating her like a sister and looking out for her [and that s]he felt safe with him"), 26430 (former employer would testify that [Schierman] was "a hard worker, car[ed] for animals and [was] a team player").

absence," but that lay witnesses generally were not qualified to opine on the psychological effects of divorce or abuse on a child. VRP (Apr. 13, 2010) at 29-30. The court also ruled that no witness could testify about the impact of Schierman's execution on other people.

The defense moved for reconsideration, submitted a more detailed offer of proof regarding the excluded witnesses, and requested the addition of two new categories of witness: "family counselors" and "corrections officers." CP at 7899. In response, the court ruled that the defense could add seven new mitigation witnesses: the Reverend David Tinney (a "Friend" on the first witness list, CP at 7934), Ed Morrison (a family counselor not on the first witness list), two additional family members from the first witness list, and three new witnesses from the department of "adult juvenile detention" (not on first witness list). VRP (Apr. 15, 2010) at 104. This meant that the trial court permitted Schierman to call, in total, 37 character witnesses out of 73 proposed character witnesses.

On April 19, the defense offered the testimony of Eldon Vail, the secretary of the Washington DOC, regarding the resources and programming available to offenders sentenced to life without parole in Washington. The court agreed that Vail's testimony was "certainly relevant . . . on the statutory mitigating circumstances of future dangerousness or lack thereof," but ruled that if Vail

*State v. Schierman (Conner)*, No. 84614-6

testified, another defense mitigation witness, James Aiken, could not. VRP (Apr. 19, 2010) at 22.

Aiken's testimony covered the same general topic and thus was just as relevant as Vail's. Aiken is a security consultant to numerous prison systems; the defense offered his testimony on "an inmate's overall adjustment to confinement as well as current/future danger to society" and "Mr. Schierman's classification records from the King County Correctional Facility in Seattle." CP at 7920, 7943, 26422. Consistent with its limitation on Dr. Cunningham's evidence, the trial court ruled that Aiken could testify only as to his knowledge of prisons in Washington State. VRP (Apr. 19, 2010) at 22. But it also ruled that Vail was "in a much better position to testify on that than is Mr. Aiken," and excluded Aiken's testimony as cumulative—*if* Vail were to testify. *Id.*

On April 22, 2010, in response to the State's motion, the trial court excluded testimony by Kinsey Schierman "regarding the effects of . . . her father's anger or his unpredictable behavior on her." VRP (Apr. 22, 2010) at 15. It ruled, however, that Kinsey could testify regarding "any observation she made of the impacts, not her interpretation of the impact, but actual observations of impacts . . . [that her father's] behaviors had on the defendant." *Id.* at 16.

On April 26, 2010, the trial court limited the testimony of Schierman's uncle, Michael Christensen. Christensen would have testified that he was a former

123

corrections officer, that he had observed Schierman "reach[ing] out to his family . . . from the correctional setting," and that he viewed this as a positive thing. VRP (Apr. 26, 2010) at 11. The court ruled that Christensen could testify "to the same scope that other family witnesses have been allowed to testify," but that he could not "relat[e] his own employment to [Schierman's] situation and how he thinks that [Schierman] will . . . do." *Id.* at 14.

On the same day, the trial court ruled that no mitigation witnesses could testify as to what their children did for a living or how many grandchildren they had. The court stated that it was making that ruling in response to a "pattern throughout the examination of . . . both family and friends witnesses." *Id.* at 13.

Ultimately, Schierman called 33 mitigation witnesses.[46]

Finally, Schierman presented 23 photographs through the mitigation testimony of his sister, Kinsey. The defense offered 54 more photos of Schierman through Schierman's mother. The trial court limited these additional photographs to

---

[46] VRP (Apr. 20, 2010) at 43 (Dean Dubinsky), 132 (Keith O'Brien), 151 (Amy Hawkinson); VRP (Apr. 21, 2010) at 10 (James Ilika), 54 (Mark Nowak), 63 (Chris O'Brien), 93 (Marilyn Lagerquist), 138 (Eldon Vail), 161 (Lori Huotari), 179 (Corrine Cross), 190 (Michelle Brask); VRP (Apr. 22, 2010) at 34 (Timothy Driver), 44 (Candace Budhram), 89 (Michael Holley), 100 (Charlotte Zachary-Klutchnikova), 106 (Kinsey Schierman); VRP (Apr. 26, 2010) at 15 (Jaime Yantis), 27 (Gail Justesen), 36 (Michael Christensen), 40 (Linda Schierman), 62 (Seth Justesen), 69 (Kimberly Yantis), 72 (Isaac Way), 108 (Jerry Walsh), 115 (Roni Uyeda), 124 (Corey Anne Louis Kelman), 136 (Lois Tallman); VRP (Apr. 27, 2010) at 24 (Karl McGavran), 35 (Phyllis Roderick), 44 (Linda Kesler), 51 (Eugenia Allen-Brablik), at 63 (Wendy Dubinsky); Def.'s Ex. 11 (Jim Tallman).

12. The court also ruled that the defense could present only 12 pieces of Schierman's artwork, either live or in photographs. The court denied defense counsel's request to present a single photograph showing more than 12 pieces of artwork.

### 2. *Analysis*

Schierman argues that the trial court committed eight errors in excluding or limiting this mitigation testimony. We address each alleged error separately.

#### a. Exclusion of mitigation character witness testimony as cumulative

Schierman contends that it was error to exclude mitigation witnesses on the ground that their testimony was cumulative. He cites his cousin Erica Akingcoye's proposed testimony as an example of excluded evidence that "would have gone to Schierman's ability to form strong social bonds with others, and to touch their lives in positive ways." Appellant's Opening Br. at 129 (citing CP at 7893). Schierman argues that this type of testimony "says something about the person [he] was when he was not drinking or taking drugs." *Id.* at 130. He also argues that such testimony should not be excluded as cumulative because "[t]o a large extent, the sheer number of witnesses was the very point: a person who has touched and enhanced the lives of many people will likely be seen as more deserving of leniency." *Id.*

We know of no case holding that a trial court erred by excluding mitigating character evidence as cumulative in a capital sentencing proceeding. But neither do

*State v. Schierman (Conner)*, No. 84614-6

we know of any case in which a trial court preemptively limited the number of mitigation character witnesses who could testify.[47]

We do not resolve this issue here. Schierman offered character testimony by 47 non-family-member witnesses,[48] and the trial court excluded 30 of these witnesses as cumulative.[49] He also offered the testimony of 26 family members, and the trial court excluded 12 of them. VRP (Apr. 13, 2010) at 32-33; VRP (Apr. 15, 2010) at 104. In all, therefore, the trial court deprived Schierman of mitigating character testimony by 42 individuals—more than half of all the penalty phase

---

[47] There are cases, however, affirming a trial court's exclusion of *written* character evidence as cumulative of live witness testimony. *E.g.*, *People v. Pearson*, 56 Cal. 4th 393, 470, 297 P.3d 793, 154 Cal. Rptr. 3d 541 (trial court did not violate defendant's right to due process by excluding three reference letters, describing defendant as reliable and hardworking, as "cumulative of other testimony regarding defendant's character presented during the penalty phase"), *cert. denied*, 134 S. Ct. 198 (2013); *State v. Wise*, 879 S.W.2d 494, 521-22 (Mo. 1994) (no denial of due process where trial court excluded letter from corrections officer describing defendant's talent in music, poetry, and writing; because other witnesses had testified to these qualities, letter was properly excluded as cumulative), *overruled on other grounds by Joy v. Morrison*, 254 S.W.3d 885 (Mo. 2008); *Fox v. State*, 1989 OK CR 51, 779 P.2d 562, 572 (where defendant presented 54 witnesses "who testified that his life had meaning to them and who felt that he should be sentenced to life imprisonment rather than being given the death penalty," five additional affidavits containing similar statements were "needless . . . cumulative evidence"; trial court did not deny defendant due process protections by excluding affidavits).

[48] CP at 7933-35 (31 "Friends," five "School" witnesses, and 10 "Work" witnesses), 7899 (Morrison).

[49] VRP (Apr. 13, 2010) at 33 (ruling that Schierman could present 15 non-family-member lay witnesses); VRP (Apr. 15, 2010) at 104 (allowing Schierman to add Reverend Tinney and Morrison).

126

witnesses offered by the defense. And it did so not because these witnesses offered irrelevant or unreliable testimony, but because it determined that their testimony would delay the proceedings.[50]

But Schierman then chose to forgo calling even the character witnesses he was permitted to call. We therefore conclude that he did not preserve this claimed error for review.

> b. Exclusion of testimony about mitigation witnesses' lives and families

Schierman asserts that the trial court prohibited mitigation witnesses from discussing their own lives and families. He argues that this was error because those witnesses' "loving . . . [and] pro-social" lives were relevant in assessing the value of their testimony on Schierman's behalf. Appellant's Opening Br. at 130-31.

The trial court, however, did not generally prohibit witnesses from "discussing their own lives and family relationships," as Schierman suggests. *Id.* at 130. Instead, the trial court stated once—apparently in response to testimony from certain mitigation character witnesses—that witnesses could not testify about how many grandchildren they had or what their children did for a living.

---

[50] *See* CP at 7921-22 (State's "Memorandum in Support of Motion to Exclude Cumulative Defense Penalty Phase Witnesses," arguing that witnesses should be excluded because "jurors have been repeatedly advised . . . that this trial will conclude by late-March or early April").

Moreover, Schierman fails to identify any particular testimony that he was unable to present as a result of this ruling. In fact, on April 27, the day after the court issued this ruling, a friend of Schierman's from the Lakeside-Milam testified that she had six grandchildren and that the eldest was being deployed to Afghanistan in July.

This issue does not entitle Schierman to relief.

### c. Exclusion of lay opinion testimony about the effects of abuse and divorce

Schierman argues that the trial court erred by excluding lay testimony regarding the way he was affected by domestic violence and divorce. Citing *State v. Claflin*, 38 Wn. App. 847, 854, 690 P.2d 1186 (1984), he argues that such testimony is admissible under the Rules of Evidence. He implies that even if it weren't admissible under the Rules of Evidence, such testimony would still be admissible in the penalty phase of a capital case.

The trial court, however, did not actually exclude testimony about Schierman's behavior following his parents' divorce or his father's abuse. Indeed, Schierman's mother, stepfather, and sister all testified about the way abuse and divorce affected Schierman. VRP (Apr. 20, 2010) at 44, 70 (Dean Dubinsky testifying that Schierman's childhood trauma led him to have emotional and substance abuse problems); VRP (Apr. 22, 2010) at 108-12 (Kinsey testifying about

physical and emotional abuse; testifying that she "noticed more of a change in [Schierman] just shortly after the separation"); VRP (Apr. 27, 2010) at 83-88 (Wendy Dubinsky testifying about the effect that abuse and divorce had on Schierman).

Thus, regardless of some trial court comments seeming to exclude testimony on this topic, most of it was, in fact, admitted. Ultimately, Timothy Driver testified that when he coached Schierman in high school, he saw signs in Schierman's behavior that "it was . . . uncomfortable for him at home at that time." VRP (Apr. 22, 2010) at 40. This is consistent with the summary provided in the defense's April 9, 2010, supplemental disclosure. And after the defense filed its motion for reconsideration, the court ruled that Morrison could testify. Although Morrison was ultimately unavailable, the defense substituted Phyllis Roderick, Schierman's junior high school counselor. Roderick testified that Schierman "was a child who was angry at dad and mom over what was going on[,] . . . who was slipping into what I was concerned might be a depression[,] . . . [and who] struggl[ed] between wanting to be the kid that he was and that need to . . . also be the caretaker for the family." VRP (Apr. 27, 2010) at 41.

As for the other proffered witnesses, only Schierman's mother, Linda Schierman, testified. But she testified consistently with the summary in the supplemental disclosure, describing her family's legacy of alcoholism and the abuse

129

that Schierman suffered at the hands of his biological father. Thus, it does not appear that the court's ruling on lay opinion actually had any limiting effect on Linda Schierman's testimony.

Finally, although Stephanie Overland and Joshua Parker did not testify, we cannot tell from the record why the defense did not call them. As explained above, the defense called only 12 of the 14 family member witnesses that the trial court ultimately permitted. Both Overland and Parker were family members and thus could have testified.

> d. Forcing Schierman to choose between Eldon Vail and James Aiken

Schierman argues that the trial court erred by forcing him to choose between Aiken and Vail. He contends that Aiken could have offered his perspective on prisons outside Washington State, to which Schierman might one day be transferred. The State argues that this error is unpreserved because Schierman failed to object to the court's April 19 ruling.

The State is correct. And, in any event, Aiken's testimony would have been entirely cumulative of Vail's. The defense offered both Aiken and Vail as experts on Schierman's probable conditions of confinement in the Washington State DOC. Vail had much more direct experience with Washington's prisons than Aiken did.

> e. Exclusion of Kinsey Schierman's testimony regarding her own abuse

Schierman argues that the trial court erred by prohibiting Kinsey Schierman from testifying about the way she was affected by her father's abuse.

The State argues that the trial court acted within its discretion when it determined that Kinsey's experience was not relevant. It argues that the jury could not assume that their father's abuse affected Kinsey and Schierman in similar ways because "Kinsey was four years younger than Schierman, testified that she suffered an alcohol addiction but was successful in recovery, and apparently was not violent toward others," and because her gender and personality were different from Schierman's. Br. of Resp't at 191 (citing VRP (Apr. 22, 2010) at 107, 115).

We agree with the State that this relevance determination was within the trial court's discretion.

> f. Exclusion of Michael Christensen's testimony about his experience as a corrections officer

Schierman argues that the trial court erred by limiting Christensen's testimony. Christensen is both Schierman's uncle and a former corrections officer, and the defense offered his opinion testimony on Schierman's adjustment to life in prison.

The court ruled that Christensen could testify about his relationship with Schierman, as a family member, but could not "relat[e] his own employment to

131

*State v. Schierman (Conner)*, No. 84614-6

[Schierman's] situation and how he thinks that [Schierman] will . . . do, or has done because of his own prior or current employment." VRP (Apr. 26, 2010) at 14. The court explained that that testimony "is neither relevant [nor] probative of the issues present in the penalty [phase] of this case." *Id.* at 11.

The trial court erred here for the same reason it erred in excluding Dr. Cunningham's actuarial testimony regarding future dangerousness. The cumulative effect of exclusion of all this mitigating evidence also weighs in favor of reversal of the death sentences.

> g. Exclusion of testimony about the effect of an execution on family members

Schierman argues that he should have been allowed to present testimony on the effect of his execution on his friends and family. But he failed to object to the court's ruling. Because there was no objection, there was no colloquy on this issue. Nor was there any relevant offer of proof, so the record does not indicate what evidence Schierman would have presented regarding the effect of his execution on his friends or family. *See* CP at 7889-900, 26422-33 (summarizing proposed mitigation witness testimony; omitting any reference to the impact of Schierman's execution on his friends or family). For this reason, any error is not "manifest" under RAP 2.5(a)(3). *Kalebaugh*, 183 Wn.2d at 584 (error not "manifest," for purposes of RAP 2.5(a)(3), unless there is a "'plausible showing by the [appellant] that the

132

asserted error had practical and identifiable consequences in the trial'") (alteration in original) (internal quotation marks omitted) (quoting *O'Hara*, 167 Wn.2d at 99)).

### h.  Photographs

In his opening brief, Schierman implies that the trial court admitted only 12 of his many offered photographs of his life.  The State points out, correctly, that the court actually admitted 35 of Schierman's photographs.  Schierman does not explain, in either his opening or his reply brief, how he was prejudiced by the 35-photograph limit.  When the trial court excluded 42 of the photographs offered through Schierman's mother, it ruled that the photographs were "not relevant or probative in that quantity" because many of them depicted Schierman at the same life stages. VRP (Apr. 26, 2010) at 149.  With respect to Schierman's artwork, the trial court ruled that Schierman could present 12 separate pieces.  Schierman asked to display a single image of his artwork "in such a way that it could be just observed en mass[e], as opposed to individual pieces," presumably because in that way he could present more than 12 individual pieces. *Id.* at 151.  The trial court denied this request.

The trial court acted within its discretion in placing these minimal limits on Schierman's photographs and artwork.

133

II.    The Admission of Certain Victim Impact Testimony Did Not Violate Schierman's Rights to Due Process or Protection against Cruel Punishment

Schierman challenges the trial court's admission of two types of victim impact evidence: (1) a memorial service video tribute to the four victims and (2) testimony by several of the victims' family members regarding their immigration from the former Soviet Union and the importance of Christianity to them and to the adult victims. He argues that the admission of this evidence violated the Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 3 and 14 of the Washington State Constitution.

A. Facts

*1. Memorial service video*

On April 15, 2010, the State offered as penalty phase evidence "a video that was prepared for purposes of a memorial service by the [victims'] family, which provides . . . moving images of the four victims in this case . . . [and is] about 15 minutes long." VRP (Apr. 15, 2010) at 110. The defense objected that the State should be limited to one "in-life" photograph of each victim, arguing that "memorial services are beyond the boundaries of evidence that should be otherwise admissible" because they tend to "inflame the passions of [the] jury." *Id.* at 111.

The trial court noted that the State had listed the video in its discovery materials in December 2009, and asserted that it was "a little late to be objecting to

134

it now." *Id.* at 112. But once again, the court gave the defense more time; it allowed the defense until noon the following day to submit specific objections in writing. The defense then argued that the video was "well crafted, and it . . . make[s] it extremely difficult for [the defense] to put on mitigation." VRP (Apr. 19, 2010) at 8.

The State countered that the memorial video was admissible because its "focus on family, the focus on faith, the focus on children, is exactly who these people were, in a way that . . . is unusual for people perhaps in our society, and for that reason [the video] truly give[s] the most meaningful glimpse of who these people . . . were." *Id.* at 4. The State also suggested that if the court concluded that the video's music soundtrack was inflammatory, the video could be played without sound.

The court ruled that the video was largely admissible under *State v. Gregory*, in which this court held that victim impact evidence is admissible in the penalty phase of a capital case, so long as it does not "'so infect[] the sentencing proceeding as to render it fundamentally unfair.'" 158 Wn.2d 759, 852, 147 P.3d 1201 (2006) (quoting *Payne v. Tennessee*, 501 U.S. 808, 831, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) (O'Connor, J., concurring)), *overruled in part on other grounds by State v. W.J.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). The trial court concluded that the only objectionable part of the memorial video was the soundtrack, and ruled that the video

135

must therefore be played silently. The court excluded the music because "in the court's view, [it] does magnify tremendously the -- both, the religious, spiritual, and, as the case law [has] held, inappropriate attempts to influence through those means the jury's decision in this case." VRP (Apr. 19, 2010) at 10.

### 2. *Victim family member testimony*

The State presented four witnesses during the penalty phase: Lybov Botvina (the mother of Olga and Lyuba), Pavel Milkin (the father of Leonid), Yelena Shidilovsky (the sister of Olga and Lyuba), and Leonid (the husband of Olga and father of Andrew and Justin).

All of these witnesses testified about their relationship to the victims and their sense of loss. Lybov and Pavel testified that both of their families came to the United States as political refugees, sponsored by the Catholic Church, because they were persecuted in the former Soviet Union for their Christianity. Leonid testified that he was 13 when his family immigrated to the United States, and that he spoke no English when they arrived. The prosecutor asked Lybov whether she ever wished that she had not come to the United States "because of what happened." VRP (Apr. 19, 2010) at 124. She answered, "Yeah, that's what my husband say, if I would know, I will lose my girl, I would have stayed in Ukraine no matter what." *Id.*

Lybov and Yelena testified that Lyuba and Olga were deeply religious. Leonid testified that Olga was extremely active in their church. The prosecutor asked Lybov whether the murder had shaken her faith. She replied:

> You know, we have [a] very deep belief, we are Christian and we came from Ukraine, where Christianity was underground, and so it did not shake my faith, no, it doesn't, because I have belief I will meet him in heaven on the last day, because they are with Jesus.

*Id.* at 124. The prosecutor asked Yelena, "How important was faith in Olga's life?"

*Id.* at 152. She answered:

> Just like it was earlier said by my mom, we grew up, and pretty much the reason why we left the former Soviet Union is because of religious persecution, and as a result we knew that this is something -- freedom to really believe in God freely is something absolutely amazing and we should really treasure that, and knowing that you can freely go on Sunday to church was absolutely a privilege, and having a Bible, read the Bible, as well, and so for her that was just the cornerstone, this was something that was an important part of her . . . daily life. I'm not talking about Sundays, I'm talking about the conversation I had with her at some point when I was working during the work hours.
>
> I called her and asked [a] simple question, what are you doing? She said, "I'm just reading my Bible," and that's not something to brag about, that's just . . . the fact that that was her life, to read the Bible and really believe according to the principles and be a good example. That's why she was absolutely loved and adored by people around her. She had a lot of friends.

*Id.* at 152-53.

B. Analysis

In *Booth v. Maryland*, 482 U.S. 496, 501-02, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987), *overruled in part by Payne*, 501 U.S. 808, the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibited the presentation of victim impact evidence to a capital sentencing jury. The *Booth* Court reasoned that victim impact testimony was inherently inflammatory, was virtually impossible to rebut, and created a risk of arbitrary sentencing decisions. *Id.* at 505, 509. Two years later, in *South Carolina v. Gathers*, 490 U.S. 805, 810, 109 S. Ct. 2207, 104 L. Ed. 2d 876 (1989), *overruled in part by Payne*, 501 U.S. 808, the Court extended *Booth*'s holding to apply to the prosecutor's remarks.

The Court overruled *Booth* and *Gathers* in *Payne*, reasoning that the states have always been free to punish crime according to the harm that results:

> Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities. We think the *Booth* Court was wrong in stating that this kind of evidence leads to the arbitrary imposition of the death penalty. In the majority of cases, . . . victim impact evidence serves entirely legitimate purposes. In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.

501 U.S. at 825. The *Payne* Court, however, expressly declined to overrule *Booth*'s holding that victims' family members may not testify to their opinions about the defendant, the crime, or the appropriate sentence. *Id.* at 830 n.2.

In *State v. Gentry*, this court adopted *Payne*'s reasoning and rejected the defendant's argument that article I, sections 3 and 14 of the Washington State Constitution prohibited the presentation of victim impact evidence to a capital sentencing jury. 125 Wn.2d 570, 618-33, 888 P.2d 1105 (1995). The *Gentry* court held that the addition of the victims' rights amendment (article I, section 35) to our state constitution expanded the category of evidence that is admissible in a death sentencing proceeding under *Bartholomew* II, 101 Wn.2d 631. The court cautioned, however, that the trial court must always weigh the probative value of victim impact evidence against its potential for prejudice, and that it must exclude "'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response.'" *Gentry*, 125 Wn.2d at 632 (quoting *People v. Raley*, 2 Cal. 4th 870, 916, 830 P.2d 712, 8 Cal. Rptr. 678 (1992)).

The testimony at issue in *Gentry* was given by the victim's father. *Id.* at 617. He testified "about the victim's interests, and her plans for the future[, and about] . . . the effects of his young daughter's murder on his work, his emotions and his family." *Id.* This court held that the testimony was properly admitted at the sentencing phase. *Id.*

139

Schierman acknowledges that the Eighth Amendment to the United States Constitution no longer bars victim impact evidence, but he argues that the evidence admitted in his case violated due process protections by "'injecting arbitrary factors into [the] capital sentencing hearing.'" Appellant's Opening Br. at 147 (quoting *State v. Barnard*, 608 So. 2d 966, 968 (La. 1992). He also argues that even if the federal constitution does not bar the victim impact evidence admitted in his case, Washington's more protective constitution does. WASH. CONST. art. I, §§ 3, 14.

Since the addition of the victims' rights amendment to the Washington State Constitution, however, this court has always looked to federal precedent to determine the scope of victim impact evidence admissible under our state due process and cruel punishment clauses.[51] To be sure, Washington's constitution imposes more stringent restrictions on *all* of the State's evidence at a special sentencing proceeding, and these restrictions apply with full force to victim impact evidence. *E.g.*, *Gregory*, 158 Wn.2d at 854 (because the Rules of Evidence apply to

---

[51] *Gregory*, 158 Wn.2d at 854-55 (concluding that even if victim's statement that defendant's crime was "'unspeakable' improperly characterized the crime in violation of *Booth*, [482 U.S. 496], and [*State v.*] *Pirtle*, [127 Wn.2d 628, 672, 904 P.2d 245 (1995)]," any error was harmless under Washington Constitution's due process and cruel punishment clauses because the statement "was fleeting compared with those made in *Booth*"); *Gentry*, 125 Wn.2d at 625-29 (holding that the due process and cruel punishment clauses of Washington's constitution (article I, §§ 3, 14) can be harmonized with the victim's rights amendment (article I, § 35) only by permitting victim impact evidence in a capital sentencing proceeding, and concluding that such evidence is "relevant," under Washington's death penalty statute, for the same reasons it was deemed relevant in *Payne*).

140

State's evidence at special sentencing proceeding, victim impact evidence must comply with hearsay rule). But Washington's constitution imposes no stricter limits on victim impact evidence, specifically, than the federal constitution does.

### 1. *Memorial service video*

No Washington case directly addresses the issue, but Schierman contends that courts in other jurisdictions have rejected victim impact evidence similar to the State's video in his case. He cites *United States v. Sampson*, 335 F. Supp. 2d 166, 192 (D. Mass. 2004), *Salazar v. State*, 118 S.W.3d 880, 882-85 (Tex. Ct. App. 2003), and *People v. Prince*, 40 Cal. 4th 1179, 156 P.3d 1015, 57 Cal. Rptr. 3d 543 (2007)).

In *Salazar*, 118 S.W.3d at 882-85, a noncapital case, the Texas Court of Appeals remanded for resentencing because the prosecution showed a 17-minute video "tribute" to the victim's life. The appellate court deemed the video inflammatory, in violation of the defendant's due process rights, because it featured "'highly emotional and moving background music'" and images of the adult victim as a baby and young child. *Id*. at 884. In *Prince*, 40 Cal. 4th at 1291, the court approved the use of a 25-minute video interview of the victim by a local television station. It distinguished that video, which it described as "a calm, even static, discussion of [the victim's] accomplishments and interests," from videos containing music or images of the victim as an infant or young child. *Id*. at 1287. And in *State v. Hess*, 207 N.J. 123, 158-59, 23 A.3d 373 (2011), the New Jersey Supreme Court

held that defense counsel erred by failing to object to the admission of a 17-minute, professionally produced video featuring music, images of the victim's childhood and tombstone, and the superimposed text of poems scrolling over the images.

In response, the State relies primarily on *People v. Kelly*, approving the use of a 20-minute video, set to background music by Enya, depicting the victim from infancy until her death at age 19. 42 Cal. 4th 763, 793-99, 68 Cal. Rptr. 3d 531, 171 P.3d 548 (2007). The *Kelly* decision repeatedly emphasizes the need for trial courts to be "very cautious" in admitting videotape victim impact evidence, but concludes that the video in question was "not unduly emotional" and "was relevant to the penalty determination[ because i]t humanized [the victim]." *Id.* at 797-99. The decision acknowledges that the background music was probably "irrelevant" and "emotional," and it appears to disapprove of a "theatric" image of people on horseback at the end of the video, but it concludes that these elements, even if erroneously admitted, were harmless. *Id.* at 798.

Thus, the case law on victim impact videos, including *Kelly*, generally distinguishes between objective representations (admissible) and stylized productions (inflammatory). It also distinguishes between information *about* the victim's life (admissible) and tributes *to* the victim (inflammatory).

The memorial video presented in this case contains four basic elements: many still images of the victims, many moving images of the victims, a few captions with

phrases like "you are gone, but not forgotten," and a few images of clouds and coastlines. It also contains a few images of the two adult victims as children.

The captions and images of nature are the kind of stylized elements that courts have deemed inflammatory and therefore inadmissible. *E.g.*, *Hess*, 207 N.J. at 158-59; *Salazar*, 118 S.W.3d at 884. And the images of the adult victims as children are also problematic. *Hess*, 207 N.J. at 158-59; *Salazar*, 118 S.W.3d at 884. But in this case, the emotional impact of those fleeting elements is negligible compared with the impact of the many still and moving images of the two child victims. And courts applying *Payne* have held that moving images and video photomontages are admissible as victim impact evidence in a capital case. *E.g.*, *State v. Gray*, 887 S.W.2d 369, 389 (Mo. 1994) (videotape of victim at family's Christmas admissible "to show the victims are individuals whose deaths represent a unique loss to society and to their family and that the victims are not simply 'faceless strangers'" (quoting *Payne*, 501 U.S. at 825)); *State v. Leon*, 142 Idaho 705, 707, 710, 132 P.3d 462 (Idaho Ct. App. 2006) (4 1/2-minute DVD (digital video disk) containing video and photographic images of victim and victim's children was admissible victim impact evidence). *But see Sampson*, 335 F. Supp. 2d at 191-93 (27-minute video featuring 200 still photographs of the victim from victim's life, beginning at infancy, would have been inadmissible even without evocative musical soundtrack because it "provided much more than a 'quick glimpse' of the victim's life").

In light of our precedent allowing the State to present victim impact evidence, the trial court did not err by admitting the video without sound.

### 2. *Victim family member testimony*

#### a. Preservation of error

The State argues that we should decline to reach the issue of the victim impact testimony because Schierman did not object to this testimony at trial. The State contends that the defendant is required to preserve such an error under *Gregory*, 158 Wn.2d at 853 n.43.

We reject the State's argument and reach the merits of this issue. First, we construe procedural rules more liberally in a capital case. *Lord* I, 117 Wn.2d at 849 (citing *Jeffries*, 105 Wn.2d at 418). Second, this court has addressed unpreserved challenges to the admission of victim impact evidence in the past. *See Gregory*, 158 Wn.2d at 853 n.43 (noting that defendant failed to preserve state, as opposed to federal, constitutional challenges to the admission of victim impact evidence; stating that "to the extent that we evaluate these arguments, we do so under RAP 2.5(a)'s limitations"; and addressing the state constitutional arguments).

#### b. Merits

Schierman argues that the victim impact testimony was irrelevant and inflammatory under *Gentry* because it emphasized "the victims' goodness, beauty,

144

piety, and glorious struggle to free themselves from community oppression so that they could practice their Christian religion." Appellant's Opening Br. at 151.

The State argues that many cases have approved victim impact testimony referring to the victim's religious activities. The State is correct. *See United States v. Mitchell*, 502 F.3d 931, 989-90 (9th Cir. 2007) (approving victim impact testimony that the victim was the person responsible for teaching family's children about their Navajo heritage, traditions, and practices); *United States v. Bernard*, 299 F.3d 467, 479-80 (5th Cir. 2002) (approving victim impact testimony regarding victim's religious activities and survivors' reliance on faith; disapproving one witness' appeal to defendants to "put their faith in Jesus Christ for the forgiveness of their sins," but finding error harmless); *People v. Vines*, 51 Cal. 4th 830, 251 P.3d 943, 124 Cal. Rptr. 3d 830 (2011) (approving testimony by mother of victim's young son that she told her son the victim was in heaven with Jesus; approving testimony that victim attended church); *People v. Pollock*, 32 Cal. 4th 1153, 1181, 89 P.3d 353, 13 Cal. Rptr. 3d 34 (2004) (approving testimony as to the victim's participation in Bible study classes, but specifically noting that witnesses did not testify about "[victim's] specific religious beliefs . . . [or] suggest that religious doctrines should guide or affect the penalty determination process"); *Pickren v. State*, 269 Ga. 453, 454-55, 500 S.E.2d 566 (1998) (approving testimony as to the impact of victim's death on his church community); *State v. Reeves*, 337 N.C. 700, 722-23, 448 S.E.2d

802 (1994) (approving testimony that victim was a good person, who would do anything for anyone and always went to church).

Courts have also admitted victim impact testimony involving immigration and persecution. *People v. Virgil*, 51 Cal. 4th 1210, 1274-75, 253 P.3d 553, 126 Cal. Rptr. 3d 465 (2011) (approving victims' sister's testimony that victim fled Cambodia to escape Communism when victim was 10 years old); *People v. Valencia*, 43 Cal. 4th 268, 74 Cal. Rptr. 3d 605, 180 P.3d 351 (2008) (approving victim's parents' testimony that when victim was still alive, he sent them money and clothing to help alleviate their poverty in Mexico; approving victims' mother's testimony that she was very proud of victim for graduating from high school since she had never learned to read or write).

We hold that the victim impact testimony in this case did not violate constitutional protections. We decline to adopt a rule that says some victims' stories—particularly those involving religion, immigration, or persecution—are too compelling to be admissible.[52]

---

[52] Finally, Schierman asserts that the presence of uniformed military personnel in the courtroom, combined with Leonid's testimony that he was stationed in Iraq when the murders occurred, "rendered the death sentence arbitrary and capricious in violation of the Eighth Amendment and Article I, § 14." Appellant's Opening Br. at 84. Schierman cites no authority for this argument. In the portion of this opinion that addressed the guilt phase of Schierman's trial, we concluded that the presence of uniformed officers, even in combination with Leonid's testimony, did not render Schierman's trial unfair. We know of no authority suggesting that we should reach a different conclusion under the Eighth Amendment and article I, § 14.

146

III.    The Trial Court Did Not Violate Schierman's Right to Due Process or Protection Against Cruel Punishment When It Permitted the State to Cross-Examine Schierman's Stepfather on the Contents of Schierman's Rehabilitation Treatment Journal

Schierman challenges the trial court's ruling allowing the State to cross-examine his stepfather, Dean Dubinsky, about selected passages in a journal Schierman kept while undergoing treatment at the Lakeside-Milam. The trial court permitted this cross-examination as rebuttal to Dubinsky's testimony that he never worried about the possibility that Schierman might harm another person when he was intoxicated. Schierman argues that the treatment journal's prejudicial effect outweighed its rebuttal value, and that the cross-examination therefore violated the constitutional rules adopted in *Bartholomew* I and II. *State v. Bartholomew*, 98 Wn.2d 173, 654 P.2d 1170 (1982) (*Bartholomew* I), *vacated by* 463 U.S. 1203, 103 S. Ct. 3530, 77 L. Ed. 2d 1383 (1983), *aff'd on remand by Bartholomew* II, 101 Wn.2d 631.

A. Facts

On April 19, 2010, the first day of the penalty phase, the defense asked the court to limit the State's cross-examination of mitigation witnesses as follows:

"[W]e'd move to exclude cross-examination by the State with respect to . . . other bad acts without foundation . . . . I can give an example.

What I'm concerned about is a particular witness gets up, family or friend, indicates that their experience with [Schierman] has been a good one and they find him to have certain characteristics and background, and the State gets up and asks a series of questions like

147

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> without foundation regarding other bad acts, for example if you knew that he beat somebody up, would that change your opinion, or if he did this or that, would that change your opinion. So I'm concerned about . . . the, if you will, do you still beat your wife kind of questions.

VRP (Apr. 19, 2010) at 44.

The State responded that it had "an abundance of foundation" to ask about prior bad acts, "from the defendant's own writings and his descriptions to others of his past life." *Id.* at 45. The defense disagreed, but only because the State could not "establish foundation as to any *personal knowledge* by any of these witnesses." *Id.* at 46 (emphasis added).

The court rejected that argument on the ground that the State did not need to establish that any mitigation witness was personally aware of an alleged specific prior instance of bad or violent conduct. Instead, the court ruled, the State needed to establish only that it had a "good faith basis" to believe that the prior bad act in fact occurred: "One is not required to assume or know in advance whether the witness is aware of the prior bad act, there simply has to be a good faith basis for asking about the act itself." VRP (Apr. 19, 2010) at 46-47.

The defense explained that it was particularly concerned about questioning based on a "treatment journal" that Schierman had kept while he was a patient at the Lakeside-Milam, a drug and alcohol addiction treatment facility. *Id.* at 47. The court asked the defense, "What's the basis for moving to exclude any references to

the defendant's own version of events?" *Id.* The defense repeated that the journal described incidents about which no mitigation witness had direct, personal knowledge. The court again rejected the argument that such knowledge was a necessary foundation for questioning witnesses about the contents of the journal.[53]

The following day, the defense called Schierman's stepfather, Dubinsky, as its first mitigation witness. Dubinsky testified that Schierman had emotional problems stemming from his childhood, and that this led him to use alcohol and drugs. He explained that "[Schierman] and Kinsey[, Schierman's sister,] came from an alcoholic home," that Schierman was smart but had low self-esteem, and that Schierman had apparently attempted suicide before Dubinsky began dating Schierman's mother. VRP (Apr. 20, 2010) at 49-60. He also testified that Schierman was extremely protective of his mother and sister, a characteristic that Dubinsky attributed to "the previous lives with their father." *Id.* at 56.

Dubinsky described Schierman's last two years of high school as difficult, mainly because of Schierman's depression, which he also attributed to psychological abuse by Schierman's father. But he explained that Schierman's outlook improved

---

[53] In his opening brief, Schierman asserted that "[t]he defense objected to the introduction of information from the journal[,] citing *State v. Bartholomew* [II]." Appellant's Opening Br. at 156. But in his reply brief, Schierman concedes that defense counsel did not cite to *Bartholomew* I and II when objecting to the admission of the treatment journal.

when he entered an alternative high school. When asked to describe Schierman when he graduated from high school, Dubinsky said that "he was full of promise." *Id.* at 65.

Shortly after Schierman enrolled in college, however, his relationship with his mother and Dubinsky began to deteriorate and he moved out of their home. During this period, Schierman lived with his father briefly. By the time Schierman was 23, Dubinsky believed that he was drinking excessively on a daily basis. Finally, after Schierman showed up at his family's home carrying a gun and threatening suicide, he entered a 28-day inpatient treatment program at Lakeside-Milam.

Dubinsky testified that Schierman responded well to treatment. At the end of the 28 days, Schierman moved into a group home for recovering addicts.

Near the end of Dubinsky's direct examination, defense counsel asked him if he ever feared that Schierman would harm another person while he was intoxicated. Dubinsky testified that he did not because although he had "heard . . . maybe one or two stories about [Schierman] being in a fight at a bar or something . . . . *He didn't have the history of hurting people or hurting things, or doing things that were violent."* *Id.* at 104 (emphasis added). Defense counsel then prompted Dubinsky to address the treatment journal, which "may or may not have described assaultive behavior." *Id.* at 105. Dubinsky stated that he had first learned of the journal "the other day," and had asked defense counsel to show him a copy of it in preparation

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

for his testimony. *Id.* Dubinsky testified that Schierman had never been violent or assaultive toward anyone else in Dubinsky's presence.

On cross-examination, the prosecutor handed Dubinsky a collection of photocopied papers, "marked for identification as State's Exhibit Number 2," and asked if he recognized them. *Id.* at 115. He said he did not. The prosecutor indicated that they were excerpts of the treatment journal and asked Dubinsky if he'd seen the journal. Dubinsky explained that he had "asked the defense attorneys if I could have some information about the journal [and t]hey sent me some excerpts on line." *Id.* at 115-16. He clarified that the excerpts were typed, whereas the photocopies he'd just been handed were handwritten.

The prosecutor then questioned Dubinsky about particular passages in the journal, referring him to specific numbered pages and asking whether they'd been included in the excerpts he'd seen online. In these excerpts, Schierman described "stealing cigarettes and clothes and getting in fights," *id.* at 117-18; being "a really good actor," *id.* at 118-19; "mak[ing] short work of"—as in beating up —his father, *id.* at 120; inadvertently exposing his pets to the residual cocaine and ecstasy in his sweat; and using hallucinogens and "beating the shit out of a homeless person that [he] thought was an alligator," *id.* at 122-23. Dubinsky indicated that he had seen most of these excerpts in the materials provided by defense counsel, but could not

151

remember seeing the excerpt about stealing cigarettes and clothes, and had not been provided the excerpt about cocaine and ecstasy.

The prosecutor asked Dubinsky whether he'd seen an excerpt in which Schierman described putting the back of his father's head through a wall and knocking him unconscious. In the excerpt, Schierman stated that he "gave his [father's] right hand a good couple sto[m]ps till I hear bones break," and later told his father that he'd punched a hole in the wall in a drunken rage. *Id.* at 124. Dubinsky acknowledged that this episode had been included in the journal excerpts provided to him. He then stated:

> [J]ust to be upfront with you, I don't recall [Schierman's father] ever having a broken hand and I don't remember -- he never called to discuss with us about an assault like this that would have taken place. I would have imagined that there would have been some sort of communications, parent to parent, if there was something like this going on.

*Id.*

Finally, the prosecutor asked Dubinsky about an excerpt in which Schierman stated that he'd had "several close calls with police, often with handcuffs on, in the back of a cruiser, yet I never was arrested." *Id.* at 125. Dubinsky said that the excerpt had been provided to him in the defense materials and did not match his experience with Schierman: "I would imagine he would have ended up in jail or we would have gotten a phone call or there would be some sort of write-up by the police

152

officer, but, no . . . ." *Id.* He made similar comments about two more excerpts in which Schierman described "an ass whooping at the hands of a telescoping, steel baton . . . [but] no arrest still," and a fight in which "I sent one guy to the ER and just about broke another guy'[s] neck." *Id.* at 126.

### B. Analysis

#### 1. *Preservation of error*

Schierman acknowledges that the prosecution may rebut testimony by a capital defendant's mitigation witness, but he argues that the journal was inadmissible because it was more prejudicial than probative. First, he argues that the journal was not relevant rebuttal evidence because Dubinsky "never made sweeping statements about Schierman's peacefulness." Appellant's Opening Br. at 166. Second, Schierman argues that the journal was unreliable. The State argues that Schierman failed to preserve any such error because he did not cite *Bartholomew* I and II or argue that the journal was more prejudicial than probative when challenging its admission in the penalty phase proceeding.

The State is correct that Schierman neither cited *Bartholomew* I and II nor objected to the journal's admission on the ground that the journal was irrelevant or more prejudicial than probative. Instead, he sought to exclude the journal on the ground that none of his mitigation witnesses had personal knowledge of the events

(fictional or otherwise) recounted in the journal. Thus, defense counsel did not preserve the errors that Schierman now raises.

Under RAP 2.5(a)(3), this court may decline review of an unpreserved error unless the error is both "manifest" and "truly of constitutional dimension." *O'Hara*, 167 Wn.2d at 98. We have said that an error is of constitutional magnitude only if it deprives the defendant of an actual constitutional guaranty. *Id.* at 99, 103 (contrasting errors of constitutional magnitude, such as jury instructions that shift the burden of proof, and errors of nonconstitutional magnitude, such as failure to instruct on a lesser included offense). But the limitation on aggravating evidence in a capital penalty phase proceeding was established by *Bartholomew* I and II and was clearly based on our state constitution. Thus, the admission of aggravating evidence in violation of *Bartholomew* I and II is an error of constitutional magnitude.[54]

---

[54] To the extent that this holding conflicts with certain statements in *Lord* I, 117 Wn.2d at 895, we disavow *Lord* I. In that case, this court held that it would not consider an unpreserved challenge to the admission of penalty phase testimony regarding the age of a girl the defendant victimized in a prior offense. *Id.* It reasoned that the defendant "does not specify how the age of the victim especially *prejudiced* him and, *thus*, was *constitutional* error." *Id.* (emphasis added). This misstates our precedent on RAP 2.5(a)(3). In equating "prejudice" with "constitutional magnitude," the *Lord* I court purported to rely on *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988). 117 Wn.2d at 895. But *Scott* does not equate those concepts—on the contrary, it defines errors of "constitutional magnitude" just as they are defined in *O'Hara*, 167 Wn.2d at 98-99: as errors that deprive the defendant of a constitutional guaranty. *See* 110 Wn.2d at 689-91 (declining review under RAP 2.5 not because defendant failed to show prejudice, but because alleged error did not violate constitutional guaranty).

Whether the admission of the treatment journal was "manifest" error under RAP 2.5(a)(3) is a more difficult question. To prove that an unpreserved error is manifest, an appellant must make a "'plausible showing . . . that the asserted error had practical and identifiable consequences in the trial.'" *Kalebaugh*, 183 Wn.2d at 584 (quoting *O'Hara*, 167 Wn.2d at 99). And a practical and identifiable error is one that "'the [trial] court could have corrected,'" given what it knew at the time. *Id.* (quoting *O'Hara*, 167 Wn.2d at 100).

In this case, that standard is satisfied as to two of the alleged but unpreserved errors regarding the treatment journal—the ruling that the journal's references to specific instances of conduct were *relevant* rebuttal evidence (under ER 402) and the ruling that this evidence was more probative than prejudicial (ER 403). These are legal questions, which we can resolve—and the trial court could have addressed—by comparing the content of Dubinsky's testimony on direct examination with the content of the treatment journal the State sought to use on cross-examination. But that standard is not met with respect to the other error that Schierman alleges—the trial court's (implicit) determination that the treatment journal was sufficiently *reliable* for the State to have a good faith basis to use it, particularly in the penalty phase proceeding. Because the defense failed to challenge the journal as unreliable (or otherwise insufficient to provide the State with a good faith base for cross-examination), the record contains no colloquy on this issue. We

155

cannot now guess what that colloquy would have revealed if it had actually occurred. Nor could the trial court have corrected a problem about which it was unaware. We therefore address the merits of only the first two issues: relevance and probative value versus prejudicial effect.

> *2. We reject Schierman's claim that the specific instances of conduct described in the treatment journal were inadmissible*

In *Lord* I, this court held that the scope of rebuttal evidence in a penalty phase proceeding was broad, but still limited by *Bartholomew* II's balancing of probative value against prejudicial effect: "defense witnesses may be cross-examined concerning anything relevant to a matter raised in mitigation by the defendant, subject to the balancing test." 117 Wn.2d at 889-93, 892. The *Lord* I court explained that *Bartholomew* II's rebuttal rule was "analogous to the rules of evidence concerning testimony about defendant's character":

> When a defendant presents evidence of his character, the State may inquire further to determine the reliability of that evidence. A defendant's character witness may be cross-examined about his personal knowledge of specific incidents of misconduct. . . .
>
> The scope of cross-examination is sufficiently broad to make it dangerous for the defendant to call character witnesses unless the defendant has led a good life. A character witness may not only be asked whether he "has heard" this or that about the defendant, but he may also be asked "Do you know" this or that about the defendant.

117 Wn.2d at 892-93 (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE, § 125, at 45 (3d ed. 1989)).

In *State v. Brett*, 126 Wn.2d 136, 185-89, 892 P.2d 29 (1995), *vacated and remanded*, 142 Wn.2d 868, 16 P.3d 601 (2001), this court reaffirmed the rebuttal evidence rule stated in *Bartholomew* II and *Lord* I. It held that evidence of the defendant's prior uncharged crimes was admissible to rebut a mitigation witness's testimony that the defendant "'respected people'" and "was 'a real gentleman'." *Id.* at 188. Dubinsky's testimony was similar to that offered in *Brett*; Dubinsky stated that Schierman had no history of hurting people or acting violently, VRP (Apr. 20, 2010) at 104. Under *Lord* I, the State could rebut this testimony with specific instances of Schierman's conduct, to the extent that the evidence was responsive to the assertions about his nonviolent character and more probative than unfairly prejudicial. 117 Wn.2d at 892; *see generally State v. Kelly*, 102 Wn.2d 188, 193-94, 685 P.2d 564 (1984) (regarding admission of evidence of accused's character under ER 404(a)(1) and cross-examination as to "specific instances of conduct" per ER 405(a)). The State basically did this. Most of the specific instances of conduct that it cited in Schierman's journal were instances of violent or abusive behavior. Thus, the State's use of the journal fell within the boundaries of ER 404(a)(1) and ER 403 and was not barred by *Bartholomew* II.

Finally, Schierman argues that *Lord* I and *Brett* are distinguishable because in both of those cases, the specific instances of the defendant's prior conduct addressed on cross-examination were "well known to the defense witness." Appellant's Reply Br. at 62. (This alleged error is preserved.) This is incorrect. In *Brett*, 126 Wn.2d at 187, the State was permitted to ask a mitigation witness about a prior uncharged assault committed by the defendant, even though the witness did not learn of that assault until he was subpoenaed. The events described in Schierman's treatment journal were no less well known to Dubinsky, who first read excerpts from the journal the night before giving his mitigation testimony.

IV. The Trial Court Did Not Violate Schierman's Right to Due Process or Protection against Cruel Punishment (under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 3 and 14 of the Washington State Constitution) When It Prohibited Defense Counsel from Using Other Specific Instances of Conduct Described in the Treatment Journal on Redirect Examination of Schierman's Stepfather

After the State cross-examined Dubinsky about the specific instances of violence contained in Schierman's treatment journal, defense counsel attempted to rehabilitate Dubinsky by asking him about other portions of the journal containing specific instances of lawful and prosocial conduct. The trial court sustained the State's objection. It did so by ruling that the defense could not question Dubinsky about any passage in the journal that Dubinsky had not previously read—not by ruling that the defense could not inquire into nonresponsive specific instances of

158

prosocial conduct. Schierman contends that this ruling violated his state and federal rights to due process and to present mitigating evidence.

A. Facts

On redirect, defense counsel called Dubinsky's attention to a portion of the treatment journal labeled page 3379, which was included among the photocopied pages marked as State's exhibit 2, and asked if it "look[ed] like addresses where [Schierman was] maybe seeking jobs or doing something like that?" VRP (Apr. 20, 2010) at 128. The State objected on grounds of foundation, and the court sustained the objection.

Defense counsel stated that the State had already laid the foundation: "[The prosecutor] has shown you what has been marked as . . . State's exhibit number two." *Id.* at 129. Counsel then asked Dubinsky to read from page 3379. The State again objected that it was hearsay without foundation.

The court sustained the objection: "[T]here was no foundation. This witness has not indicated he's ever seen that portion of the journal. The questions from [the prosecutor] were about the excerpts of the journal which had been sent to this witness by defense counsel yesterday, that he had reviewed." *Id.*

Defense counsel then asked Dubinsky whether he'd seen three different pages of the journal; Dubinsky answered that he had not seen any of the pages. Finally, defense counsel asked whether "the select references that [the prosecutor] has

159

chosen to excerpt from this journal . . . change[d Dubinsky's] opinion . . . about how this tragedy has impacted your family and [Schierman]?" *Id.* at 131. The court sustained the State's objection on grounds of relevance.

B. Analysis

Schierman argues that the defense "had a right" at trial "to introduce more positive aspects of [the treatment journal]" after the State "cherry pick[ed] those [passages] where Schierman described anger or violence." Appellant's Opening Br. at 168. The State counters that Schierman could have introduced the treatment journal through other witnesses, but could not simply have Dubinsky "read for the jury portions of a document as to which he has no knowledge." Br. of Resp't at 226.

The State is correct. Dubinsky's testimony on direct examination included evidence of Schierman's (the "accused['s]," per ER 404(a)(1)) character, specifically his character trait of nonviolence while drunk. It was admissible under *Bartholomew* II (even if it had not been admissible under the Rules of Evidence). The State's inquiry into specific instances of Schierman's violence on cross-examination was permissible to impeach Dubinsky's testimony that Schierman was not violent when drinking—it tended both to rebut this testimony and call into question Dubinsky's credibility. Thus, it was admissible under ER 405(a) and not barred by *Bartholomew* II. *Lord* I, 117 Wn.2d at 892-93.

By contrast, introducing various "positive aspects" of the treatment journal—such as Schierman's apparent attempts to find employment—did not rebut or clarify anything the State elicited on cross-examination. Thus, we cannot say that the trial court abused its discretion in excluding redirect examination on these subjects.[55] *State v. Hinkley*, 52 Wn.2d 415, 419, 325 P.2d 889 (1958) (trial court has discretion to admit or exclude testimony on redirect that "is not strictly rebuttal of testimony elicited by cross-examination").

V. The Trial Court's Decision To Allow Broad and Irrelevant Cross-Examination of Christopher O'Brien Was Error, But the Error Was Harmless

During the penalty phase, the defense called Schierman's friend Christopher O'Brien. He testified that Schierman was friendly, well liked, and serious about his addiction recovery. The court then permitted the State to cross examine O'Brien about statements he made to detectives investigating the murders. The State asked O'Brien whether he relayed incriminating statements that a third party, Mark Nanna, made about Schierman. Schierman argues that this line of questioning violates the constitutional rules adopted in *Bartholomew* I and II by introducing aggravating evidence that was both irrelevant and hearsay.

---

[55] As the trial court suggested, the positive aspects of Schierman's life reflected in the treatment journal might well have been admissible through other witnesses; they constitute aspects of his character that might weigh in favor of a life sentence and might even have been admissible under ER 106 to help complete the jury's understanding of the journal. But the defense did not pursue either of these routes in the trial court.

161

A. Facts

Schierman called O'Brien as a mitigation witness. O'Brien testified that he met Schierman in late 2000 and that the two became close friends. He testified that their relationship became more distant when Schierman began using drugs, but improved when Schierman completed treatment. He described Schierman as friendly, well liked, and energetic, and stated that Schierman took his treatment and recovery seriously and appeared to be doing well when O'Brien last saw him before the murders. O'Brien also testified that he still tried to visit Schierman regularly and that Schierman always appeared to be in good spirits and happy to see him.

On cross-examination, the prosecutor asked O'Brien about the arguably contradictory statements he had made to detectives following the murders. These statements related to Schierman's drinking, the strain it had put on their friendship, and Schierman's tendency to be friendly and flirtatious when he drank, but they did not touch directly on Schierman's general friendliness, energy, or treatment progress. The prosecutor then asked O'Brien whether he remembered calling a detective at the Kirkland Police Station and "telling him that you needed to get something off your chest?" VRP (Apr. 21, 2010) at 82. O'Brien responded that he had told the detective he had "some information that he might be able to use." *Id.* He said that he was not "trying to help either side, but if there was a possibility that

162

it could help clear [Schierman's] name, if it would show that he was not in possession of anything, that's where I was headed." *Id.* at 83.

The prosecutor asked O'Brien whether he remembered telling the detective "that there was somebody that we would want to talk [to] because the defendant had a bucketful of knives?" *Id.* O'Brien answered that he did not remember "a bucketful of knives," but had told the detective that a person named Mark Galante (then Mark Nanna) had helped Schierman move and might be able to provide some information. *Id.*

The prosecutor asked O'Brien if he remembered telling the detectives about a comment Schierman made "about the quote, hot chick across the street, washing her car in a bikini?" *Id.* at 84. O'Brien answered that he had told the detectives that "Mark had mentioned something along those lines." *Id.* The prosecutor repeated the question two more times, and O'Brien stated that he could not remember his exact statement to the detectives. The prosecutor then read the following from a Kirkland Police Department detail marked as State's exhibit 4:

> Nanna told O'Brien that Schierman had a bucketful of knives and that he observed Schierman playing with a knife similar to the first knife found at the crime scene, and Nanna also said that Schierman made a comment about the quote, hot chick, unquote, across the street, washing her car in a bikini. O'Brien also provided me with contact numbers for each person on our list for the previous week, including Nanna.

*Id.* at 85-86. O'Brien acknowledged that the notes refreshed his memory of the statement he had given to the detectives. He said that they reflected "what [Nanna] had told me." *Id.* at 86.

After a brief redirect followed by a recess, the defense moved to strike the last question and answer in O'Brien's cross-examination, arguing that Nanna's statements were hearsay. The court denied the motion, concluding that the statements were not offered for the truth of the matter asserted, but instead to "indicate that Mr. O'Brien had heard them from Mr. Nanna, allegedly statements made by the defendant, and that, in fact, those statements were then conveyed to the police." *Id.* at 89-90. The court found that this was an appropriate subject for cross-examination given that O'Brien was called as a character witness for the defense who had contacted police with information about Schierman after the murders and then "tr[ied] to be as vague as he could about his recall of [that contact]" on the witness stand. *Id.* at 89.

The defense then requested a limiting instruction telling the jury that the statements were not offered as proof of the matter asserted. The court said that if it gave such an instruction, it would also instruct the jury that the statements were offered "to reflect the fact that this witness was testifying that these statements had been made by the defendant to this other individual and then conveyed to him." *Id.* at 90.

The defense objected to the last part of that proposed instruction. *Id.* at 91.

The court then stated that it would

> advise the jury that the . . . testimony Mr. O'Brien related to statements by Mr. Mark Nanna are not admitted for the truth of the matters asserted by Mr. Nanna to Mr. O'Brien, they are only admitted for the limited purpose of considering Chris O'Brien's testimony that [Nanna] had made these statements to him.

*Id.* at 92. The defense agreed to that instruction.

On April 27, 2010, the defense filed a written motion to strike the portion of O'Brien's testimony that addressed Nanna's alleged statements. The motion included a transcript of the defense interview of the detective who interviewed Nanna about the statements. The transcript showed that Nanna had denied making any statements about a bucket of knives or a hot chick. The defense argued that the State lacked a good faith basis for asking about the statements, and that the statements were therefore irrelevant and prejudicial.

The court heard argument on the motion the following day. The State argued that it had a good faith basis for asking O'Brien about Nanna's alleged statements, because it had determined that Nanna was trying to protect Schierman (and that his statements to detectives could therefore not be trusted). The defense argued that Nanna's statements were irrelevant because O'Brien did not deny giving any information to detectives.

The court found that the State had a good faith basis for asking about Nanna's statements and denied the motion. It reasoned that the State's "extensive questioning was required because clearly Mr. O'Brien was attempting to deny or minimize the information he had earlier provided to detective[s] . . . and when finally confronted with that follow-up report, . . . Mr. O'Brien was backpedaling as fast as he could, in the Court's opinion." VRP (Apr. 28, 2010) at 22-23.

The court also ruled that defense counsel could call the detective who interviewed Nanna, for "purposes of examining him regarding his . . . attempt[s] . . . to verify or refute or follow up on the statements that Mr. O'Brien told him were made by Mr. Nanna." *Id.* at 24. The defense ultimately did not call that detective.

B. Analysis

Schierman argues that O'Brien's statements to the police "had *no* rebuttal value" because they did not contradict anything O'Brien said on direct examination: "the court suggested that the prosecutor's rebuttal was appropriate because O'Brien was reluctant to acknowledge his role in the investigation. But that reasoning is circular: it assumes that the prosecutor had a good reason in the first place for questioning O'Brien about his dealings with the police." Appellant's Opening Br. at 177, 180.

This argument goes much farther than any made in the trial court. At trial, defense counsel did not object that O'Brien's contacts with police were *irrelevant.*

166

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Instead, defense counsel objected only to the portion of that questioning in which the prosecutor actually read from the investigating officers' notes—the portion that quoted the statements attributed to Nanna—and did so only on the basis that these statements were *hearsay*. For this reason, we must consider whether to review Schierman's unpreserved claim that O'Brien's contacts with police were irrelevant.

Schierman also argues, as did defense counsel in the trial court, that the statements attributed to Nanna were inadmissible hearsay.

Because we reach the merits of Schierman's first argument—that O'Brien's decision to contact police was not relevant to rebut O'Brien's mitigation testimony—and because we agree with Schierman on this issue, we do not decide whether Nanna's statements were inadmissible hearsay.

### 1. *Relevance of O'Brien's decision to contact police*

#### a. Preservation of error

The prosecutor began his cross-examination by asking O'Brien whether he remembered calling a detective at the Kirkland Police Station and "telling him that you needed to get something off your chest?" VRP (Apr. 21, 2010) at 82. This line of questioning implies the following evidentiary rule: when a witness offers mitigating character testimony in a capital sentencing proceeding, that witness's decision to furnish the police with information tending to show the defendant's guilt is inherently relevant in rebuttal. Defense counsel did not challenge that assumption

167

in the trial court, but Schierman does now. He argues that it violates the constitutional rules adopted in *Bartholomew* I and II and *Lord* I.

An appellate court may decline to review an unpreserved error unless the error is both "manifest" and "truly of constitutional dimension." *O'Hara*, 167 Wn.2d at 98. But the erroneous admission of aggravating penalty phase evidence is always of "constitutional dimension" if the claim is that it violates *Bartholomew* I and II. *Id.* We also conclude that relevance of O'Brien's decision to contact police is a question of law that the trial court could have addressed on the record before it at the time of trial without need for any other evidence, testimony, or other information. We therefore reach the merits of Schierman's claim that O'Brien's decision to contact police was not relevant rebuttal evidence.

### b. Merits

The question presented is whether a capital penalty phase mitigation witness' decision to provide the police with incriminating information about the defendant rebuts that witness' testimony on the topic of the defendant's friendliness, energy, and treatment progress. Our only cases on the scope of mitigation witness cross-examination are *Lord* I and *Brett*. In those cases, the State was permitted to cross-examine mitigation witnesses about the defendant's prior uncharged or juvenile offenses. *Lord* I, 117 Wn.2d at 889; *Brett*, 126 Wn.2d at 185.

In *Lord* I, this court analogized *Bartholomew* I and II's limits on mitigation-rebuttal to "the rules of evidence concerning testimony about defendant's character." 117 Wn.2d at 891-92 (quoting ER 405(a)). Ultimately, *Lord* I held that testimony that the defendant "fled from police and violated his probation" was relevant to rebut his father's testimony that he was "a 'good boy'." *Id.* at 893-94. In *Brett*, the prosecution cross-examined mitigation witnesses about the defendant's juvenile crimes, including first degree kidnapping and assault. 126 Wn.2d at 187. This court approved the cross-examination as "relevant to rebut . . . mitigation witness[] testimony that [the defendant] was not a threatening person and/or that it was surprising that he took a person's life." *Id.* at 188. It also held that evidence of prior uncharged crimes was relevant to rebut another mitigation witness's testimony that the defendant "'respected people'" and was "'a real gentleman'." *Id.*

This case is distinguishable from *Lord* I and *Brett* in that O'Brien did not claim that Schierman was a good or trustworthy person. Instead, he claimed only that Schierman was well liked, took his addiction treatment seriously, and maintained a friendship with O'Brien even after his incarceration. For this reason, questioning O'Brien about his decision to contact the police was outside the scope of permissible cross-examination under *Lord* I and *Brett* (applying ER 404 and 405). O'Brien's decision to contact police—arguably showing his suspicions about Schierman's guilt—does not rebut his testimony that Schierman was well liked, took treatment

169

seriously, or maintained a friendship with O'Brien after being incarcerated, all of which is relevant to the penalty phase determination as opposed to the question of guilt. We therefore hold that the trial court erred by permitting the State to cross-examine O'Brien about his decision to contact detectives. We agree with the State, however, that this error alone would not warrant reversal because the jury already knew that Schierman owned knives and was attracted to women.

VI. Even Implicitly Comparing a Jury That Would Let Schierman Live to Those Who Stood Silent during the Holocaust Would Constitute Improper Prosecutorial Argument

Schierman argues that the prosecutor committed misconduct warranting reversal when he (1) compared the crime to the Holocaust and (2) impugned defense counsel's integrity.

A. Comparing crime to the Holocaust and referencing 9/11

*1. Facts*

In his penalty phase opening statement, the prosecutor told the jury that it, "in this case more than any other, [was] truly the conscience of the community." VRP (Apr. 19, 2010) at 58. He repeated certain questions he asked the jury in his guilt phase opening statement: "Was this a mass killing? Was this mass murder?" And he told the jury, "That question, in large measure, has been answered with your verdict." *Id.* at 65.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner)*, No. 84614-6

In his penalty phase closing argument, the prosecutor repeated to the jury that it was the conscience of the community; defense counsel objected and the objection was overruled.

Near the end of the argument, the prosecutor brought up the DNA evidence collected from the Milkin home:

> . . . It identified the genetic profiles of Olga, [Lyuba], Justin, Andrew, and . . . Conner Schierman, based upon their inherited genetic identity, based upon their genetic history, what they had received from their parents . . . and so on.
>
> The genetic history of all that came before[] is the genetic profiles of all of the DNA profiles that we have in this case. But the DNA, if you think about it, also tells you something else. It gives you a measure of what has been lost forever. It tells you of the future that is obliterated.

VRP (May 3, 2010) at 63-64. The prosecutor then summarized a Ray Bradbury short story titled "A Sound of Thunder." *Id.* at 64. When he finished, he asked:

> What is the point of that story?
>
> Let me tell you. The idea that even small events can change history . . . the butterfly effect. . . . The point is that what this man has done, what this defendant has done, doesn't affect just those four lives. It doesn't affect just those four families. It doesn't affect just those who loved the victims in this case.
>
> This man, in killing those four people, literally changed and destroyed history. Destroyed the future of a family. Not only [what] Olga and [Lyuba] would have become, but what Justin and Andrew could have become. The defendant changed the history of those who would have come from Olga and [Lyuba] and Justin and Andrew.

Remember that quote, "destroy this one life and you destroy a race, a people, an entire history of life."

We will never know what might have become or what might have come from Olga, [Lyuba], Justin and Andrew. We will never know what the future might have been, but we do know this, that the defendant removed for all time an entire history of life by what he had done on July 16, 2006.

The second point that I want to make before I sit down, I will talk to you about this idea, the second reason why I would suggest to you that the appropriate punishment is death.

I talked to you about the impact of what the defendant did on the future. It is also appropriate for how he committed the murders. I would suggest to you that it is not too much of an exaggeration to say that the many ways, if you are living in [the] age of terror, this is an age of post September 11th, 2001. We now have a Department of Homeland Security. We now have terror alerts. We now have terror alert levels and terror alert colors. I would suggest to you that terror is a word that is used.

[Defense counsel objected; the court overruled the objection.]

. . . Terror is a word, ladies and gentleman, almost too casual in its use to describe the things that we use [it] to describe. But what is real terror?

Well, there is the simple dictionary definition, "terror is a state of intense over-powering fear, a nightmare, and fear is dread, terror, horror and panic."

VRP (May 3, 2010) at 67-69.

The prosecutor then described, in vivid detail, the terror that the four victims must have felt. Afterward, the following exchange regarding the Holocaust took place:

[PROSECUTOR]: There is a plaque outside of the holocaust museum in Washington, D.C., [which] says the following, "thou shalt not be a victim" --

[DEFENSE COUNSEL]: Objection, your Honor.

[DEFENSE COCOUNSEL]: Objection.

THE COURT: Overrule the objection. This is argument.

[DEFENSE COUNSEL]: Reference to the holocaust.

THE COURT: Overrule the objection. This is argument. The jury has been instructed.

[PROSECUTOR]: That plaque says that "thou shall not be a victim, thou shall not be a perpetrator, above all that thou shall not be a bystander."

You are not bystanders, for that, I thank you.

*Id.* at 73-74.

The court then excused the jury. Defense counsel again objected to "analogies to the Holocaust and the 9-11 . . . terror attacks," and moved for a mistrial. *Id.* at 75.

The court again overruled the objection:

THE COURT: Counsel, the comments, while arguably inappropriate, relating to the quote from the Holocaust museum plaque did not liken this case to the Holocaust. The quote was given in that context to give it, obviously, some sort of foundation.

The comment earlier about terror to which [counsel] objected . . . was not, again, in the context of terrorism and likening this. It was simply a relationship explained of what terror was, what terror is and how it was experienced in this case.

173

*State v. Schierman (Conner)*, No. 84614-6

> . . . .

> I will cautio[n] the counsel for the state, however, to be circumspect in any [of] the arguments along these very same lines.

*Id.* at 75-76.

Just before the jury returned, the court asked defense counsel whether it was "requesting or making a motion to strike that portion of [the prosecutor's] final closing arguments?" *Id.* at 78. Defense counsel answered affirmatively. When the jury returned, the court gave the following instruction:

> I want to advise the jury that the court has ordered to be stricken from the record the last comments in closing arguments made by [the prosecutor], relating to the Holocaust museum and a plaque apparently outside of the museum.

> That, and all references to that are stricken from the record. You are instructed to disregard all of the related comments made at that part of the closing arguments.

*Id.* at 78. Defense counsel then began closing argument.

### 2. *Analysis*

Schierman argues that the prosecutor appealed to the jury to be the "conscience of the community" in his case, and that this appeal was designed to inflame the jury because it was coupled with references to the Holocaust and September 11. Appellant's Opening Br. at 189.

In a capital sentencing proceeding in Washington, the State may argue the virtues of the death penalty.[56] In *State v. Davis*, this court found no misconduct where the prosecutor argued that "'if our courts of law . . . are unwilling to impose the ultimate penalty where appropriate, it sows the seeds of anarchy [and] it invites the lynch law,'" and exhorted the jury not to "'violate the social contract between us.'" 141 Wn.2d 798, 870-73 & n.396, 10 P.3d 977 (2000) (*Davis* I) (emphasis omitted), *aff'd*, 175 Wn.2d 287, 290 P.3d 43 (2012) (*Davis* II).[57] It also approved of the prosecutor's argument that

> "when a society is unwilling to overlook the *abhorrent acts of someone like the defendant*, and recognize that the death penalty is the only appropriate response, that represents civilized society and we put the focus where it belongs, *a failure to impose a death penalty in a case like this, in other words, it cheapens all of our lives*."

---

[56] *See Finch*, 137 Wn.2d at 841 (citing *State v. Bautista-Caldera*, 56 Wn. App. 186, 783 P.2d 116 (1989); *State v. Coleman*, 74 Wn. App. 835, 876 P.2d 458 (1994)).

[57] Because the defense did not object to the allegedly improper statements in *Davis* I, on appeal the defendant bore the burden of showing that the prosecutor's statements were "'so flagrant and ill intentioned that [they] evince[d] an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" 141 Wn.2d at 872 (quoting *Gentry*, 125 Wn.2d at 640). That heightened standard does not apply in this case because (1) Schierman objected and (2) we have tempered that standard somewhat since *Davis* I was decided. *See Emery*, 174 Wn.2d at 762 (where defense failed to object to alleged prosecutorial misconduct, "[r]eviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured")). But the analysis in *Davis* I is nevertheless relevant because this court found the statements at issue were not improper and thus did not reach the question of prejudice. 141 Wn.2d at 871-74.

*Id.* at 873 n.398. *Davis* I held that these arguments, even in combination, did not "inflame the jury." *Id.* at 873 & n.402.

But there are certain arguments that a prosecutor may not make in a capital sentencing proceeding. These include religious appeals,[58] arguments that diminish the jury's sense of responsibility for its verdict,[59] and arguments that emphasize the prosecutor's exercise of discretion in seeking the death penalty.[60] The prosecution is also prohibited, in a death penalty sentencing phase argument, from seeking a verdict based on "emotion,"[61] or on "passion or prejudice," RCW 10.95.130(2)(c).

---

[58] *See, e.g., Sandoval v. Calderon*, 241 F.3d 765, 778-79 (9th Cir. 2000) (finding reversible error where the prosecutor paraphrased the New Testament in his penalty phase argument, telling the jury, "'Let every person be in subjection to the governing authorities for there is no authority except from God and those which are established by God,'" and arguing that execution might save the defendant's soul). *Sandoval* condemned the State's invocation of religious authority in a capital sentencing phase proceeding because (1) it tainted the jury's deliberations with "concepts of vengeance" incompatible with the "refined approach" our constitution requires and (2) it tended to diminish the jury's sense of responsibility for its verdict. *Id.* at 776-77; *see also Bennett v. Angelone*, 92 F.3d 1336, 1346 (4th Cir. 1996) (prosecutor's penalty phase religious argumentation "confusing, unnecessary, and inflammatory," but not reversible error).

[59] *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), *vacated on other grounds*, 479 U.S. 1075 (1987).

[60] *See, e.g., Shurn v. Delo*, 177 F.3d 662, 667 (8th Cir. 1999) (disapproving prosecutor's capital sentencing phase argument that "emphasized his position of authority and expressed his personal opinion on the propriety of the death sentence").

[61] *E.g., State v. Taylor*, 944 S.W.2d 925, 937 (Mo. 1997) (prosecutor committed misconduct when he urged the jury to "'put your emotion into'" the penalty phase deliberations and "'get mad'" at the defendant (emphasis omitted) (citing *Gardner v. Florida*, 430 U.S. 349, 358, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977)); *King v. State*, 623

Given the nature of the jury's decision in a capital sentencing proceeding, courts have struggled to draw the line between impermissible "emotional" appeals and permissible arguments with emotional overtones. *See, e.g., State v. Kleypas*, 272 Kan. 894, 1110, 40 P.3d 139 (2001) (collecting cases illustrating division over the propriety of prosecutor's argument that jury "should show a defendant the same mercy that the defendant gave to the victim"), *overruled on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004). Courts faced with this task have reached widely divergent decisions.[62] Some have even rejected the idea that emotion can or should be excluded from a capital sentencing jury's deliberations.[63]

---

So. 2d 486, 488 (Fla. 1993) (prosecutor committed misconduct in capital penalty phase argument when he "admonish[ed] the jurors that 'they would be cooperating with evil and would themselves be involved in evil just like' [the defendant] if they recommended life imprisonment").

[62] *Compare State v. Artis*, 325 N.C. 278, 323-25, 384 S.E.2d 470 (1989) (in penalty phase, prosecutor did not commit misconduct when he asked the jurors to hold their breath for four minutes so they could appreciate the victim's suffering as she was strangled to death), *vacated on other grounds*, 494 U.S. 1023, 110 S. Ct. 1466, 108 L. Ed. 2d 604 (1990), *with Collier v. State*, 101 Nev. 473, 480-81, 705 P.2d 1126 (1985) (prosecutor's statement that "the coroner 'had to carry [the victim] out of that store in a body bag and bury him someplace because [the defendant] decided that his son wouldn't have a father' was "manifestly improper").

[63] *E.g., People v. Smith*, 30 Cal. 4th 581, 634, 68 P.3d 302, 134 Cal. Rptr. 2d 1 (2003) (explaining that "emotion need not, indeed, cannot, be entirely excluded from the jury's moral assessment"); *Tucker v. Zant*, 724 F.2d 882, 888-89 & n.7 (11th Cir. 1984) (stating that the prosecutor may "arous[e] the emotions of the jury with statements that are supported by the evidence and relate to issues of an inherently emotional nature that are crucial to the jury's sentencing decision," but noting that "[e]ven an emotional appeal that

Under our mandatory statutory review, however, this court must "'vacate sentences that were the product of appeals to the passion or prejudice of the jury.'" *Davis* II, 175 Wn.2d at 373 (quoting *Cross*, 156 Wn.2d at 634). Thus, in this case, we must evaluate the prosecutor's reference to the Holocaust and September 11 in light of the prosecutor's "total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury," *Brown*, 132 Wn.2d at 561, paying special attention to whether that argument appealed to the "passion or prejudice of the jury," *Id.* at 564.

We hold that, in the context of the prosecutor's total argument, the reference to September 11 is not an attempt to analogize Schierman to a political terrorist or the murders of the Milkin family to the civilian deaths on September 11, 2001. Rather, it seems that the prosecutor invoked September 11 as part of a meditation on the meaning of the word "terror." VRP (May 3, 2010) at 67-69. He argued that that word is used "almost too casual[ly]" today, and invited the jury to imagine the "real terror" that the Milkin family must have felt when they were attacked. *Id.* at 69. The circumstances of the defendant's crime are relevant to the jury's decision at the penalty phase in a capital case—indeed, the jury is required to consider them. *Rice*,

---

falls within this standard may be impermissible if it is unreasonably inflammatory"); *Rice*, 110 Wn.2d at 606-07 (in special sentencing proceeding, prosecutor may narrate the crime and ask the jurors to imagine the victims' experience, even though such an argument is "an emotional event").

110 Wn.2d at 606-08. The prosecutor's reference to September 11 was a segue into his description of the victims' suffering. It was not misconduct.

The Holocaust reference is different. The prosecutor did not just analogize the murders of the Milkin family to the Nazi murders of the victims of the Holocaust. Instead, the prosecutor quoted from a Holocaust museum plaque about the immorality of remaining a "bystander." VRP (May 3, 2010) at 74. The message to the jurors was that they had a moral duty to take meaningful affirmative action in response to Schierman's holocaust, or else they would suffer the same moral guilt as those who stood silent and thereby effectively collaborated during the Nazi Holocaust. The prosecutor's implicit message was thus, essentially, that only a bystander such as a Nazi sympathizer would vote for life without parole instead of the death penalty.

That was, to say the least, an argument that appealed to passion and prejudice. Other courts overwhelmingly disapprove of a prosecutor's Holocaust analogy in closing argument—although we find no case in which a court has reversed a conviction or death sentence because a prosecutor employed that tactic. *See, e.g., People v. Tiller*, 94 Ill. 2d 303, 320, 447 N.E.2d 174, 68 Ill. Dec. 916 (1982) (prosecutor's analogy of defendant's crimes to "the Nazi holocaust" was error, but not reversible in light of overwhelming evidence of guilt); *Wiggins v. State*, 193 So. 3d 765, 806 (Ala. Crim. App. 2014) (in capital sentencing proceeding, prosecutor's

argument that Albert Einstein stated, after escaping the Holocaust, that "'[i]t's not the evil people we have to fear, [but] the good people who see evil and do nothing,'" did not render proceedings fundamentally unfair); *Commonwealth v. Henry*, 524 Pa. 135, 157-58, 569 A.2d 929 (1990) ("strongly discourag[ing]" counsel's comparison, in capital sentencing phase argument, of defendant to "'[t]he people responsible for the Holocaust, Charles Manson, and many, many others,'" but finding comment "within the bounds of 'oratorical flair'" permitted in arguments at the sentencing stage).

But although the prosecutor's Holocaust reference was improper, it does not require reversal. As noted above, there is no case in which a court has reversed a conviction or death sentence because a prosecutor employed that tactic. Consistent with these other jurisdictions, we hold that the prosecutor's Holocaust analogy was misconduct but insufficiently prejudicial, standing alone, to warrant reversal.

### B. Impugning defense counsel's integrity

#### 1. Facts

In his closing argument, defense counsel told the jury that "there is a death penalty sentencing proceeding in the Bible." VRP (May 3, 2010) at 133. He then recounted the parable in which Jesus tells a crowd of people preparing to execute an accused adulterer, "'[H]e who is without sin among you, let him first cast the stone on her.'" *Id.* at 135.

After discussing the parable for a few pages, defense counsel pointed out for

the jury "some differences between the procedure that was followed and the law that

had to be applied to the sentencing in the City of Jerusalem nearly 2000 years ago

and the law that Judge Canova has mentioned to you." *Id.* at 138-39. He asked the

jury to consider the absence of a prosecutor in the biblical text:

> One thing that is not present with the transcript according to [the gospel of] John of that trial is any indication that there was a prosecutor there, much like the prosecutor . . . that you have just heard.

> Who knows had there been a prosecutor like [this prosecutor] reminding everybody of the harm or horror that had been done, who knows what the outcome may have been, who knows that the result may have been different, that woman would have died under the pile of rocks.

> The episode would be one more [of a] million . . . episodes of man's inhumanity to man that would never have made it into the Bible and none of us would have heard from it.

*Id.* at 141.

In rebuttal, the prosecutor responded to defense counsel's biblical reference

as follows:

> I heard with interest the biblical story given by [defense counsel] towards the end of his comments, in which he said that he expressed some surprise, did you know that there was a trial in the [N]ew [T]estament. It is the trial that is described by, I guess in the [G]ospel of John, regarding Mary Magdalen.

> There is another trial, which is the trial of the crucifixion of Christ, which is the whole focus of the New Testament. That

181

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

notwithstanding, I found it very interesting [but] I could have objected at any point to that.

*Having the prosecutor being compared to the person, [who] I guess is Satan [because he] would oppose Christ in that little parable* may be offensive or not, but I didn't object, because I wanted to see how far that [defense counsel] had to go to convince you to pause or question.

I don't think that he has convinced himself. To compare me, as the person, who deposed [sic] a biblical story like that, I think that is all I need to say about the credibility or the weight that you should give it.

*Id.* at 149-50 (emphasis added).

### 2. *Analysis*

A prosecuting attorney's remarks, even if improper, are not grounds for reversal if they were invited by defense counsel. *Gentry*, 125 Wn.2d at 643-44. Remarks are invited if they are "a pertinent reply" and are not "so prejudicial that a curative instruction would be ineffective." *Id.*

In *Gentry*, this court held that a prosecutor's penalty phase reference to the biblical story of David and Goliath was "invited . . . by defense counsel's extensive use of Biblical stories during his own closing argument." *Id.* at 644.

Whether defense counsel in this case actually compared the prosecutor to Satan—a determination this court cannot make without venturing into scriptural interpretation—defense counsel certainly invited the responsive remarks now at issue.

VII.   Statutory Review

Washington's death penalty statute requires this court to consider four questions when reviewing a sentence of death:

> (a) Whether there was sufficient evidence to justify the affirmative finding to the question posted by RCW 10.95.060(4);[64] and
> (b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant . . . ; [and]
> (c) Whether the sentence of death was brought about through passion or prejudice; and
> (d) Whether the defendant had an intellectual disability within the meaning of RCW 10.95.030(2).

RCW 10.95.130(2).

Schierman does not argue that the evidence was insufficient to support the jury's finding under RCW 10.95.060(4) or that he has an "intellectual disability" within the meaning of RCW 10.95.030(2)(d).  He does argue that his sentence was disproportionate and that it resulted from passion or prejudice.

Schierman contends that his death sentence is disproportionate because the death penalty is meted out randomly in Washington, where, for example, Gary Ridgway was convicted of killing 48 people but received only a life sentence while Schierman, who killed far fewer people, was sentenced to death.  He acknowledges

---

[64] Under RCW 10.95.060(4), the jury must "retire to deliberate upon the following question: 'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?'"

that this court rejected that argument in *Davis* II, 175 Wn.2d 287, and *Cross*, 156 Wn.2d at 630, but he argues that those cases were wrongly decided. For the reasons given below, I agree.

    A. Washington's proportionality review statute (RCW 10.95.130(2)(b)) is a prophylactic measure designed to prevent the constitutional violations recognized in *Furman v. Georgia*[65]

Washington's death penalty statute requires this court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b).[66] If the court answers yes to that question, the sentence must be invalidated. RCW 10.95.140(1)(b). When this court conducts a proportionality review, it considers the penalties imposed in all cases of aggravated first degree murder, regardless of whether the prosecutor pursued the death penalty or whether the fact-finder ultimately imposed it. This court has described this review as comparing the case at bar to all "death eligible cases." *Cross*, 156 Wn.2d at 630.

---

[65] 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

[66] The statute defines "similar cases" as "cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120." RCW 10.95.130(2)(b). In turn, RCW 10.95.120 requires trial judges to submit reports with information on the defendant, the victim, and the crime in all cases where the defendant is convicted of aggravated first degree murder.

Our legislature enacted RCW 10.95.130(2)(b) in response to the United States Supreme Court's decision in *Furman,* 408 U.S. 238, which prohibited sentencing procedures that create a substantial risk that death will be imposed in an arbitrary and capricious manner. *State v. Harris,* 106 Wn.2d 784, 798, 725 P.2d 975 (1986). *Furman* and its progeny do not require a proportionality *review* in death penalty cases, *Lewis v. Jeffers,* 497 U.S. 764, 779, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990), but they do require *proportionality* in sentencing. Thus, Washington's proportionality review statute serves a prophylactic purpose: to prevent the death penalty from being imposed "'wantonly and freakishly,'" *Harris,* 106 Wn.2d at 798 (internal quotation marks omitted) (quoting *Moore v. State,* 233 Ga. 861, 864, 213 S.E. 2d 829 (1975)), in violation of the constitutional principles announced in *Furman.* The statute is intended to carry out the *Furman* Court's directive, *see id.,* but it also goes farther than *Furman.*

> B. In four decades, this court has never applied a consistent standard for proportionality under RCW 10.95.130(2)(b)

In *Harris,* one of the earliest cases applying RCW 10.95.130(2)(b), this court acknowledged that the statute's plain language "provides little guidance to determine at what point a death sentence becomes proportionate or disproportionate." *Id.* But the *Harris* court noted that in Georgia, a state with an identical proportionality review statute, "the test for proportionality is whether death sentences have been

185

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

imposed '*generally*' in similar cases." *Id.* at 798 (emphasis added) (quoting *Moore*, 233 Ga. at 864). The Georgia Supreme Court case on which *Harris* relied contrasted a sentence imposed "'generally'" with a sentence imposed "'wantonly and freakishly'":

> "This court is not required to determine that less than a death sentence was never imposed in a case with some similar characteristics. On the contrary, we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed *generally* and not 'wantonly and freakishly imposed.'"

*Id.* (quoting *Moore*, 233 Ga. at 864 (quoting *Furman*, 408 U.S. at 310 (Stewart, J., concurring))).[67]

This court reiterated *Harris*' "generally" standard in *State v. Rupe*, 108 Wn.2d 734, 767, 743 P.2d 210 (1987) ("a death sentence must not be affirmed where death sentences have not generally been imposed in similar cases"), and *Rice*, 110 Wn.2d at 625 ("[o]ccasional aberrational outcomes do not require a reversal . . . so long as

---

[67] After approving of the Georgia standard, the *Harris* court employed a very brief proportionality analysis. It first noted the difficulty of determining what subset of all death-eligible murders are comparable to a given defendant's, for purposes of proportionality review. 106 Wn.2d at 798 (citing *Jeffries*, 105 Wn.2d at 431 (Utter, J., dissenting)). It then compared the murder at bar—a contract killing—to other contract killings prosecuted in Washington since 1981. *Id.* at 798-99. Of these, there were three where in each case the prosecutor declined to pursue the death penalty. *Id.* Nevertheless, the *Harris* court found that the death penalty had not been imposed on Harris "wantonly and freakishly" for three reasons: (1) because in one of the other contract killing cases, the trial judge "said if the State had requested the death penalty it would have gotten it," (2) because Harris had participated in the killing he solicited, and (3) because Harris had received a fair trial, had a prior conviction for manslaughter, and had intended to kill multiple victims. *Id.* at 799.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the death sentence has been imposed generally in similar cases"). But it did not clearly articulate any standard for determining when a death sentence had been "generally" imposed in similar cases.

In *Rupe*, this court began by noting that there had been eight death eligible cases in Washington, including Rupe's, in which the jury found "two of the [three] aggravating factors found in [Rupe's] case." 108 Wn.2d at 768. Because death sentences were imposed in four of these cases, this court concluded that Rupe's sentence was not disproportionate in light of his offense. *Id.* at 769-70. This analysis suggests a statistical approach in which this court asks whether a death sentence has been imposed in some critical mass of cases possessing a certain characteristic (in *Rupe*, the same set of aggravating circumstances).

But the rest of the *Rupe* analysis rejects a statistical approach. After evaluating Rupe's crime in terms of aggravating circumstances, the court considered Rupe's personal characteristics. It acknowledged that his respect in the community and lack of a criminal record made him unusual among death eligible defendants, most of whom had extensive criminal histories. *Id.* at 770. But it did not then undertake the kind of statistical analysis it had applied with respect to the aggravating factors. Instead, it held that "[s]imply because the majority of those eligible for the death sentence under our statutes have criminal backgrounds, or backgrounds marred by other conditions, does not mean that one who has a

187

background like Rupe's is thereby ineligible for the death sentence." *Id.* After observing that Rupe had committed "exceedingly cold-blooded, calculated murders," that "nothing about Rupe or his background . . . excuse[s] him from facing the consequences of his actions," and that Rupe had received a fair trial, the court affirmed the death sentence. *Id.*

A year later, in *Rice*, this court began its proportionality review by noting that "[o]f all the comparison cases, only [Rupe's] case involved the same three aggravating factors" as Rice's. 110 Wn.2d at 625-26. This weighed heavily in the court's analysis since the court had upheld Rupe's death sentence largely on the basis of aggravating factors. *Id.* at 626. The court also observed that "Rice's crime is . . . similar in nature to those committed in two other cases recently before this court in which we affirmed death sentences." *Id.* By "similar in nature," the court appeared to refer to the fact that, like Rice, the defendants in these cases killed at least one victim in order to cover up other murders. *Id.* As in *Rupe*, the court noted that Rice's personal characteristics were primarily mitigating: Rice had mental illness and no criminal history. *Id.* at 626-27. Nevertheless, this court held that under *Rupe*, "[a] lack of prior criminal history does not by itself render a death sentence disproportionate." *Id.* at 627. And it held that Rice's mental illness did not render his death sentence disproportionate because even though the death penalty was *not* imposed in any of the four other death eligible cases in which "there [was] credible

188

evidence of mental disorder or diminished capacity," other factors in those cases, such as the defendant's youth or a single juror's opposition to the death penalty, "likely caused the jury to grant leniency." *Id.* at 627-28.

Shortly after the *Rice* decision, Justice Utter wrote a dissent championing the kind of statistical analysis exemplified by the *Rupe* court's treatment of aggravating circumstances. *Lord* I, 117 Wn.2d at 939-45. Justice Utter argued that a death "sentence is excessive and disproportionate if it has not '*generally* been imposed in similar cases,'" and maintained that "[a] sentence is not 'generally' imposed unless it is imposed in at least 50 percent of the similar cases." *Id.*

The *Lord* I majority rejected that analysis, reasoning that disproportionality review is not concerned "with . . . [t]echnical inconsistencies in a line-by-line comparison":

> Indeed, the jury is directed to tailor its decision to the individual circumstances of the crime. A jury could decline to impose the death penalty because a particular defendant deserves mercy. However, the decision to afford one defendant mercy, and yet not another, does not violate the constitution.

117 Wn.2d at 910.

Because one can never predict when a jury will show mercy, the *Lord* I majority concluded that "[r]equiring precise uniformity [of punishment] . . . would effectively eliminate the death penalty." *Id.* The majority then went on to apply a proportionality analysis that can best be summarized as follows: a death sentence is

189

not disproportionate if, considering the defendant's crime and personal characteristics, any other similar or less aggravated offense has ever resulted in a death sentence. *Id.* at 911-14.

After *Lord* I, this court sometimes reiterated *Harris*'s "generally" standard in its proportionality review.[68] More often and more recently, however, it has omitted any reference to that standard, stating instead that the purpose of proportionality review is to prevent only the "wanton and freakish" imposition of a death sentence.[69]

> C. Since *Lord* I, our proportionality review has always considered the same four factors, but we have analyzed those factors in widely varying ways

In addition to rejecting the dissent's "at least 50 percent"[70] standard for proportionality review, the *Lord* I court rejected the notion that any two death-eligible crimes can ever be truly comparable:

> Lord would have us review his case as a forensic scientist analyzes fingerprints, looking for a specified number of identity points.

---

[68] *Davis* I, 141 Wn.2d at 880; *Brown*, 132 Wn.2d at 555; *State v. Elmore*, 139 Wn.2d 250, 308, 985 P.2d 289 (1999); *State v. Elledge*, 144 Wn.2d 62, 80, 26 P.3d 271 (2001); *Benn* I, 120 Wn.2d at 679; *State v. Dodd*, 120 Wn.2d 1, 26, 838 P.2d 86 (1992).

[69] *Davis* II, 175 Wn.2d at 348; *State v. Yates*, 161 Wn.2d 714, 788, 168 P.3d 359 (2007); *Cross*, 156 Wn.2d at 630; *In re Pers. Restraint of Stenson*, 153 Wn.2d 137, 148, 102 P.3d 151 (2004); *State v. Woods*, 143 Wn.2d 561, 615-16, 23 P.3d 1046 (2001), *overruled in part by Carey*, 549 U.S. 70; *State v. Sagastegui*, 135 Wn.2d 67, 92-94, 954 P.2d 1311 (1998); *State v. Stenson*, 132 Wn.2d 668, 759, 940 P.2d 1239 (1997); *Pirtle*, 127 Wn.2d at 684-88; *Gentry*, 125 Wn.2d at 654-58.

[70] *Lord* I, 117 Wn.2d at 939.

Only if one can conclusively determine that each swirl, ridge, and whorl is present in both samples is a match declared. We decline to do this. Crimes, particularly the brutal and extreme ones with which we deal in death penalty cases, are unique and cannot be matched up like so many points on a graph.

*Id.* at 910. Nevertheless, the court held that it could assemble pools of comparable cases, for purposes of proportionality review, by searching for "'family resemblances'." *Id.* at 911 (quoting LUDWIG WITTGENSTEIN, PHILOSOPHICAL INVESTIGATIONS §§ 65-67 (2 ed. 1958)).

The *Lord* I court identified four points of comparison in its search for family resemblances: "the nature of [the defendant's] crime, the number of aggravating factors, his prior convictions[,] and [his] personal history." *Id.* at 914. It upheld Lord's death sentence after identifying (1) two death sentences imposed on offenders who, like Lord, killed only one victim, (2) three death sentences imposed on offenders whose crimes, like Lord's, entailed three or fewer aggravating circumstances, (3) four death sentences imposed on offenders whose victims suffered less than Lord's did, and (4) two death sentences imposed on offenders younger than Lord. *Id.* at 911-14.

Since the *Lord* I decision, this court has consistently considered the same four factors when performing a proportionality review: the nature of the offense, the statutory aggravating circumstances found, the defendant's criminal history, and the

191

defendant's personal circumstances.[71] But the manner in which it has analyzed these factors has varied.

In one case, this court listed and described each of the death eligible cases it considered comparable to the defendant's—including all those in which the death penalty was *not* imposed—and inquired whether death sentences were rare (to the point of being arbitrary) within that specific pool. *Benn* I, 120 Wn.2d at 681-92. In another, this court "rank[ed]" the defendant and his crime, with respect to the four comparability factors, and concluded that the death penalty is not disproportionate where the ranking is high, meaning that the facts were particularly bad relative to

---

[71] *See, e.g.*, *Yates*, 161 Wn.2d at 789-91 (crime involved "calculated cruelty" to multiple victims; two "disturbing" aggravating circumstances; extensive criminal history, including prior murders; defendant had stable and happy childhood, no mental disorders, and was not young); *Cross*, 156 Wn.2d at 631-34 (defendant killed multiple family members and showed "a marked level of cruelty," single aggravating factor, no criminal history, defendant abused as a child and diagnosed with personality disorders); *Elledge*, 144 Wn.2d at 80 (victim's suffering, single aggravating circumstance, extensive criminal history, no mitigating circumstances); *Davis* I, 141 Wn.2d at 881-84 (victim's conscious suffering, three aggravating factors, extensive criminal history including violent crimes, defendant abused as a child and diagnosed with personality disorders); *Elmore*, 139 Wn.2d at 308-10 (crime involved rape and torture; two aggravating circumstances; criminal history involving burglary, forgery, and larceny; defendant abused as a child); *Brown*, 132 Wn.2d at 556-59 (crime involve rape and torture, four aggravating factors, extensive and violent criminal history, defendant abused as a child and diagnosed with personality disorders); *Benn* I, 120 Wn.2d at 689 (multiple adult victims, single aggravating factor, mitigating circumstances including close relationship with family and severe personality disorders); *Dodd*, 120 Wn.2d at 26-27 (multiple child victims, multiple statutory aggravating factors, victim suffering, prior convictions, and mitigating circumstances— here, a personality disorder).

most other death eligible cases. *State v. Pirtle*, 127 Wn.2d 628, 687-88, 904 P.2d 245 (1995) (death sentence upheld because nature of crime, number of aggravating factors, and defendant's criminal history all made case "among the most serious" of all death eligible offenses). In two cases, this court simply stated, without any specific references to other death-eligible cases, that it had reviewed all of those cases and concluded that the present defendant's sentence was not disproportionate.[72]

Most frequently, this court has eschewed a comprehensive survey of death-eligible cases, instead asking only if the death penalty has *ever* been imposed in *any*

---

[72] *Stenson*, 132 Wn.2d at 760 ("[w]e have compared this case an all the circumstances of the Defendant and his crime with other first degree aggravated murders which have and have not received the death penalty . . . [and] we conclude the sentence was neither excessive nor disproportionate"); *Brett*, 126 Wn.2d at 213 "[a]fter carefully reviewing the totality of similar cases, we hold . . . [t]here is no unique or distinguishing characteristic of the Defendant or of this crime which makes imposition of the death penalty wanton and freakish").

case with similar or worse facts.[73] But this court has also sometimes combined that

analysis with other approaches in a single proportionality review.[74]

_____

[73] *Yates*, 161 Wn.2d at 789-91 (death sentence not disproportionate because, with respect to each of four comparability factors, defendant's crime was similar to or worse than one in which the death penalty had been imposed and upheld); *Cross*, 156 Wn.2d at 630-34 (death sentence not disproportionate because crime involved a "marked level of cruelty" similar to three prior cases in which death was imposed; this is true even though, with respect to every comparability factor, some similar or worse crimes had resulted in a life sentence); *Davis* I, 141 Wn.2d at 884 (death sentence not disproportionate because defendant's "case is sufficiently similar to other cases in which the death penalty has been imposed and upheld on appeal"); *Elmore*, 139 Wn.2d at 308 ("If the facts of Elmore's case are similar to some of the facts taken from cases in which the death penalty was upheld, the proportionality review is satisfied."); *Sagastegui*, 135 Wn.2d at 93-94 (death sentence not disproportionate because defendant's crime resembled, with respect to each of the four comparability factors, five crimes for which death sentences had been imposed in the past); *Brown*, 132 Wn.2d at 562 ("Appellant's crime is at least as vicious as those committed in other cases in which we upheld imposition of the death penalty after proportionality review."); *Gentry*, 125 Wn.2d at 656-57 (death sentence not disproportionate because defendant's crime was similar, in terms of certain comparability factors, to the crimes committed in *Lord* I, *Rice*, and *Dodd*).

[74] *E.g.*, *Elledge*, 144 Wn.2d at 81-83 (death sentence not disproportionate in light of the nature of the crime because defendant's "crime was at least as vicious and brutal as others in which the death penalty was imposed"; death sentence not disproportionate in light of defendant's prior manslaughter conviction because "[o]ver half of . . . defendants [with prior manslaughter convictions] were sentenced to death"); *Woods*, 143 Wn.2d at 617-18 (death sentence not disproportionate in light of statutory aggravating circumstances because presence of three aggravators put defendant's crime in "top 21 percent of [death-eligible] crimes"; death sentence not disproportionate in light of nature of the crime because crime was similarly brutal to that in *Stenson*, a case in which the death penalty was imposed and upheld).

D. Our proportionality review has become so deferential that it fails to serve the protective purpose the legislature intended

While this court's decisions have varied in their approach to proportionality review, a few consistent holdings have emerged. Each of them helps to illustrate why this court is unlikely ever to find a death sentence disproportionate—and, hence, why the proportionality review statute is being improperly construed in favor of the State rather than in favor of the defendant.

First, if the defendant shows cruelty to his victims (the nature of the crime), a death sentence is proportionate even if no other comparability factor weighs in favor of that finding. *Cross*, 156 Wn.2d at 631-34 (death sentence proportionate where at least one victim consciously suffered, aggravating circumstances weighed neither for nor against a finding of proportionality, the defendant lacked a significant criminal history, and the defendant's personal history "contain[ed] elements that both tend to support the jury's verdict and argue in favor of mercy").

Second, a death sentence is not disproportionate simply because it is imposed on a defendant with serious mental illness and no significant criminal history. *Id.* at 593, 630, 633-34.

Third, juries do not impose death sentences in an arbitrary, wanton, or freakish manner simply because no one can predict when a jury will show mercy.[75]

Finally, the death penalty is not imposed in an arbitrary, wanton, or freakish manner simply because prosecutors make plea deals or consider the wishes of the victims' families and thus spare the lives of prolific serial killers but not the lives of those with far fewer victims.[76]

The latter two holdings stem primarily from this court's decisions in *Cross*, 156 Wn.2d 580, and *Davis* II, 175 Wn.2d 287.

In *Cross*, the defendant argued that "the death penalty in Washington is effectively standardless" if it permits Ridgway to receive a life sentence while others, who kill far fewer victims, are sentenced to death. 156 Wn.2d at 620. That argument split this court 5 to 4. The dissent agreed and concluded that, in light of

---

[75] *Davis* II, 175 Wn.2d at 359-60 & n.35 (in one case very similar to Davis', life sentence could be explained by the fact that two jurors found mitigating circumstances meriting leniency after "a '[v]ery emotional' special sentencing proceeding"; in another very similar case, life sentence could be explained by the presence of a lone dissenting juror who had concealed his "'strong philosophical opposition'" to the death penalty during voir dire (alteration in original)); *Brett*, 126 Wn.2d at 213 ("'the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 203, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976))).

[76] *Davis* II, 175 Wn.2d at 357 (different sentences imposed for similar crimes may be explained by prosecution's decision to offer a plea due to family's wishes or lack of direct evidence); *Cross*, 156 Wn.2d at 634 (life sentence imposed for Ridgway's crimes "is not sufficient reason to find capital sentences always disproportionate").

Ridgway's and other mass murderers' life sentences—specifically, those imposed on Benjamin Ng, Kwan Fai Mak, David Rice, and Robert Yates—"[n]o rational explanation exists to explain why some individuals escape the penalty of death and others do not." *Id.* at 651. The *Cross* dissent would have held that Washington's death penalty violated the proportionality imperative because "the penalty of death is not imposed generally in similar cases" and is instead "like lightning, randomly striking some defendants and not others." *Id.* at 652.

The *Cross* majority rejected this argument, concluding that a prosecutor's decision to extend a plea deal in exchange for information is "highly rational" and upholding Cross's death sentence because he showed a marked level of cruelty to his victims. 156 Wn.2d at 622, 631-34. But the majority also acknowledged that "the death penalty has not been sought in [several] cases at least as brutal." *Id.* at 632.

Six years later, this court reaffirmed and expanded on this holding in *Davis* II. 175 Wn.2d at 350-62. Three justices dissented, arguing that "Ridgway is [only] a notable entry in a long list of murderers who escaped death for crimes comparable to those that support death sentences." *Id.* at 377 (Fairhurst, J., dissenting), 388-89 (Wiggins, J., concurring in dissent). The dissent analyzed dozens of death eligible cases comparable to Davis' and concluded that, with respect to every single comparability factor, the vast majority of defendants received sentences of life

197

without parole. *Id.* at 377-86. The *Davis* II majority affirmed the death sentence because it found plausible explanations for several of these sentences—explanations like the defendant's youth or diminished capacity, the prosecution's lack of direct evidence, the presence of a single juror who was adamantly opposed to the death penalty, or the prosecutor's disqualification for an overlooked conflict. *Id.* at 357-60. But, as the dissent noted, this ignored RCW 10.95.130(2)(b)'s requirement that we affirm a death sentence only if that sentence is generally "imposed in similar cases":

> The majority suggests that our death penalty system is proportional because death and life sentences can be explained by factors beyond the crime and the defendant, such as the strength of the State's case, the wishes of the victim's family, or facts known to the defendant about other, unsolved cases. In concluding that these factors make the death penalty proportional, the majority again ignores the language of RCW 10.95.130(2)(b), mistaking the question of whether a sentence is appropriate in an individual case for whether the sentence is *generally imposed* in similar cases. But the statute requires us to analyze the death penalty, a punishment unique in its severity and irrevocability, on a system-wide level.
>
> When one takes the broad, statutorily directed perspective, factors that appear rational at an individual level become irrational. . . . [W]hen viewed as part of a system of deciding who dies and who lives, these same factors create irrational, perverse results. A murderer is more likely to escape death if he has concealed the details of an unsolved crime or fortuitously picked a victim whose family opposes the death penalty.

*Id.* at 387 (emphasis added).

Schierman argues that a majority of this court should adopt the "well-reasoned dissents" in *Davis* II and *Cross*. Appellant's Opening Br. at 201. I agree. This court's approach to proportionality review no longer comports with our legislature's protective intent in enacting RCW 10.95.130(2)(b).

The history of proportionality review demonstrates that we have no single clear interpretation of RCW 10.95.130(2)(b). Instead, for the past 35 years we have applied continually shifting interpretations—interpretations that allowed us to keep affirming death sentences even as they grew more and more statistically rare. When questions arose about the proper interpretation of the proportionality review statute, we consistently resolved those questions in favor of the State. *See Cross*, 156 Wn.2d at 636-37 (acknowledging uncertainty over whether the legislature intended this court to include in the comparison database death penalty sentences later reversed, but resolving that "doubt" adversely to the defendant); *Lord* I, 117 Wn.2d at 909-10 (acknowledging that RCW 10.95.130(2)(b) "'provides little guidance to determine at what point a death sentence becomes . . . disproportionate,'" but rejecting Justice Utter's standard because "it would effectively eliminate the death penalty" (quoting *Harris*, 106 Wn.2d at 798)).

In the end, given how rarely death sentences were actually sought or imposed in these cases, we could find those sentences proportionate only by ignoring most or all of the comparability factors in our analysis. *E.g.*, *Davis* II, 175 Wn.2d at 354-55

199

(finding death sentence proportionate even though, with respect to every comparability factor, the number of life sentences imposed vastly exceeded the number of death sentences imposed); *Cross*, 156 Wn.2d at 631-34 (affirming death sentence even though (1) "the death penalty has not been sought in cases at least as brutal," (2) the single aggravating circumstance of multiple victims as part of a common scheme or plan does not weigh either for or against finding of proportionality, (3) the defendant had minimal criminal history, and (4) the defendant suffered childhood abuse and had diagnosed personality disorders). And that is exactly what we would need to do again, to affirm the death penalty in this case since, for purposes of the proportionality analysis, Schierman's case is similar to Cross'.[77]

I agree with Schierman that this precedent is incorrect: it fails to fulfill RCW 10.95.130(2)(b)'s prophylactic purpose and it interprets an ambiguous penal statute in favor of the State, rather than the defendant. I also agree that it is harmful: it results in the disproportionate imposition of the death penalty. I would therefore hold for the reasons articulated in the dissents to *Davis* II and *Cross* that imposing

---

[77] There was evidence of victim suffering (marked cruelty), the jury found the same single aggravating circumstance (multiple victims as part of a common scheme or plan), the defendant had minimal criminal history (in Schierman's case, no criminal history), and the defendant offered evidence of childhood abuse as a mitigating factor at the penalty phase.

*State v. Schierman (Conner)*, No. 84614-6

death sentences on Schierman for these crimes is impermissibly disproportionate in violation of RCW 10.95.130(2)(b).[78]

Consistent with the logic of our statutory proportionality review, this conclusion is limited to Schierman's sentence. It may be difficult to imagine a case in which a death sentence would survive a properly conducted proportionality review, but that hypothetical question is not before us. Nor is the constitutionality of the death penalty, which Schierman has not separately briefed. *See* concurrence/dissent at 21 n.10.

## CONCLUSION

A majority of this court affirms Schierman's convictions. A majority of this court, in separate opinions, also declines to reverse Schierman's sentences of death. I would reverse his death sentences due to errors in the exclusion of mitigating evidence and also because that penalty is impermissibly disproportionate under RCW 10.95.130(2)(b). I would remand with instructions to impose the only

---

[78] The concurrence/dissent concludes that we may not overrule the proportionality analysis applied in *Davis* II and *Cross* unless Schierman supplies some "new information or argument." Concurrence/dissent at 21. This is incorrect: so long as the "incorrect and harmful" standard is satisfied, we may certainly overturn precedent by adopting the logic of a prior dissent. *Compare Berlin*, 133 Wn.2d at 547-48 (overruling *State v. Lucky*, 128 Wn.2d 727, 912 P.2d 483 (1996), as "incorrect and harmful" because that decision "effectively" overruled sound precedent and precluded too many lesser included defense instructions), *with Lucky*, 128 Wn.2d at 736-39 (Johnson, J., dissenting) (criticizing the *Lucky* majority for improperly abrogating precedent and virtually eliminating the availability of lesser included offense instructions).

201

sentences permitted by our state proportionality law in this case: four consecutive

terms of life in prison without possibility of parole.

_____

WE CONCUR:

_____                    _____


_____                    _____


_____                    _____


_____                    _____

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner M.)*

No. 84614-6

MADSEN, J. (concurring in lead opinion)—I agree with Justice Gordon McCloud's lead opinion discussion of the guilt phase issues. I agree with the Justice Yu's concurring opinion discussion of the penalty phase issues. I write separately because while I agree with the lead opinion that Conner Schierman's sentence of death is disproportionate, I do not agree that our prior cases must be overturned. Rather, I find the statistics bear out that the sentence in this case is disproportionate as compared to the penalty imposed in similar cases.

Statutory Review

RCW 10.95.130(2)(b) requires this court to decide "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases." "Similar cases" are defined as "cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court." *Id.*

In 2006, I joined the dissent in *State v. Cross*, 156 Wn.2d 580, 132 P.3d 80 (2006). In that same year, the Washington State Bar Association issued a final report of its death penalty subcommittee. *See* WASH. STATE BAR ASS'N, FINAL REPORT OF THE DEATH PENALTY SUBCOMMITTEE OF THE COMMITTEE ON PUBLIC DEFENSE (2006). The report noted that between 1981 and 2006, there were 300 aggravated murder convictions. Of that group, 270 were death eligible. In 80 cases, the prosecutor filed the death notice, and

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 84614-6
Madsen, J., concurring

in 30 cases, the juries imposed death.[1] Nineteen of those death sentences were reversed on appeal and, on remand, the defendants were sentenced to life without parole. Only 5 executions have taken place since 1981. Three of the individuals executed did not appeal their death sentences and essentially were "volunteers."

Since 2006, the landscape has changed. We have a more complete set of trial court reports. At least 80 additional death eligible cases have been recorded (cases in which a person is convicted of aggravated first degree murder).[2] The death penalty was given in only 5 cases: Conner Schierman, Byron Scherf, Joseph McEnroe, Cecil Davis, and Allen Gregory.[3] Currently, there are 8 individuals on death row, 5 of whom committed their crimes in the 1990s and 1 who committed his crime in 1988.

Based on the information that is now available and considering the statutory review required by the legislature, I find the sentence of death in this case disproportionate to the penalties imposed in similar cases.

I would affirm the conviction in this case but reverse the sentence of death.

---

[1] These numbers are necessarily approximate since the trial reports were not completed in all required cases in 2006.

[2] This number is derived from trial reports filed with our court. Trial judges are statutorily required to submit trial reports to the Washington State Supreme Court "[i]n all cases in which a person is convicted of aggravated first degree murder." RCW 10.95.120.

[3] Davis and Gregory were resentencing proceedings.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 84614-6
Madsen, J., concurring

Madsen, J.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 84614-6

YU, J. (concurring in part and dissenting in part) — The majority of this court correctly concludes that petitioner Conner Michael Schierman's convictions should be affirmed, and this opinion fully concurs with the opinion of Justice Gordon McCloud regarding the guilt phase of Schierman's trial.

However, the trial court did not err in its evidentiary rulings at the penalty phase and Schierman's sentence is not statutorily disproportionate. I therefore respectfully dissent in part for the reasons expressed below.

ANALYSIS

A. Schierman's convictions are properly affirmed

Justice Gordon McCloud's opinion correctly analyzes and decides the issues relating to the guilt phase of Schierman's trial. By further discussing the de minimis standard that a majority of this court now adopts for reviewing alleged public trial right violations, this opinion does not intend to imply any inconsistency

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

between itself and the opinion of Justice Gordon McCloud on that issue. *See* lead opinion at 22-31.

1.      Our prior rejection of de minimis closures is incorrect and harmful

Stare decisis plays a critical role in our justice system by """"promot[ing] the evenhanded, predictable, and consistent development of legal principles, foster[ing] reliance on judicial decisions, and contribut[ing] to the actual and perceived integrity of the judicial process."""" *State v. Barber*, 170 Wn.2d 854, 863, 248 P.3d 494 (2011) (quoting *Keene v. Edie*, 131 Wn.2d 822, 831, 935 P.2d 588 (1997) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991))).  There is perhaps no context in which these concerns are more salient than in the judicial interpretation and application of constitutional rights.  The decision to disavow our constitutional precedent is a weighty one, which must be accompanied by a full and honest account of the reasons that our precedent is "'incorrect and harmful.'" *Id.* (quoting *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970)).

            a.      Our precedent is incorrect because it misapprehends the nature
                    of a de minimis inquiry

Our precedent rejects the possibility of a de minimis closure and instead assumes that every closure not justified by a *Bone-Club*[1] analysis on the record, no

---

[1] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

matter how trivial, violates the public trial right and requires automatic reversal as structural error. This precedent is incorrect because it is based on the assumption that in order to determine whether a closure is de minimis, we would be required to determine whether the closure caused prejudice to the defendant. *State v. Shearer*, 181 Wn.2d 564, 573, 334 P.3d 1078 (2014) (Owens, J., lead opinion) ("recognizing de minimis violations *based on the lack of prejudice to the defendant* would conflict with our precedent that public trial rights violations are structural errors and not subject to a harmlessness analysis" (emphasis added)). However, a de minimis inquiry does not require any analysis of whether there was prejudice to the defendant. Instead, a de minimis inquiry considers whether the values underlying the public trial right have been undermined.

Our precedent is unquestionably correct that it is usually impossible to determine whether structural error has resulted in prejudice to a particular defendant. In most cases, structural errors "'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006) (alteration in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). In proceedings infected by structural error, there are *no* untainted proceedings to use as a comparison point for determining whether the

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

error was harmless. *Sullivan v. Louisiana*, 508 U.S. 275, 280, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). Therefore, "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." *Gonzalez-Lopez*, 548 U.S. at 150.

Our precedent is also correct that public trial violations are properly classified as structural error, even though "in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint." *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1910, 198 L. Ed. 2d 420 (2017). Therefore, if a de minimis inquiry did consider whether an unjustified closure caused prejudice to the defendant, our precedent would be correct in rejecting it.

However, a properly conducted de minimis inquiry is entirely unrelated to any showing of prejudice or lack of prejudice to the defendant. Instead, as explained by a seminal federal case,

> [A] triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer "prejudice" or "specific injury." It is, in other words, *very different from a harmless error inquiry.* It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir.) (emphasis added), *cert. denied*, 519 U.S. 878 (1996).[2] The test adopted by the Second Circuit in *Peterson* considers the specific facts of an unjustified closure to determine whether the closure undermined "the values furthered by the public trial guarantee." *Id.* at 43. If so, then there was a public trial violation regardless of whether there was prejudice to the defendant. *Id.* at 42.

Our precedent is thus incorrect because it rejects the possibility of a de minimis closure based on a misunderstanding of what it means.

> b.    Our precedent is harmful because it requires automatic reversal based on de minimis closures

Our rigid treatment of every courtroom closure not preceded by a *Bone-Club* analysis as a public trial violation amounting to structural error requiring automatic reversal is clearly harmful. It

> leads to delayed justice and additional costs, not all of which are quantifiable but which are nevertheless onerous. These can include the time and effort of the courts, the prosecuting agencies, and the defense attorneys, often public defenders, who must retry the cases; the burdens, including possible distress and anxiety, placed on another jury; the burdens placed on victims and other witnesses who must go through the process of another trial; the losses in relevant evidence that come with long-delayed presentation, when witnesses' memories are not as clear as at the time of the original trial; and the dollar costs of the new trials.

---

[2] The Supreme Court of the United States has never rejected the possibility of a de minimis closure despite such federal appellate cases recognizing the possibility. *See State v. Sublett*, 176 Wn.2d 58, 116, 292 P.3d 715 (2012) (Madsen, C.J., concurring).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Sublett*, 176 Wn.2d 58, 103, 292 P.3d 715 (2012) (Madsen, C.J., concurring). Such costs and burdens are, of course, often implicated when any criminal conviction is reversed. But the harms resulting from our inflexible approach to public trial issues simply cannot be justified in light of the flawed reasoning underlying our rejection of the possibility of de minimis closures in which the public trial right was not actually violated.

This case is certainly not the first one in which it has been pointed out that our public trial jurisprudence is incorrect and harmful. *See, e.g., State v. Njonge*, 181 Wn.2d 546, 563, 334 P.3d 1068 (2014) (González, J., concurring); *State v. Smith*, 181 Wn.2d 508, 533-38, 334 P.3d 1049 (2014) (Wiggins, J., concurring); *Sublett*, 176 Wn.2d at 114-28 (Madsen, C.J., concurring); *State v. Paumier*, 176 Wn.2d 29, 43-57, 288 P.3d 1126 (2012) (Wiggins, J., dissenting). However, this case perfectly illustrates why we *must* now disavow it. A majority of this court agrees that justice demands we affirm Schierman's convictions, but a differently comprised majority of this court unanimously agrees that our precedent precludes us from doing so. In this direct conflict between justice and precedent, justice must prevail.

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

2.    We adopt the de minimis inquiry established by federal appellate courts

Because our precedent is incorrect and harmful, a majority of this court now disavows it and adopts "the wise and widely-accepted *Peterson* test . . . [t]o determine whether a closure was too trivial to implicate the Sixth Amendment guarantee" to a public trial. *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003) (citing *Braun v. Powell*, 227 F.3d 908, 919 (7th Cir. 2000); *United States v. Al-Smadi*, 15 F.3d 153, 154-55 (10th Cir. 1994)); *see* lead opinion at 28-29. Determining whether a closure was de minimis requires the court to carefully consider the specific facts surrounding the closure and to determine whether, in light of those facts, the purposes of the public trial right were undermined. *Peterson*, 85 F.3d at 42-44.

To a limited extent, this test for de minimis closure resembles the logic prong of the experience and logic test, as both consider the purposes underlying the public trial right. *See State v. Russell*, 183 Wn.2d 720, 732, 357 P.3d 38 (2015). However, the logic prong uses a categorical, forward-looking approach that considers the purposes of the public trial right in order to determine whether the type of proceeding at issue *implicates* the public trial right. *Id.* at 730. The test for de minimis closure, meanwhile, uses a case-by-case, backward-looking approach that assumes the public trial right is implicated by the proceeding, and then asks

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

whether, in light of the particular facts presented in the individual case, an unjustified closure *actually undermined* those purposes. *Peterson*, 85 F.3d at 42.

The de minimis test thus does not degrade the public trial right or encourage closed proceedings because it can never exempt an entire category of proceedings from the presumption that all proceedings must occur in open court. It is merely an analytical tool applied on review that will always depend on the particular circumstances presented. This must be so because no two trials are identical and no trial is perfect. "[A] trial is a uniquely human affair and can be only as flawless as the judges and lawyers who conduct it. We strive for perfection but rarely attain it. Humans are imperfect." *Paumier*, 176 Wn.2d at 44 (Wiggins, J., dissenting).

3.    In this case, the closure of discussions regarding for-cause challenges was de minimis

As stated above, the test for whether an unjustified courtroom closure is de minimis is whether, in light of the specific facts appearing in the record, the closure actually undermined the purposes of the public trial right.[3] *Peterson*, 85 F.3d at 43. These purposes are well established: "'to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance

---

[3] To reiterate, this is a different inquiry from that presented by the logic prong of the experience and logic test. It is already established that for-cause challenges implicate the public trial right generally. *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015). Applying the de minimis test, meanwhile, requires us to determine whether the purposes of the public trial right were *actually* undermined in this *particular* case.

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

of their functions, to encourage witnesses to come forward, and to discourage perjury.' It also affirms the legitimacy of the proceedings and promotes confidence in the judiciary." *In re Det. of Morgan*, 180 Wn.2d 312, 325, 330 P.3d 774 (2014) (citation omitted) (quoting *Sublett*, 176 Wn.2d at 72).

To determine whether these purposes were in fact undermined under the circumstances presented, we must carefully consider the record. In making this determination, courts may look to the length of time the courtroom was closed, the reason the courtroom was closed, whether the public actually learned what occurred during the closed proceeding, and whether the closed proceedings related to the ultimate question of guilt or innocence. *See Ivester*, 316 F.3d at 960; *Braun*, 227 F.3d at 919; *Peterson*, 85 F.3d at 43-44. However, no single factor is either necessary or sufficient. "[T]he methodology employed by the trial court must be the focal point of appellate review." *Braun*, 227 F.3d at 918.

Here, the only proceedings relating to for-cause challenges that occurred in chambers were brief arguments by the parties (many of which had already been made in open court the day before) and the court announcing its decisions (which were repeated in open court immediately afterward). *See* Verbatim Report of Proceedings (VRP) (Jan. 11, 2010) at 263-67; VRP (Jan. 12, 2010) at 16-22, 42. Encouraging witnesses to come forward and discouraging perjury were not implicated, and given how brief the closure was as compared to the entire voir dire

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

process (to say nothing of the entire trial process), it cannot be said the closure, in itself, actually undermined the purposes of the public trial right. VRP (Jan. 12, 2010) at 16 (estimating the in-chambers proceedings would take "less than ten minutes"). And while the closure was not inadvertent, the court here clearly had no intention of shielding either counsels' arguments or its own decisions from public scrutiny—a complete record of the proceedings was contemporaneously transcribed by a court reporter and is publicly available. *Id.* This served to remind the participants of their functions and responsibilities at the time, and to affirm the legitimacy of the proceedings going forward.

Courtroom closures not justified by a *Bone-Club* analysis are never advisable, but that does not mean they are always structural error requiring automatic reversal either. In this case, the closure was de minimis and did not violate the public trial right. Therefore, in accordance with the lead opinion, Schierman's convictions are affirmed.

B.     Schierman does not show error in the penalty phase

Without question, "the experienced trial court judge correctly applied a complicated set of constitutional and evidentiary rules to a contentious and emotionally charged proceeding," and the lead opinion correctly analyzes the vast majority of Schierman's penalty-phase arguments. Lead opinion at 90. However, the trial court did not err in its rulings on the scope of expert testimony that would

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

be allowed by Drs. Mark Cunningham and Mark McClung, and Schierman's

sentence is not statutorily disproportionate.

1.    Proffered testimony by Dr. Cunningham

Schierman claims that his sentence should be reversed because the trial court

limited a belatedly disclosed expansion of expert testimony from Dr. Cunningham,

a proposed defense witness who was ultimately never called to testify.

Schierman's argument mischaracterizes the record and draws erroneous

conclusions from the effect of the trial court ruling.  The trial court did not err.

It must be recognized at the outset what trial court decision we are

reviewing.  Well before trial, Dr. Cunningham was properly disclosed as a

potential mitigation witness.  The disclosure indicated that his testimony would be

"concordant with his interviews of [Schierman] in so far as they relate to Alcoholic

Blackout/Propensity/History."  Clerk's Papers (CP) at 26403.  At the completion of

the guilt phase, the defense filed a supplemental disclosure, again specifying Dr.

Cunningham's testimony would "relate to alcoholic blackout." *Id.* at 26424.

However, in opening statements for the penalty phase, defense counsel stated for

the first time that Dr. Cunningham would "testify with respect to what type of

criminal behavior is predictive of an inmate's prison behavior" and would include

testimony related to future prison behavior.  VRP (Apr. 19, 2010) at 86.  The State

objected to the expanded scope of Dr. Cunningham's proposed testimony on two

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman*, No. 84614-6
(Yu, J., concurring in part and dissenting in part)

grounds: violation of the court's discovery orders and relevance. The trial court denied the State's motion and allowed the proposed expansion of the testimony, subject to a relevancy determination. Schierman is thus seeking reversal based on a trial court ruling that was largely in his favor.

Worth noting is that the trial court would have been justified in excluding all of the expanded testimony based on defense counsel's "blatant and intentional" violation of the court's discovery orders. VRP (Apr. 20, 2010) at 16. Defense counsel never provided an adequate explanation for its failure to timely disclose the full intended scope of Dr. Cunningham's proposed testimony, and the court observed that the only apparent explanation for the defense's "incredibly untimely disclosure," *id.*, was "for tactical reasons," *id.* at 15. However, the trial court ultimately ruled that it would *allow* the expanded testimony from Dr. Cunningham regarding future dangerousness, including testimony and opinion about Schierman's development as a child and adolescent, his addictions, his alcohol treatment and recovery, and his institutional adjustment in jail, to the extent they were relevant. VRP (Apr. 30, 2010) at 10.[4]

_____

[4] On the issue of future dangerousness, extensive witness testimony was presented regarding Schierman's conduct in jail while he was awaiting trial, including testimony from two jail witnesses, and family and friends who testified. Also, Eldon Vail, former secretary of the Department of Corrections, testified extensively for the defense specific to the prison security Schierman would face if incarcerated.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Nevertheless, Schierman argues that the trial court erred in limiting part of Dr. Cunningham's proposed testimony by basing its decision on *Morva v. Commonwealth*, 278 Va. 329, 683 S.E.2d 553 (2009). This argument is simply wrong. *Morva* would have directed the trial court here to exclude Dr. Cunningham's expanded testimony entirely, and that is not what happened here.

In *Morva*, the Virginia Supreme Court upheld the trial court's exclusion of all of Dr. Cunningham's testimony, including the risk assessment specific to the defendant and the Virginia prison system. The court concluded:

> It is true that, in this case, unlike *Porter* [*v. Commonwealth*, 276 Va. 203, 661 S.E.2d 415 (2008)], Dr. Cunningham proposed to provide testimony that concerns Morva's history and background, prior behavior while incarcerated, age and educational attainment, and such factors might bear on his adjustment to prison. However, other testimony Dr. Cunningham proposed to give, and to rely upon in giving a prison risk assessment for Morva, such as potential security interventions that "could be brought to bear" upon Morva, and the rates of assaults in the Virginia Department of Corrections, is, by statute, not relevant to the determination the jury has to make concerning Morva's future dangerousness and therefore would not be admissible evidence.

*Morva*, 278 Va. at 350. Based on this holding, the argument that the trial court here applied *Morva*'s analysis is not supportable. While the State cited *Morva* in support of its motion to exclude all of Dr. Cunningham's late-disclosed testimony, the trial court *denied* total exclusion, allowing Dr. Cunningham's relevant

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

testimony that specifically related to Schierman, including the prison risk assessment pertaining specifically to him.

What Schierman takes issue with is the trial court decision excluding some of Dr. Cunningham's proposed testimony relating to other inmates incarcerated in other state prisons based on relevancy. That decision was not error. Our statute focuses the relevancy inquiry under RCW 10.95.070(8), where the jury is directed to consider "[w]hether there is a likelihood that *the defendant* will pose a danger to others in the future." (Emphasis added.) The focus of the allowable evidence thus plainly centers on the defendant and his circumstances. Eighth and Fourteenth Amendment to the United States Constitution's jurisprudence similarly supports the trial court's decision to limit Dr. Cunningham's future dangerousness testimony.[5] Even recognizing a relaxed standard applicable in capital proceedings and allowing wide latitude for the admission of testimony, any proposed testimony or expert opinion must relate to the defendant and his or her circumstances to be relevant.

The trial court here reviewed each proposed, newly disclosed Microsoft PowerPoint slide and excluded some based on relevancy because some individual

---

[5] "[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a *defendant's character or record* and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (second emphasis added).

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

slides had nothing to do with Schierman personally and involved prison statistics from other states. Meanwhile, the trial court indicated it would allow Dr. Cunningham to testify that past violence in the community is not strongly associated with prison violence and that the severity of the crime is not a good predictor of prison adjustment.[6] CP at 8306 (contents of slide 26). The trial judge

> also permitted [Dr. Cunningham] to testify that serious violence is rare in prison (slides 27-28), to the low rates of inmate assaults and homicide in the Washington [Department of Corrections] (slides 29-30), and to the number and proportion of inmates convicted of homicide in Washington prisons (slide 31). CP 8306-07; 109RP 24-25. The court also permitted testimony as to slide 35, which states that nothing about Schierman increased his risk of serious violence in prison, and listed five specific factors that decreased his risk of serious violence. CP 8307; 109RP 25.

Br. of Resp't at 171. This was entirely appropriate because the inquiry focuses on "*Mr. Schierman's* likelihood of presenting future dangerous[ness] or being involved in the future dangerous acts while confined in the *Washington* State Department of Corrections." VRP (Apr. 30, 2010) at 3 (emphasis added).

The record thus shows that the trial court properly concluded that the relevant testimony would be limited to Schierman's ability to adjust to

---

[6] The defense chose not to call Dr. Cunningham to testify, so we have no record of what actual testimony he would have presented. We need not reach the State's argument that Schierman waived any objection to the trial court's limitation of Dr. Cunningham's testimony because Schierman's objections are without merit.

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

incarceration, consistent with RCW 10.95.070(8)'s directive that the jury can consider the "likelihood that the defendant will pose a danger to others in the future." The trial court's exclusion of some of Dr. Cunningham's proposed testimony was not erroneous.

2.     Proffered testimony by Dr. McClung

The trial court properly excluded Dr. McClung's testimony regarding traumatic brain injury. "Before allowing an expert to render an opinion, the trial court must find that there is an adequate foundation so that an opinion is not mere speculation, conjecture, or misleading." *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 357, 333 P.3d 388 (2014). Here, the factual foundation for Dr. McClung's proffered testimony was inadequate.

Because Dr. McClung's proposed testimony was "premised upon a chain of other experts and their evaluations," the trial court correctly considered the foundation of each link in that chain. VRP (Apr. 29, 2010) at 7. The first link in the chain was a report by Dr. Wendy Cohen, which concluded that the scan was "suggestive of a prior insult which involved a compon[e]nt of hemorrhage." CP at 8252. Dr. Cohen did not opine that Schierman's brain scan indicated that he had suffered multiple traumatic head injuries, or even raise that possibility.

The next link in the chain of expert evaluations was a letter by Dr. Paul Connor, dated April 24, 2010. Dr. Connor concluded, based on Schierman's

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

medical records, that the prior head injury Dr. Cohen found was consistent with a concussive head injury Schierman suffered while playing football in 1997. *Id.* at 8257. Dr. Connor then noted that "Schierman and his family have reported a number of incidents of domestic violence in which he was struck in the head by his biological father." *Id.* From these reports, Dr. Connor concluded that "it would appear that Mr. Schierman has experienced multiple head injuries in his life." *Id.* Dr. Connor did not elaborate on the extent of domestic violence, describe any particular incident, or suggest that any act of domestic violence by Schierman's father may have contributed to the hemorrhaging noted by Dr. Cohen. Nevertheless, Dr. Connor concluded "that a history of multiple head trauma[s] is a more parsimonious etiology than that of [nonverbal learning disorder]." *Id.* (boldface omitted).

The next day, Dr. Richard Adler provided the final link in the chain of expert opinions that formed the basis for Dr. McClung's proposed testimony. Dr. Adler opined that Schierman suffered "'[p]ost-concussion syndrome'" after his 1997 football injury. *Id.* at 8249 (quoting Denise Garvey, *When Can Teens Return to Sports After a Head Injury?*, 4 PROCEEDINGS OF UCLA HEALTHCARE 47 (Winter 2000) [http://perma.cc/JS9R-VN9D]. However, Dr. Adler's declaration also states that post-concussion syndrome occurs "'[a]fter a history of head trauma with LOC [loss of consciousness] and post-injury amnesia.'" *Id.* (second alteration

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

in original) (quoting Garvey, *supra*, at 47). The trial court thus did not make an unqualified medical judgment about the necessary level of severity for prior head injuries—Dr. Adler, a licensed medical doctor, provided that information.

However, the trial court correctly concluded that there was no factual evidence that Schierman had a history of multiple head trauma *with loss of consciousness and post-injury amnesia*. The foundation for Dr. McClung's proposed testimony depended on such a history.

Even as applied to proffered mitigating evidence in the penalty phase of a capital case, "the trial court maintains its traditional authority 'to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.'" *State v. Davis*, 175 Wn.2d 287, 318, 290 P.3d 43 (2012) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 n.12, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)).[7] Furthermore, "'mitigating evidence' is not defined as any evidence, regardless of its content or relevance, that would disincline the jury to impose the penalty of death. Mitigating evidence is that which 'in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability.'" *State v. Pirtle*, 127 Wn.2d 628, 671, 904 P.2d 245 (1995) (quoting *State v. Bartholomew*, 101 Wn.2d 631, 647, 683 P.2d 1079 (1984)).

---

[7] The limits on this traditional authority are the same under both the state and federal constitutions. *Davis*, 175 Wn.2d at 318 n.12.

18

*State v. Schierman*, No. 84614-6
(Yu, J., concurring in part and dissenting in part)

Dr. McClung's proposed testimony might be properly considered as extenuating or reducing the degree of moral culpability as applied to a person who *did* have a history of multiple head trauma with loss of consciousness and post-injury amnesia.[8] However, without any foundational evidence that Schierman had such a history, the proposed testimony was irrelevant. The trial court therefore did not err in excluding Dr. McClung's testimony due to its inadequate foundation.

3.     Statutory capital sentence review

Because the trial court did not err in its evidentiary rulings, Schierman's sentence should be affirmed if it passes a statutory capital sentence review, which requires the court to address four issues:

> (a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4);[9] and

> (b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120;

---

[8] It only "might" be properly considered because Dr. McClung was also unable to reach any conclusion about whether any prior head injuries Schierman may have suffered actually had any impact on his behavior or mental processes. *See* CP at 8259-60.

[9] RCW 10.95.060(4) provides, "Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: 'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?'"

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(c) Whether the sentence of death was brought about through passion or prejudice; and

(d) Whether the defendant had an intellectual disability within the meaning of RCW 10.95.030(2).

RCW 10.95.130(2). As correctly noted by the lead opinion, the arguments in this case focus on the second and third issues, which are whether Schierman's sentence is disproportionate or was brought about through passion and prejudice. Lead opinion at 182.

Schierman does little to highlight specific facts about himself, his crimes, or comparable cases indicating that "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). Instead, he argues, and the lead opinion agrees, that "Washington's death penalty is imposed in a wanton and freakish manner," such that *every* capital sentence in Washington should be found statutorily disproportionate. Appellant's Opening Br. at 198; *see* lead opinion at 181-200. However, as Schierman recognizes, this court has already rejected that argument, and he provides no new information or argument that could justify

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

revisiting our precedent.[10]  Appellant's Opening Br. at 198 (citing *Davis*, 175 Wn.2d at 353-54).

When conducting a statutory disproportionality review, "[t]he goal is to ensure that the sentence, *in a particular case*, is proportional to sentences given in similar cases; is not freakish, wanton, or random; and is not based on race or other suspect classifications."[11]  *State v. Cross*, 156 Wn.2d 580, 630, 132 P.3d 80 (2006) (emphasis added).  To do this, "we must consider at least (1) the nature of the crime, (2) the aggravating circumstances, (3) the defendant's criminal history, and (4) the defendant's personal history, as well as any additional substantive challenges to the proportionality of the sentence." *Davis*, 175 Wn.2d at 348.

The nature of Schierman's crimes was indisputably horrific.  At a time when he knew that Olga Milkin's husband was deployed overseas, Schierman entered her home and killed her along with her two sons, who were three and five years old, and her sister, who was a college student.  Olga Milkin and her sister were stripped of their clothing and stabbed repeatedly in the head and neck.  Both were stabbed in the neck from the front with such force that the knife actually damaged

---

[10] This court has shown it is firmly committed to carefully considering new information regarding the constitutionality of capital punishment. *See* Order, *State v. Gregory*, No. 88086-7 (Wash. Nov. 21, 2017).  That issue is simply not presented here.  Schierman does not provide any new information or any new arguments, and the relevant portions of his briefing do not engage in any meaningful analysis of any constitutional provisions. *See* Appellant's Opening Br. at 197-202; Appellant's Reply Br. at 72-75.

[11] Schierman is white, and there is no indication that race or any other suspect classification was implicated at any point in these proceedings.

21

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

their spines, and there was evidence that they attempted to fight back, indicating that they endured significant conscious suffering before they died. One of the children was stabbed through the throat from one side to the other, and the other child's throat was cut so deeply that he was nearly decapitated. When Schierman woke up in the Milkins' home and found himself covered in blood with four dead bodies, he took a shower, changed his clothes, and attempted to burn the house down in order to destroy the evidence. The nature of these crimes is at least as brutal as others in which we have upheld a capital sentence. *See id.* at 349-51.

The only aggravating factor submitted to the jury was that "[t]here was more than one victim and the murders were part of a common scheme or plan." RCW 10.95.020(10). However, "[t]he nature of the aggravating circumstances, as well as the number, is important to consider." *Davis*, 175 Wn.2d at 351. As applied to the particular facts presented, the nature of this aggravating circumstance goes beyond the minimal statutory requirements—Schierman's crimes ended the lives of a young mother and her two small children while their father was deployed overseas, as well as the children's aunt who was there to help while their father was gone. He literally destroyed the Milkin family and their home.

Schierman's lack of prior convictions and difficult personal history neither require nor prevent a finding of disproportionality. *Id.* at 353; *Cross*, 156 Wn.2d at 633-34; *State v. Rupe*, 108 Wn.2d 734, 770, 743 P.2d 210 (1987). But in light of

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the evidence showing Schierman planned these crimes for a time when the victims were particularly vulnerable because Mr. Milkin was deployed overseas, the ruthless nature of the murders themselves, and Schierman's subsequent efforts to destroy the evidence by burning the Milkins' house down, Schierman's sentence is not disproportionate to the penalty imposed in similar cases.

Schierman also contends that his sentence was brought about by passion and prejudice because the State's case "emphasize[d] that the victims were so 'worthy' that Schierman deserved death regardless of the constraints of the law." Appellant's Opening Br. at 203. However, he largely points to aspects of the State's case that were either entirely proper or harmless. Lead opinion at 55-63 (circumstantial evidence of sexual motivation), 64-72 (Mr. Milkin's military service), 135-39, 143-45 (the Milkins' persecution, immigration, and religious faith). Thus, "[w]e have already addressed and rejected these claims." *Davis*, 175 Wn.2d at 374.

In addition, Schierman raises the fact that the jury was shown "many, many gruesome photographs." Opening Br. of Appellant at 203. Schierman does not specify which photographs he is referring to, but both autopsy and crime scene photographs may be admitted subject to evidentiary rules. *State v. Yates*, 161 Wn.2d 714, 768, 168 P.3d 359 (2007) (autopsy photographs admissible so long as they are accurate and more probative than prejudicial); *Cross*, 156 Wn.2d at 618

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

("Generally, photographs taken by police of a crime scene will be admissible so long as the entry was lawful."). Schierman provides no explanation of how the photographs the jury saw here made an improper appeal to passion or prejudice in this particular case.

Finally, the State's references to the Holocaust were improper. *See* lead opinion at 169-173. However, the court instructed the jury to disregard those statements, and when considered in the context of the entire trial and all the evidence presented, it cannot be said that they necessarily so inflamed the passions or prejudices of the jury that its sentencing verdict must be reversed.

## CONCLUSION

This opinion is not intended to either endorse or criticize the wisdom or constitutionality of capital punishment generally, nor is it intended to express any views about the appropriate resolution of any challenges to capital punishment that have been raised in other cases. However, based on the record and issues presented in this case, Schierman's convictions and sentence should be affirmed.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

State v. Schierman, No. 84614-6
(Yu, J., concurring in part and dissenting in part)

_____ Yu, J.

Gonzáles J.

Wiggins, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner Michael)*
(Stephens, J., dissenting in part, concurring in part)

No. 84614-6

STEPHENS, J. (dissenting in part, concurring in part)—In criminal prosecutions, both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution protect the defendant's right to an open, public trial. Violation of this right has long been recognized as a structural error, generally requiring reversal of the conviction and a new trial. Here, the State recognizes a closure occurred when for-cause juror challenges were considered in chambers. And this court unanimously agrees that our precedent requires reversal of the conviction based on this structural constitutional error. Nonetheless, a majority of the court—comprised of the lead opinion and Justice Yu's concurrence—departs from precedent and disregards the error here as too "trivial" or "de minimis" to warrant any remedy. Recognizing that this court has consistently and repeatedly rejected this situational analysis in past cases, the new majority proclaims that reversing Schierman's conviction due to the violation of his public trial right is too

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

high a price to pay for following precedent, and thus we must choose between precedent and justice. *See* concurrence at 6-7 ("A majority of this court agrees that justice demands we affirm Schierman's convictions, but every member of the court unanimously agrees that our precedent precludes us from doing so. In this direct conflict between justice and precedent, justice must prevail.").

I respectfully dissent.[1] I fail to see the justice in changing our law to avoid giving relief for a constitutional violation to a man whose conviction the majority believes must be affirmed. Once we start down this path, it will become quite easy to dismiss as trivial or de minimis any number of constitutional errors so long as we convince ourselves that the trial, on the whole, was fair, or more generally that "justice demands we affirm." *Id.*

Recognition of a triviality standard inevitably results in trivializing constitutional violations, as the history of this standard in other jurisdictions bears out. While the triviality or de minimis notion began as an attempt to avoid reversal based on brief, inadvertent courtroom closures that seemed inconsequential, it has

---

[1] This case involves both an appeal and our statutorily required capital sentence review under RCW 10.95.130. Because the decision of the court on the appeal is to affirm Conner Schierman's conviction, my dissent does not relieve me of the obligation to engage in the statutory review. Based on our precedent, I concur in the opinion of Justice Yu that Schierman's capital sentence was validly imposed.

-2-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

proven impossible to restrain. It is an ersatz doctrine that has no standards and offers

no more guidance than a sniff test for courts to determine when a public trial right

violation is "bad enough" to warrant a remedy. To now adopt it as a rule of decision

in a case involving a deliberate, ordered closure will produce only confusion and

lead to inconsistent results. We should adhere to established precedent, and

recognize that justice demands a remedy in the face of a public trial violation. The

proper remedy is to reverse Schierman's conviction and remand for a full public

trial.

## DISCUSSION

I. We Should Adhere to Our Public Trial Precedent Because It Is Neither Incorrect Nor Harmful

Both the State and the majority recognize that we have, many times,

considered and rejected adoption of a triviality or de minimis doctrine, and have

consistently adhered to the remedy required for a structural constitutional error:

reversal and a new trial.[2] Importantly, our cases are based not only on the principles

---

[2] We have recognized that the requirement for a "new trial" is shorthand for the rule of automatic reversal. *See State v. Njonge*, 181 Wn.2d 546, 554 n.3, 334 P.3d 1068 (2014). In isolated situations in which a public trial error occurs in a pretrial proceeding that can be repeated without any effect on the trial, the lesser remedy of invalidating that proceeding may be appropriate. *Id.* (citing *Waller v. Georgia*, 467 U.S. 39, 49, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (ordering new suppression hearing, with new trial necessary "only if a new, public suppression hearing results in the suppression of material evidence not

-3-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

underlying article I, section 22 of our state constitution, but also on decisions from the United States Supreme Court interpreting the Sixth Amendment to the United States Constitution. *See, e.g., Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984); *Presley v. Georgia*, 558 U.S. 209, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010). These decisions provide defendants a minimum level of constitutional protection we are not free to disregard.

Consistent with our own and United States Supreme Court precedent, we decided a trio of cases in 2012 that reaffirmed that a violation of the public trial right is structural error, prejudice is presumed, and a new trial is required. In those cases, a minority of the court argued our precedent was incorrect and harmful and urged the adoption of a de minimis exception of some kind. *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 288 P.3d 1140 (2012) (plurality opinion); *State v. Paumier*, 176 Wn.2d 29, 288 P.3d 1126 (2012); *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012). Yet, we rejected those arguments. We recognized that the right to a public trial is at the core of our system of justice, and a violation of this right does not require showing that something else went wrong, i.e., that the trial was otherwise unfair.

---

suppressed at the first trial, or in some other material change in the positions of the parties")). Where it is not certain that the invalid proceeding will have no effect on the trial, however, a new trial is required. *See State v. Bone-Club*, 128 Wn.2d 254, 262, 906 P.2d 325 (1995).

-4-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

Most recently in 2014, we again confronted the argument for a de minimis exception. *State v. Shearer*, 181 Wn.2d 564, 573 & n.2, 334 P.3d 1078 (2014) (plurality opinion) (noting that, even prior to the 2012 cases, the court had rejected a de minimis standard as inconsistent with the structural nature of public trial error (citing *State v. Easterling*, 157 Wn.2d 167, 180, 137 P.3d 825 (2006))). We again rejected it, observing that, time and time again, we have resisted calls to water down the constitutional right to a public trial in the interest of expediency or based on the perception that a closure was inconsequential. *Id.*[3]

Today's lead opinion has found no new arguments to demonstrate that our public trial precedent is incorrect and harmful. The lead opinion does not even attempt to offer reasons and simply rejects what it characterizes as "*Shearer*'s dicta foreclosing the possibility of de minimis violations altogether." Lead op. at 31. This is not even an accurate description of our precedent, which fully recognizes that not

---

[3] The lead opinion suggests that none of our prior cases address the situation presented here because they all involved "the determination of facts behind closed doors." Lead opinion at 24-25. Contrary to the lead opinion's insistence that "[t]his distinction matters to the public trial analysis," *id.* at 25, we have rejected drawing a line between legal or ministerial issues on the one side and the resolution of disputed facts on the other. In *State v. Sublett*, a clear majority of this court recognized that such a distinction "will not adequately serve to protect defendants' and the public's right to an open trial." 176 Wn.2d 58, 72, 292 P.3d 715 (2012) (lead opinion of Johnson, J.); *see also id.* at 138 ("The legal/factual distinction is simply out of place in the context of the right to a public trial.") (Stephens, J., concurring).

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

every court proceeding implicates the public trial right or constitutes a closure. *Shearer* made this clear, though the majority misreads our discussion in that case of when the public trial right attaches as somehow supporting its adoption of a triviality exception. *See id.* at 26; *cf. Shearer*, 181 Wn.2d at 573 ("'[N]ot every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public.'" (quoting *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012) (plurality opinion) (adopting "experience and logic" test))).

Justice Yu's concurrence proffers reasons, but they are not new; as the concurrence acknowledges, prior dissents have argued, unsuccessfully, that our public trial jurisprudence is incorrect and harmful. *See* concurrence at 6 (citing *State v. Njonge*, 181 Wn.2d 546, 563, 334 P.3d 1068 (2014) (González, J., concurring); *State v. Smith*, 181 Wn.2d 508, 533-38, 334 P.3d 1049 (2014) (Wiggins, J., concurring); *Sublett*, 176 Wn.2d at 114-28 (Madsen, C.J., concurring); *Paumier*, 176 Wn.2d at 43-57 (Wiggins, J., dissenting)). The concurrence repeats the refrain that our precedent is incorrect because it wrongly equates the de minimis standard with proof of prejudice or harm. *See id.* at 3. Adherents to the standard insist that evaluating whether a court closure is too trivial to undermine the "values" of the

-6-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

public trial right is not, in fact, a harmless error inquiry. *See id.* at 3-5; *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir.), *cert. denied*, 519 U.S. 878 (1996). The apparent distinction is that a prejudice analysis considers the defendant's ultimate guilt or innocence, while a triviality analysis considers only whether the defendant was deprived of the protections conferred by the public trial right. Concurrence at 3-5. This distinction is semantic at best. While it is true that the triviality doctrine does not invoke that aspect of harmless error review that considers trial error harmless in the face of overwhelming untainted evidence of guilt, that is not the sum total of harmlessness review. Fully understood, such review necessarily asks whether the defendant suffered a cognizable harm from deprivation of the constitutional right at issue. As one commentator has aptly observed, requiring defendants to demonstrate that a closure tangibly subverted the core values of the public trial right amounts to a harmless error review that is inconsistent with controlling Sixth Amendment precedent:

> The triviality doctrine also approaches harmless error analysis, requiring more of defendants than *Waller* and *Presley* allow. . . . Although these courts [that embrace the de minimis standard] have been careful to distinguish this standard from harmless error analysis, the test still demands much more of defendants than the Supreme Court has deemed reasonable when dealing with the intangible benefits of structural error rights. A defendant in a triviality jurisdiction does not have to show a reasonable possibility that the outcome of the trial would have been different (i.e., prejudice), but he does have to show some kind of specific injury manifested

-7-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

> through the undermining of one of four chosen Sixth Amendment values. If he cannot, then the closure was trivial—in other words, harmless. While these courts do not require a showing of prejudice, they do require that defendants show that the closure was *not harmless*.

Kristin Saetveit, *Close Calls: Defining Courtroom Closures Under the Sixth Amendment*, 68 STAN. L. REV. 897, 924-25 (2016) (footnote omitted). We have been correct—until today—to consistently reject the de minimis doctrine on this basis.

Justice Yu's concurrence also argues that our public trial precedent is harmful principally because it requires us to reverse Schierman's conviction and order a new trial. *See* concurrence at 6-7. That the seemingly unworthy, as well as the worthy, may reap the benefit of the law is no reason to find it harmful. Moreover, Justice Yu adheres to precedent classifying public trial violations as structural error, even when an unlawful closure might not render a trial fundamentally unfair. *See id.* at 4 (quoting *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1910, 198 L. Ed. 2d 420 (2017)). Given the clear message—not called into question by today's majority—that trial courts must engage in the analysis under *Waller* and *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995) before considering any closure, I am baffled that the concurrence considers our "rigid" adherence to this analysis *harmful*. Concurrence at 5. It seems to me that the real harm will come from sending mixed messages, as today's majority does. Trial judges will understandably be

-8-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

confused by the message to maintain open courtrooms unless a closure is justified under the proper analysis, yet to go ahead and close a proceeding when it appears "nothing of significance" will happen. *Gibbons v. Savage*, 555 F.3d 112, 121 (2d Cir. 2009) (holding closed portion of voir dire violated Sixth Amendment but refusing to reverse based on triviality doctrine because "nothing of significance happened during the part of the session that took place in the courtroom")[4]. The surest way to incentivize trial courts to sedulously protect public trial rights is to make it count when they fall short. *See* Saetveit, *supra*, at 931 ("Appellate courts are bending over backwards to avoid reversal, when, in actuality, retrials would encourage more consistent application of *Waller*'s test at the trial level. That, in turn, would reduce the frequency of these appeals and reversals, as trial judges would more often avoid violating the right in the first place. A fuller conception of *Waller*'s

---

[4] The Second Circuit was the first to embrace the triviality or de minimis exception. *See Peterson*, 85 F.3d 39. In *Gibbons*, the court concluded that nothing of significance happened during an afternoon of voir dire in which the public, including the defendant's mother, were excluded from the courtroom, in part because individual jurors were being questioned privately in a room adjacent to the courtroom during that time. *Id.* at 114, 121. Of course, under subsequent case law, the private questioning of jurors outside the open courtroom, in the absence of a demonstrated need under the *Waller* or *Bone-Club* analysis, is itself an unlawful closure. *See In re Pers. Restraint of Orange*, 152 Wn.2d 795, 100 P.3d 291 (2004). It is therefore ironic that the court in *Gibbons* relied on this separate closure (which it ex ante deemed justified) as the reason nothing significant took place in the closed courtroom.

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

test would thus lead to a more unified doctrine, stronger protection of the right and more up-front consideration of countervailing concerns in particular cases." (footnote omitted)).

In sum, our public trial jurisprudence is neither incorrect nor harmful, and there is no call to revisit our precedent in this case. That a bare majority of this court now prefers the triviality standard we have, time and again, rejected, is not a sufficient basis to adopt that standard today. Not only is a course change unwarranted, but as explained below, it is also unwise.

II. The Triviality or De Minimis Doctrine Offers No Clear Guidance for Courts, Stands in Tension with Controlling United States Supreme Court Precedent, and Produces Unjust and Inconsistent Results

Neither the lead opinion nor Justice Yu's concurrence tells us much about how the triviality or de minimis doctrine works in practice. Examination of some cases invoking the exception sheds light on its reach. The doctrine purports to isolate the tangible values of the public trial right, and then asks the defendant to make a fact-based showing that they were harmed.[5] For example, since one of the values is to

---

[5] Based on *Peterson*, most courts number the values of a public trial at four, citing the passage in *Waller* extolling the importance of open courts. *See, e.g., Peterson*, 85 F.3d at 43 (citing *Waller*, 467 U.S. at 46-47 and listing as nonexhaustive the values of (1) ensuring a fair trial, (2) reminding the prosecutor and judge of their responsibilities to the accused and the importance of their role, (3) encouraging witnesses to come forward, and (4) discouraging perjury). This reflects a reductionist reading of *Waller*, which does not

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

encourage honest testimony, a triviality analysis asks whether any testimony took place during closed proceedings. *See, e.g., Gibbons*, 555 F.3d at 121 (holding values of encouraging witnesses to come forward and discouraging perjury were not implicated by closed voir dire because no witnesses testified). It also looks at the length of the closure, when it occurred (for example, during voir dire or midtrial), and whether it was inadvertent. *See, e.g., Peterson*, 85 F.3d at 41 (finding error trivial when bailiff inadvertently kept courtroom locked during 15-20 minutes of witness's testimony); *State v. Brown*, 815 N.W.2d 609 (Minn. 2012) (finding error trivial when judge locked courtroom during reading of jury instructions in order to keep the jury attentive).

Not surprisingly, courts have gone in various directions applying the doctrine. The same closure has been found trivial by one court, but reversible in the absence of a *Waller* analysis by another. *Compare Peterson*, 85 F.3d at 43 (applying triviality standard to courtroom closure during witness testimony), *with Tinsley v. United*

---

purport to reduce the value of openness to a meager list, but more broadly explains that "'judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings.'" 467 U.S. at 46 n.4 (quoting *Estes v. Texas*, 381 U.S. 532, 588, 855 S. Ct. 1628, 14 L. Ed. 2d 543 (1965) (Harlan, J., concurring)). Indeed, *Waller* suggests no list is possible, as "the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, [yet] the Framers plainly thought them nonetheless real." *Id.* at 49 n.9.

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

*States*, 868 A.2d 867, 871, 875 (D.C. 2005) (requiring full *Waller* test to examine closure of courtroom during witness testimony). The Ninth Circuit has deemed a closure trivial based on the conclusion that "questioning the jurors to determine whether they felt safe is an administrative jury problem" with "no bearing on Ivester's ultimate guilt or innocence," confirming the blurry line between this doctrine and harmless error review. *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003). Another court has invoked the doctrine without specific reliance on any of the identified values of a public trial, based simply on the conclusion that the closed proceeding was, overall, fair. *See People v. Vaughn*, 491 Mich. 642, 668-69, 821 N.W.2d 288 (2012) (referencing *Gibbons* to conclude that "[b]ecause the closure of the courtroom was limited to a vigorous voir dire process that ultimately yielded a jury that satisfied both parties, we cannot conclude that the closure 'seriously affected the fairness, integrity, or public reputation of judicial proceedings'" (quoting *People v. Carines*, 460 Mich. 750, 774, 597 N.W.2d 130 (1999))).

Over time, the triviality or de minimis exception has moved far beyond its initial application to cases of partial closures, such as the exclusion of a particular individual, or inadvertence in failing to unlock the courtroom door. *See United*

-12-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

*States v. Gupta*, 650 F.3d 863, 874 (2d Cir. 2011) (*Gupta* I) (Parker, J., dissenting) (identifying 18 cases applying triviality exception to partial or inadvertent closures)), *opinion vacated and superseded*, 699 F.3d 682 (2d Cir. 2011) (*Gupta* II). Courts have even disagreed on whether key factors such as inadvertence are actually important to deem a closure trivial, or instead "constitutionally irrelevant" to the analysis. *Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004); *cf. United States v. Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994) (holding "[t]he denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom").

The *Gupta* I case perfectly illustrates the unpredictability of a triviality analysis. In its 2011 opinion, the Second Circuit panel applied its precedent from *Peterson* and *Gibbons* to conclude that closure of the entire voir dire was a trivial error because Gupta had not shown how any of the relevant Sixth Amendment values were implicated. *Gupta* I, 650 F.3d at 868-69 & n.3 (quoting *Gibbons* that "'nothing of significance happened'" during the closure, as "neither Gupta nor the dissent has identified any specific events which occurred during *voir dire* here that are distinguishable from *Gibbons*, and which might, as a consequence, suggest that the proceedings were unfair or that the prosecutor and judge were unaware of their

-13-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

responsibility to the accused and the importance of their functions—i.e., that the proceedings subverted the two relevant values underlying the public trial guarantee"). Following a petition for certiorari to the United States Supreme Court and rehearing En Banc in the Second Circuit, the panel vacated its opinion and reversed course. *See Gupta* II, 699 F.3d at 682 n.*. In *Gupta* II, the panel found the conclusion directly opposite its prior holding to be obvious: "Whatever the outer boundaries of our 'triviality standard' may be (and we see no reason to define these boundaries in the present context), a trial court's intentional, unjustified closure of a courtroom during the entirety of *voir dire* cannot be deemed 'trivial.'" *Id.* at 689.

Beyond being rudderless, the triviality standard demands of a defendant proof that will generally be unavailable. As noted, it places upon the defense the burden of showing that an unlawful closure in fact undermined some or all of the core values of the public trial right. *See Peterson*, 85 F.3d at 42; concurrence at 8. This requires *evidence*, which may not be available when a closure is unaccompanied by a transcript or other record. In rejecting application of a harmless error standard to public trial error, the United States Supreme Court in *Waller* recognized that "'it would be difficult to envisage a case in which [the defendant] would have evidence available of specific injury.'" 467 U.S. at 49 n.9 (quoting *United States ex rel.*

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

*Bennett v. Rundle*, 419 F.2d 599, 608 (3d Cir. 1969)). Critics have thus recognized that the triviality test encounters the same difficulty as harmless error review and is in tension with *Waller*. *See* Zach Cronen, Note, *Criminal Law: Behind Closed Doors: Expanding the Triviality Doctrine to Intentional Closures*—State v. Brown, 40 WM. MITCHELL L. REV. 252, 279 (2013) ("By looking for a tangible piece of evidence to weigh for or against a trivial closure, courts are inching closer to a harmless error analysis."); Recent Case, *Criminal Law—Sixth Amendment—Second Circuit Affirms Conviction Despite Closure to the Public of a Voir Dire*—United States v. Gupta, *650 F.3d 863 (2d Cir. 2011)*, 125 HARV. L. REV. 1072, 1075 (2012) ("*Gupta* [I] renders the triviality doctrine akin to the harmless error doctrine and thus comes into tension with *Waller*.").

The purpose of this dissent is not to catalogue the boundless possibilities the triviality doctrine offers for appellate courts to avoid reversing convictions marred by public trial error. Even this small sampling of case law confirms that the doctrine offers little guidance, as no single consideration is dispositive or any public trial value sufficient in and of itself. *See Peterson*, 85 F.3d at 44 (refusing to say how the triviality exception may play out beyond the facts of the case); *Gupta* II, 699 F.3d at 689 (refusing to define doctrine's boundaries); concurrence at 7-8 (recognizing the

-15-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

de minimis test "uses a case-by-case, backward-looking approach"). In sum, the triviality doctrine operates as an ad hoc, post hoc, sniff test. Its sole purpose is to allow appellate courts to excuse public trial violations when the trial, on the whole, seems fair enough.

Albeit subtly, the majority in this case recognizes that the United States Supreme Court has never embraced the triviality doctrine as consistent with its public trial jurisprudence under the Sixth Amendment. *See* concurrence at 5 n.2 (stating the inverse proposition: "The Supreme Court of the United States has never rejected the possibility of a de minimis closure"). The recent decision in *Weaver*, which recognized the petitioner must show prejudice to establish an ineffective assistance of counsel claim in a collateral attack on a conviction, does not foreshadow the Supreme Court's eventual adoption of a triviality test. While the court there rejected the argument that an unjustified closure necessarily renders a trial "fundamentally unfair," this was in the context of rejecting an automatic prejudice rule for purposes of an ineffective assistance of counsel claim. *See Weaver*, 137 S. Ct. at 1911. The court in *Weaver* adhered to its precedents in *Waller* and *Presley*, reaffirming that although courtroom closures may be justified in some circumstances, it is "'still incumbent upon' the trial court 'to consider all reasonable

-16-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

alternatives to closure [under the *Waller* test].'" *Id*. at 1909 (quoting *Presley*, 588 U.S. at 215-16). As noted, critics have recognized the obvious tension between adherence to the *Waller* test and application of a triviality analysis, in that the former requires a preclosure examination of justified reasons to close a proceeding, while the latter eschews this requirement to excuse a closure after the fact.

Furthermore, application of a triviality test is inconsistent with United States Supreme Court precedent that refuses to reduce specific Sixth Amendment protections to a generalized "fairness" inquiry; the Court has warned that this approach

> in effect reads the Sixth Amendment as a more detailed version of the Due Process Clause—and then proceeds to give no effect to the details. It is true enough that the purpose of the rights set forth in that Amendment is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair. What the Government urges upon us here is what was urged upon us (successfully, at one time, *see Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597[] (1980)) with regard to the Sixth Amendment's right of confrontation—a line of reasoning that "abstracts from the right to its purposes, and then eliminates the right." *Maryland v. Craig*, 497 U.S. 836, 862[, 110 S. Ct. 3157, 111 L. Ed. 2d 666] (1990) (Scalia, J., dissenting).

*United States v. Gonzalez-Lopez*, 548 U.S. 140, 145, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006).

Today's majority justifies its decision to adopt the triviality exception in the interest of doing justice (i.e., not reversing otherwise valid convictions) and avoiding

-17-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

the rigid structural error rule. What it fails to appreciate, however, is that the structural error analysis compelled under the Sixth Amendment by *Waller*, and under article I, section 22 of our state constitution by *Bone-Club*, is not a rigid rule. As explained below, these cases fully allow courts to meaningfully assess when it is possible to close proceedings consistent with the constitutional guaranty of a public trial. But, unlike the triviality doctrine, they provide a principled analysis that safeguards the public trial right.

III. The Well-Established Standards for Evaluating Closures under *Waller* and *Bone-Club* Provide the Flexibility Courts Need without Diminishing the Public Trial Right

The majority's motivation for embracing the triviality standard appears to be a desire to avoid a rigid, inflexible rule of automatic reversal in the face of inconsequential closures. There is no such rule. Behind the seemingly draconian label of "structural error" is the real public trial doctrine that has developed since *Waller*. This doctrine is flexible and takes into account the competing values that face a trial court in deciding whether to close a particular proceeding.

*Waller* and *Bone-Club* recognize that the defendant's right to a public trial is not absolute but may give way to other values, including the right to a fair trial or

-18-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

the interest in inhibiting disclosure of sensitive information. *See Waller* 467 U.S. at 45. This court in *Bone-Club* set forth the necessary analysis:

> "1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.
> "2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
> "3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
> "4. The court must weigh the competing interests of the proponent of closure and the public.
> "5. The order must be no broader in its application or duration than necessary to serve its purpose."

128 Wn.2d at 258-59 (alteration in original) (quoting *Allied Daily Newspapers of Wash. v. Eikenberry,* 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)); *see also Waller*, 467 U.S. at 48-49 (applying similar analysis).

The *Bone-Club* analysis provides a sound rule of decision for trial courts to determine when a closure is justified—an analysis that cannot be made after the fact. *See* 128 Wn.2d at 261. The majority's adoption of an ex ante triviality standard only muddies the waters by suggesting to trial courts that in addition to engaging in a *Bone-Club* analysis, they should consider whether an appellate court will deem a closure made without such analysis too trivial to warrant reversal in any event. Such a message to the trial bench is entirely unhelpful at this juncture in our public trial

-19-

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

jurisprudence. By now, every trial judge certainly knows the required analysis, so the need to have a backward-looking "escape valve" is less compelling than it may have seemed in 1996 when the second circuit first announced the triviality exception to avoid reversal in the face of a brief, inadvertent closure.

We do a disservice to our trial bench when we keep throwing out new ideas. We should apply our precedent with a steady hand rather than making every appeal of a public trial issue a post hoc attempt to rationalize an unlawful closure that, in many cases, could have been lawfully made upon full consideration of the relevant factors under *Waller* and *Bone-Club*.

## CONCLUSION

The court should adhere to settled precedent under both the Sixth Amendment and article I, section 22 of the Washington Constitution, and apply the constitutionally required remedy for the trial court's violation of Schierman's public trial right: reversal of his conviction and remand for a new trial.

Because that is not the decision of the court, however, I join in that portion of Justice Yu's concurring opinion upholding Schierman's capital sentence upon review of the required considerations under RCW 10.95.130.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

*State v. Schierman (Conner Michael)*, No. 84614-6
(Stephens, J., dissenting in part, concurring in part)

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman*, No. 84614-6
Fairhurst, C.J., dissenting

No. 84614-6

FAIRHURST, C.J. (dissenting)—I agree with the dissent on the guilt phase issue and would reverse. However, because a majority of the court would affirm the guilt phase, the court must perform its statutory death sentence review. I agree with Justice Gordon McCloud's opinion that the penalty is impermissibly disproportionate under RCW 10.95.130(2)(b).

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Schierman*, No. 84614-6
Fairhurst, C.J., dissenting

Fairhurst, C.J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

2